

2021 AUG -5 P 3:30

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

# FELONY

## SECOND SUPERSEDING INDICTMENT FOR CONSPIRACY TO COMMIT BANK FRAUD, BANK FRAUD, FALSE ENTRIES, AND NOTICE OF FORFEITURE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 20-65** |
| **v.** | * | **SECTION: "L"** |
| **ASHTON J. RYAN, JR.** | * | **VIOLATIONS: 18 U.S.C. § 1344** |
| **WILLIAM J. BURNELL** | | **18 U.S.C. § 1349** |
| **ROBERT B. CALLOWAY** | * | **18 U.S.C. § 1005** |
| **FRANK J. ADOLPH** | | **18 U.S.C. § 2** |
| **FRED V. BEEBE** | * | |

* * *

The Grand Jury charges that:

## COUNT 1
(Conspiracy to Commit Bank Fraud)

### A.     AT ALL MATERIAL TIMES HEREIN:

1.      First NBC Bank (the "Bank") was a financial institution, as defined in Title 18, United States Code, Section 20(1), and a member of the Federal Deposit Insurance Corporation ("FDIC") with deposits insured by the FDIC. The FDIC is an independent agency created by Congress to maintain the stability and public confidence in the nation's financial system by, among

other things, insuring deposits and examining and supervising financial institutions for safety and soundness and consumer protection.

2.      The Bank was established in or around 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At various times, the Bank maintained branch offices in Louisiana, Mississippi, and Florida. The Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

3.      The Bank also had a Board of Directors ("the Board").

4.      From its inception until approximately April 2017, the Bank's assets grew to approximately $5 billion. The Bank funded this rapid growth, in part, by increasing its loan portfolio.

5.      On or about April 28, 2017, the Bank was closed by the Louisiana Office of Financial Institutions, and the FDIC took control over the Bank. The Bank's failure cost the FDIC's deposit insurance fund approximately $996.9 million.

**Members of the Conspiracy**

6.      **ASHTON J. RYAN, JR. ("RYAN")** was a founder of the Bank and acted as its President, Chief Executive Officer, and Chairman of the Board from in or around May 2006 until in or around December 2016 when he stepped down as CEO and Chairman of the Board. **RYAN** was responsible for developing and executing the Bank's strategic plan, overseeing all of the Bank's affairs, and managing the Bank's day-to-day operations. Additionally, **RYAN** was responsible for keeping other Board members informed of the Bank's financial condition, the adequacy of its policies and procedures, and internal controls. From 2006 through April 2017, **RYAN** received over $9.5 million in compensation, employee benefits, membership at three

2

country clubs in the New Orleans area, and other payments, including income from forgivable loans from the Bank.

7.     From in or around 2006 through April 2017, **WILLIAM J. BURNELL ("BURNELL")** was the Bank's Chief Credit Officer. He was responsible for, among other things, the overall quality of the Bank's lending function; the Bank's credit policies and administration; the Bank's loan recovery and collection efforts; and the Bank's monitoring and managing of past-due loans, including the approval of the Bank's internal list of past-due loans. **BURNELL** was responsible for compiling month-end reports, including lists of overdrawn borrowers and past-due loans. These reports should have accurately shown the quality of the Bank's assets, which included loans. Misrepresentations on these reports would have distorted a true assessment of the Bank's overall financial well-being. **BURNELL** was also responsible for assigning risk ratings before the Bank lent to its customers. In the Bank's rating system, a "10" meant very low risk of loss to the Bank, while a "1" signified a high risk of loss to the Bank. From 2006 through April 2017, **BURNELL** received compensation from the Bank of over $3.5 million.

8.     From in or around 2006 through April 2017, **ROBERT B. CALLOWAY ("CALLOWAY")** was employed by the Bank as an Executive Vice President and served as a commercial relationship manager with tax credit specialization. From 2006 through April 2017, **CALLOWAY** received compensation of more than $2.3 million.

9.     From in or around 2009 through February 2017, **FRED V. BEEBE ("BEEBE")** was employed by the Bank as a Senior Vice President and as a commercial relationship manager. From 2009 through February 2017, **BEEBE** received compensation of more than $1.5 million.

10.     Gary Gibbs ("Gibbs") was a real estate developer and borrower at the Bank. He owned and operated the entities Coastal Phoenix Investments, CBBB, Delta Greenscape, DeltaCB, GRGCB, GRGCBHS, HP South, and numerous others. **CALLOWAY** was Gibbs's loan officer. **RYAN**, **BURNELL**, and **CALLOWAY** exercised authority over Gibbs's loans. By the time the Bank closed, Gibbs and his related entities owed approximately $123 million to the Bank.

11.     Kenneth Charity ("Charity") was a real estate investor and borrower at the Bank. Charity had a banking relationship with the Bank individually and through the entities DMK Group Three, DMK Group Five, DMK Acquisitions and Properties, DMK Enterprises, 190W1515, and 21W104. From in or around February 2007 through in or around September 2016, **RYAN** was Charity's loan officer, and **BURNELL** participated with **RYAN** in decisions affecting the Charity loans. By the time the Bank closed, Charity and his related entities owed the Bank approximately $18 million.

12.     Gregory St. Angelo ("St. Angelo") was an attorney, and from in or around September 2006 through in or around September 2016, he was the Bank's General Counsel. From in or around 2006 through April 2017, St. Angelo also had a banking relationship with the Bank individually and through various entities, including St. Angelo Investment Company, Premier Information Systems, Conti Development, Annadele, and 616 Girod. From in or around July 2006, through in or around September 2016, **RYAN** was the loan officer for St. Angelo and his entities, and **BURNELL** participated with **RYAN** in decisions affecting the St. Angelo loans. By the time the Bank closed, St. Angelo and his entities owed the Bank approximately $46.7 million. **RYAN** and **BURNELL** also caused the Bank to pay St. Angelo approximately $9.6 million for fake tax credit investments.

13.     **FRANK J. ADOLPH ("ADOLPH")** was a businessman and borrower at the Bank individually and through related entities, including Metro Rediscount Company, Motorcycle Acquisition and Investment Company, and Frank Adolph, LLC. **ADOLPH's** loans were secured, in part, by accounts receivable from his factoring business. By the time the Bank closed, **ADOLPH** and his related entities owed the Bank approximately $6.1 million.

14.     Arvind Vira ("Vira") was a New Orleans hotel owner. In 2008, Vira moved his accounts to the Bank at **RYAN's** urging and became a borrower at the Bank. Beginning in 2009, **RYAN** took loans from Vira, knowing that the funds were derived from Bank loan proceeds. **RYAN** and Vira concealed this loan relationship from the Board, auditors, and examiners. Vira, at **RYAN's** direction, inflated his assets on loan documents so that he could receive beneficial interest rates on Bank loans. **RYAN** then ensured that Vira received the most favorable interest rates of any customer at the Bank on his savings and checking accounts. By the time the Bank closed, Vira owed the Bank approximately $39 million, and **RYAN** owed Vira approximately $2.75 million.

15.     Warren Treme ("Treme") was a businessman and part owner of the following entities: BNW Ventures, Airline Investment Properties, Airline Investments II, Gulf Mississippi River Port, and Treme Builders. Together with **RYAN**, Treme also owned Wadsworth Estates, R Bend Estates Homes, R Bend Estates, and R Bend Estates II. Treme and certain of his entities were borrowers at the Bank. **BEEBE** was Treme's loan officer. **RYAN**, **BURNELL**, and **BEEBE** exercised authority over Treme's loans. By the time the Bank closed, Treme and his entities owed the Bank approximately $6.3 million.

16.     Jeffrey Dunlap ("Dunlap") was a contractor and the owner of Phoenix Civil Contractors ("Phoenix"). In or around March 2009, **RYAN** began using Phoenix as a contractor to develop Wadsworth Estates, a property owned by **RYAN** and Treme. At the same time, **RYAN** was the loan officer for Phoenix and Dunlap while they were borrowers at the Bank. **RYAN** reviewed and approved loans and loan increases for Phoenix and Dunlap, while Dunlap worked for **RYAN** and Treme on the Wadsworth Estates project. Phoenix's loans were secured by a percentage of Phoenix's accounts receivable. From in or around 2009 through in or around 2017, Wadsworth Estates and R Bend Estates II, both of which were owned by **RYAN** and Treme, were listed as accounts on Phoenix's accounts receivable. At the time the Bank closed, Phoenix owed the Bank approximately $22 million.

## B.     CONSPIRACY TO COMMIT BANK FRAUD:

Beginning at a time unknown, but from at least 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendants, **ASHTON J. RYAN, JR.**, **WILLIAM J. BURNELL**, **ROBERT B. CALLOWAY**, **FRED V. BEEBE**, **FRANK J. ADOLPH**, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, thereby placing First NBC Bank at risk of civil liability or financial loss, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344(1).

**C.**     **THE SCHEME AND ARTIFICE TO DEFRAUD:**

1.     It was part of the scheme and artifice to defraud that the defendants, **ASHTON J. RYAN, JR.**, **WILLIAM J. BURNELL**, **ROBERT B. CALLOWAY**, **FRED V. BEEBE**, **FRANK J. ADOLPH**, and others unjustly enriched themselves by disguising the true financial status of certain borrowers and their troubled loans in order to conceal the true financial condition of the Bank from the Board, auditors, and examiners.

2.     It was further part of the scheme and artifice to defraud that **RYAN, BURNELL, CALLOWAY, BEEBE** and others masked the true financial condition of troubled loans in many ways, including (1) overdrawing demand deposit accounts to make loan payments; (2) using Bank loan proceeds from nominee and related entities, at times without authorization from the borrower, to make loan payments; and (3) increasing, extending, or renewing existing loans, and issuing new loans, to hide borrowers' inability to make loan payments. These actions benefitted the defendants by, among other things, preventing the borrowers from being forced into default and the Bank from declaring a loss. Gibbs, St. Angelo, Charity, **ADOLPH**, Treme, Dunlap, and other borrowers made few, if any, payments on their Bank loans with funds other than loan proceeds. As a result, the debt of these borrowers grew.

**Gary Gibbs Banking Relationship**

3.     From in or around 2008 through in or around April 2017, Gibbs was a real estate developer and borrower at the Bank, both individually and through his numerous entities. **CALLOWAY** was Gibbs's loan officer. **RYAN** served as the approving officer on Gibbs's loans, and **BURNELL** approved the credit risk rating. **RYAN, BURNELL,** and **CALLOWAY** frequently discussed Gibbs's loans with each other and with other Bank employees. **RYAN** and **CALLOWAY** also discussed the loans with Gibbs and Gibbs's employees.

7

4.     From early in Gibbs's borrowing relationship, **RYAN**, **BURNELL**, and **CALLOWAY** knew that Gibbs's spending was out of control and that Gibbs's entities did not generate sufficient income to make Gibbs's loan payments. Despite this knowledge, **RYAN**, **BURNELL**, and **CALLOWAY** funneled loan proceeds to Gibbs by approving and facilitating loans. **CALLOWAY** and others often used loan proceeds to pay Gibbs's overdrafts and existing debt service, which artificially kept Gibbs off of month-end reports. The month-end reports documented borrowers with overdrafts or past-due loans. Other loan proceeds went to Gibbs's personal expenses, including private planes Gibbs used for personal travel, two sport fishing boats, vehicles for Gibbs and his family, as well as several personal residences. As **RYAN**, **BURNELL**, and **CALLOWAY** knew, Gibbs could not afford to make his loan payments or finance his lifestyle without loan proceeds. In an effort to avoid or minimize Gibbs's appearances on the overdraft and past-due reports, **RYAN**, **BURNELL**, and **CALLOWAY** made misrepresentations and material omissions regarding Gibbs's creditworthiness and financial status. These misrepresentations and omissions also allowed **RYAN**, **BURNELL**, and **CALLOWAY** to avoid writing off Gibbs's loans and to evade inquiries by the Board, auditors, and examiners.

5.     For example, in dozens of loan documents over several years, **RYAN**, **BURNELL**, and **CALLOWAY** falsely represented that Gibbs satisfactorily handled his loan payments and that Gibbs would repay his loans with money he generated from his businesses. As Gibbs's debt at the Bank grew to over $100 million with no signs of slowing down, **RYAN**, **BURNELL**, and **CALLOWAY** continued to misrepresent the manner in which the proceeds from Gibbs's loans would be spent and the manner in which the loans would be repaid. Often, **RYAN**, **BURNELL**, and **CALLOWAY** falsely represented that Gibbs's loans were for "working capital" or to finance

Gibbs's business expenses, when in truth and in fact, **RYAN**, **BURNELL**, and **CALLOWAY** used the loan proceeds to make payments on his previous loans.

6.      **RYAN**, **BURNELL**, and **CALLOWAY** knew, but chose not to disclose in either loan documents or to the Board, auditors, or examiners, that Gibbs's businesses failed to generate sufficient revenues to cover his debts at the Bank and that Gibbs had substantial expenses that he could not have paid without loan proceeds. Despite this knowledge, **RYAN**, **BURNELL**, and **CALLOWAY** signed loan documents that assigned a false and inaccurate credit risk rating of 5 to Gibbs and his entities, when in truth and in fact, they should have been rated 3 or lower.

7.      **RYAN** directed Gibbs to submit false financial statements to the Bank to support Gibbs's loans. In the financial statements, Gibbs fraudulently inflated his assets and deflated his liabilities to appear more creditworthy. **RYAN**, **BURNELL**, and **CALLOWAY** knew that Gibbs's financial statements did not accurately describe Gibbs's financial status and creditworthiness. Nevertheless, **RYAN**, **BURNELL**, and **CALLOWAY** allowed Gibbs to provide false financial statements to support his loans.

8.      By the end of 2016, **RYAN**, **BURNELL**, and **CALLOWAY's** practice of funneling money to Gibbs led to Gibbs's borrowing relationship becoming one of the largest in the Bank's loan portfolio. Despite the numerous risks associated with Gibbs's loans and the substantial threat Gibbs's borrowing relationship posed to the Bank, **RYAN**, **BURNELL**, and **CALLOWAY** continued to approve and facilitate Gibbs's loans, and they concealed the truth regarding Gibbs's inability to pay his loans from the Board, auditors, and examiners.

### Kenneth Charity Banking Relationship

9.      Kenneth Charity was the owner of residential properties in the New Orleans area. In or around 2007, he became a borrower at the Bank. **RYAN** was Charity's loan officer.

10.     **RYAN** kept Charity and his related entities off the overdraft and past-due loan lists by directing employees to keep a "cheat sheet." This cheat sheet helped **RYAN** determine the amount of loan proceeds Charity needed to cover loan payments and overdrafts by month-end so **RYAN** could keep Charity off the month-end reports. **RYAN, BURNELL**, and others masked the poor quality of Charity's loans, which delayed the Bank from downgrading them.

11.     **RYAN** and **BURNELL** knew that Charity had insufficient cash flow to pay his loans at the Bank. **RYAN** and **BURNELL** were aware that Charity did not spend, and demonstrated no intention of spending, the loan proceeds for the approved purpose. **RYAN** knew the Charity overdrafts included significant use of loan proceeds on personal expenses because **RYAN** monitored the status of Charity's accounts on a monthly basis by taking Charity-related "homework" to his house at night to review.

*Lake Terrace Shopping Center*

12.     In or around April 2007, Charity purchased the Lake Terrace Shopping Center in New Orleans using loan proceeds from the Bank.

13.     During the time that Charity owned the shopping center, **RYAN** represented in loan documents and elsewhere that Charity needed additional loan proceeds to develop the property. **RYAN** also represented in loan documents and elsewhere that development of the shopping center was about to begin or that it would soon be completed.

14.      In truth and in fact, the shopping center was never developed, and the City of New Orleans cited it for blight in 2012. Nonetheless, as late as February 2015, **RYAN** falsely represented to auditors that the shopping center was under construction or close to being finished.

15.      **RYAN** also falsely represented to the Board, auditors, and examiners that Charity was entitled to government grant money and low-interest, forgivable loans of approximately $4 million. **RYAN** knew as early as November 2013 that Charity's applications for these funds were denied.

*False Statements about Nominee D*

16.      Nominee D was a friend of Charity's and his business partner on certain real estate projects. Nominee D was also a guarantor on many of Charity's loans.

17.      Nominee D did not have a deposit account at the Bank and did not have signature authority on any accounts associated with Charity.

18.      **RYAN** and **BURNELL** instructed Bank employees to process loans where Nominee D was a guarantor without receiving signatures from Nominee D. Neither **RYAN** nor **BURNELL** disclosed these practices to the Board, auditors, or examiners.

19.      **RYAN** falsely represented in Bank documents, to the Board, and to others that Nominee D had sufficient cash flow to cover Charity's debt. **RYAN** also falsely represented in Bank documents, to the Board, and to others that Nominee D was a willing guarantor and making payments on Charity's debt. In reality, Nominee D did not make payments on Charity's debt. Further, by January 2013, **RYAN** believed that Nominee D had serious reservations about guaranteeing Charity's debt.

*620 Decatur Street*

20.    **RYAN** and **BURNELL** misrepresented and omitted material information in Bank documents and to the Board, auditors, and examiners about a commercial real estate space at 620 Decatur Street in the French Quarter. Charity purchased the space with Bank loan proceeds in July 2008.

21.    On or about January 24, 2011, **RYAN** arranged for another Bank borrower, Borrower J, to rent space from Charity at 620 Decatur Street for approximately $20,000 per month. This arrangement ensured that Charity had a stable source of income. Borrower J operated a beignet shop in the rented space at 620 Decatur Street. **BEEBE** was Borrower J's loan officer.

22.    In or around October 2013, Borrower J made his last loan payment to the Bank and stopped paying rent to Charity. **RYAN** and **BURNELL** then arranged for the Bank to take over the beignet shop from Borrower J and make monthly payments to Charity. On or about February 28, 2014, **BURNELL** caused an account to be opened at the Bank, controlled by **RYAN** and **BURNELL**, to operate the beignet shop. Beginning in or around April 2014 and continuing through in or around March 2017, the Bank, as operator of the beignet shop, paid $20,000 in rent every month to Charity. **RYAN** and **BURNELL** used the monthly payments to make Charity appear more creditworthy and regularly cited the payments as a revenue-generating aspect of Charity's business.

23.    **RYAN** and **BURNELL** made misrepresentations about the beignet shop's profitability and value. Further, when the Bank's beignet shop account was overdrawn at the end of 2014, **RYAN** and **BURNELL** arranged for approximately $171,000 to be drawn from Borrower J's dormant line of credit to clear the overdraft. **RYAN** and **BURNELL** refused to write off Borrower J's loans, even after Borrower J was sentenced to prison and ordered to pay his victims

12

approximately $993,000 in restitution. When the Bank failed, the Bank's beignet shop account was overdrawn by more than $200,000.

24.    From on or about August 27, 2014 through on or about December 8, 2016, **RYAN** and **BURNELL** fraudulently issued four loans to Charity for the stated purpose of enclosing the patio area at the beignet shop. In four instances—in or around August 2014, December 2015, March 2016, and August 2016—**RYAN** and **BURNELL** caused Bank funds to be disbursed for the full costs of the same patio enclosure. The four loans totaled approximately $1.5 million. In several loan documents, **RYAN** stated that the enclosure would generate additional revenue for the beignet business and increase the value of the real estate. In truth and in fact, and as **RYAN** and **BURNELL** well knew, the loan proceeds never went to the patio enclosure. Rather, as **RYAN** and **BURNELL** well knew, the money went to make loan payments, pay overdrafts, and pay Charity's personal expenses, including credit card bills, student loans, and jewelry.

### Gregory St. Angelo Banking Relationship

25.    From 2006 through September 2016, St. Angelo was General Counsel of the Bank. He and his entities were borrowers at the Bank from 2006 through April 2017.

26.    **RYAN** and **BURNELL** made misrepresentations and omitted material information from the Board, auditors, and examiners about St. Angelo's financial status and creditworthiness.

27.    For example, to avoid detection by the Board, auditors, and examiners, **RYAN** and **BURNELL** directed Bank employees to track monthly payments due on St. Angelo's loans and overdrafts in his accounts. After reviewing these reports, **RYAN** and **BURNELL** issued fraudulent loans to St. Angelo and his entities in order to clear his accounts, which were often overdrawn by hundreds of thousands of dollars, and make payments on other loans. This practice was designed to prevent his exposure to the Board, auditors, and examiners as a loan default risk.

13

28.     From at least 2009 through 2015, **RYAN** and **BURNELL** caused the Bank to make false and fraudulent investments in fake tax credits for St. Angelo's projects at 622 Conti Street and 616 Girod Street in New Orleans and Annadele's restaurant in Covington. **RYAN** and **BURNELL** used the fraudulent tax credit investment money to pay St. Angelo's loans and cover his overdrafts with the Bank.

29.     **RYAN** and **BURNELL** used St. Angelo's loan proceeds to pay other borrowers' debt or, alternatively, used other borrower's loans to pay St. Angelo's debt. For example, from in or around June 2009 through December 2013, **RYAN** and **BURNELL** caused Nominee A's loans to be disbursed into St. Angelo's accounts to cover overdrafts and make loan payments on St. Angelo's loans. **RYAN** and **BURNELL** did not disclose in the loan documents for Nominee A's loans that they were used for the benefit of St. Angelo. **RYAN** and **BURNELL** did not disclose in Bank documents that St. Angelo was paying other borrower's debts.

### Frank J. Adolph Banking Relationship

30.     From in or around August 2008 through April 2017, **FRANK J. ADOLPH** was a borrower at the Bank. While **RYAN** was not **ADOLPH's** loan officer, **RYAN** signed **ADOLPH's** loan documents as an approving officer, and **BURNELL** approved the credit risk rating.

31.     **ADOLPH** operated Metro Rediscount, a business that bought other companies' accounts receivable. **ADOLPH** submitted a certificate to the Bank listing Metro Rediscount's accounts receivable, and that certificate was included in loan documents to support **ADOLPH's** loans.

32.     **ADOLPH** made misrepresentations and material omissions in documents he submitted to the Bank to obtain loans. For example, in a May 2015 loan package, **ADOLPH** submitted a January 2015 statement from a different bank for an account that was non-existent at

14

the time. The forged bank statement gave the false impression that his company, Metro Rediscount, was receiving payments from companies that were not actually in business with **ADOLPH**.

33.     Additionally, **ADOLPH** fabricated Metro Rediscount's accounts receivable to allow him to borrow more money. For example, in a July 2014 loan document, **ADOLPH** submitted a certificate that falsely listed two companies as owing Metro Rediscount tens of thousands of dollars. **ADOLPH** listed one company that had never done business with Metro Rediscount and another company that had not done business with Metro Rediscount since 2012. In a May 2015 loan package, **ADOLPH** submitted a certificate dated January 31, 2015, that falsely listed the same two companies as owing Metro Rediscount money.

34.     In or around August 2013, **ADOLPH's** loan officer hired an outside auditor to audit **ADOLPH's** accounts receivable. The auditor interviewed **ADOLPH** and asked about the fraudulent accounts receivable on the certificate that **ADOLPH** provided the Bank. Despite being put on notice by the auditor that **ADOLPH's** self-described accounts receivable did not exist, **ADOLPH** continued to use the same false information in subsequent certificates he submitted to the Bank.

35.     Between in or around October 2013 and February 2014, **ADOLPH's** loan officer repeatedly alerted **RYAN** and **BURNELL** about **ADOLPH's** fraudulent accounts receivable and warned them that **ADOLPH** was living beyond his means and could not pay his debt to the Bank. Despite their knowledge of **ADOLPH's** fraudulent representations to the Bank, **RYAN** and **BURNELL** chose to approve additional loans for **ADOLPH**, and failed to alert the Board, auditors, or examiners about **ADOLPH's** fraudulent accounts receivable.

36.     Between in or around December 2013 and September 2015, **RYAN** and **BURNELL** recommended, authorized, and approved approximately $5.8 million in new loans,

renewals with increases, and consolidated loans to **ADOLPH**, despite being aware of **ADOLPH's** fraud. Although the stated purpose of many of the loans was to finance the working capital needs of Metro Rediscount or to finance Metro Rediscount's accounts receivable, **RYAN** and **BURNELL** knew the loan documents were fraudulent.

37.     **RYAN** and **BURNELL** included **ADOLPH's** false accounts receivable in loan documents despite their knowledge that the accounts receivable were fraudulent and that they gave the false impression that **ADOLPH** could pay his loans.

### Arvind Vira Banking Relationship

38.     Arvind Vira was a hotel owner in the New Orleans area. From in or around June 2008 until 2017, Vira was a borrower at the Bank.

39.     In or around 2010, **RYAN** began borrowing money from Vira. FDIC regulations required **RYAN** to disclose his relationship with Vira to Bank employees because it could improperly result in favorable treatment for a customer. However, **RYAN** instructed Vira not to disclose to Bank employees that he was loaning **RYAN** money.

40.     **RYAN** further instructed Vira to inflate his assets on loan documents. Vira complied with **RYAN's** instructions by falsely claiming that he had $15 million on deposit at other banks and by misrepresenting the amount of real estate that he owned.

41.     Vira agreed to lend **RYAN** funds derived from Vira's lines of credit at the Bank. **RYAN** agreed to pay Vira between 6 percent and 8 percent interest on his loans from Vira. The interest rate that Vira received from **RYAN** was substantially higher than the interest rate Vira had to pay to the Bank for his lines of credit. At **RYAN's** instruction, Vira did not disclose his loan relationship with **RYAN** or the interest income that Vira received from **RYAN** to the Bank.

16

42.     In return for Vira loaning money to **RYAN**, **RYAN** ensured that Vira received beneficial treatment from the Bank. The beneficial treatment included low interest rates on his loans with the Bank and high interest rates on Vira and his family's personal and business savings and checking accounts. The interest rates on these savings and checking accounts were among the highest interest rates given to any Bank customer.

43.     **RYAN** took steps to conceal this relationship from the Board, auditors, and examiners. During an FDIC regulatory exam in December 2012, FDIC examiners discovered that **RYAN** had borrowed money from the Bank using Vira's loan proceeds. When examiners questioned **RYAN**, he admitted to his relationship with Vira, but he falsely claimed that he had not been aware that the source of the funds Vira loaned him were Bank loan proceeds. The examiners warned **RYAN** that it was a conflict of interest, a violation of banking regulations, and a violation of company policy for him to borrow funds from a Bank customer such as Vira without disclosing the lending relationship to the Board. Despite this warning from the examiners, **RYAN** instructed Vira to continue concealing their loan relationship from others at the Bank.

44.     By the time the Bank failed in April 2017, the balances on loans issued to Vira totaled over $39 million. Vira and his family members had received approximately $2.3 million in interest on savings and checking accounts from the Bank. **RYAN** had paid Vira approximately $840,000 in interest on the loans he obtained from Vira.

45.     As of January 2021, **RYAN** owed Vira approximately $2,750,000, not including accrued interest.

### Warren Treme Banking Relationship

46.     Prior to the founding of the Bank, Treme was a borrower at Bank B, where **RYAN** was President. **RYAN** and Treme were partners in several business ventures, including Wadsworth Estates. Despite this conflict of interest, **RYAN** exercised authority over Treme's loans at Bank B.

47.     From at least April 2008, Treme was a borrower at First NBC Bank. Because of **RYAN** and Treme's business relationship, **BEEBE** served as the loan officer for Treme's loans, while **BURNELL** served as the approving officer and assigned the credit risk rating. Although **RYAN** was not supposed to be involved in Treme's borrowing relationship, he continued to exercise authority over Treme's loans by, among other things, approving overdraft payments and loan disbursements.

48.     From in or around June 2014 through April 2017, **RYAN**, **BURNELL**, and **BEEBE** diverted loan proceeds to Treme and **RYAN's** co-owned businesses, knowing that Treme lacked sufficient income to pay his debts to the Bank. Further, **RYAN**, **BURNELL**, and **BEEBE** knew that Treme was using loan proceeds on personal expenses or to make loan payments, contrary to the stated purposes of the loans.

*June 2014 Loan*

49.     In or around June 2014, **BEEBE** informed **BURNELL** that Treme was "tired of being poor." **BEEBE** told **BURNELL** that Treme wanted **BEEBE** to find a way to give Treme $50,000. Days later, on or about June 19, 2014, **BEEBE** and **BURNELL** approved an approximately $910,000 loan for Treme. **BURNELL** and **BEEBE** approved this loan and **BURNELL** rated it a "6," despite their knowledge that Treme struggled financially and that his businesses had suffered net losses the prior year. Additionally, **BURNELL** and **BEEBE** falsely

stated "the loan contains normal credit risks." Further, **BURNELL** and **BEEBE** recommended the loan's approval "due to [Treme's] good history with FNBC."

50.     The stated purpose of the June 2014 loan was to provide "working capital for long term investments" and to pay one of Treme's loans. Contrary to the stated purpose of the loan, Treme used loan proceeds to make loan payments. Treme also withdrew loan proceeds as cash and purchased a cashier's check payable to himself.

*February 2016 Loan*

51.     On or about February 4, 2016, **BURNELL** and **BEEBE**, knowing that the purpose was false, signed a loan document approving a $250,000 unsecured loan to Treme "to cover business expenses." Contrary to the loan's stated purpose, approximately $74,000 in proceeds went to Wadsworth Estates, which benefited **RYAN**, and approximately $49,000 went to Treme's home renovation. Treme also withdrew approximately $81,000 in cash. **RYAN** did not disclose this expenditure to the Board, auditors, or examiners.

*BNW Ventures/Gulf Mississippi River Port*

52.     **RYAN, BURNELL**, and **BEEBE** defrauded the Bank and Businessman P, a Bank customer, of funds and property through the use of two entities owned in part or wholly by Treme: BNW Ventures ("BNW") and Gulf Mississippi River Port ("GMRP").

53.     BNW was a company owned by Treme, Businessman P, and Businessman P's son. BNW owned rental properties. BNW also had a loan with the Bank. In 2015, Businessman P accused Treme of taking money out of BNW and using it for Treme's business with **RYAN**. On or about March 28, 2015, Treme told **RYAN** that he used $70,000 of BNW's funds to benefit **RYAN** and Treme's business.

54.     On or about June 21, 2015, Businessman P threatened to sue the Bank. Despite **RYAN's** repeated representations to the Board and others that he was not involved with matters related to Treme, in or around February 2016, **RYAN** and St. Angelo negotiated a settlement and release of Treme, Businessman P, and Businessman P's son from the BNW loan. In exchange for the release, Businessman P agreed to give the Bank $400,000 and BNW's rental properties. **BURNELL** signed the settlement and release documents for the Bank.

55.     In or around February 2016, **RYAN** received a $400,000 check from Businessman P and endorsed it on behalf of the Bank. On or about April 1, 2016, **RYAN** issued a check for $300,000 to Treme and another check for the remaining $100,000 to St. Angelo. Treme spent the $300,000 on, among other things, gambling at a casino, a trip to the Caribbean, and expenses related to Wadsworth Estates.

56.     **RYAN, BURNELL,** and **BEEBE** further ensured that Treme benefitted from the release of the BNW loan to the detriment of the Bank. In March 2016, **BURNELL** and **BEEBE** approved a $2.4 million loan for Treme's company, GMRP. **BURNELL** risk rated the loan a "6" despite his knowledge of Treme's poor financial status. The stated purpose for the loan was "for future business investments." **RYAN, BURNELL,** and **BEEBE** then used the proceeds from the March 2016 loan to pay off BNW's debt, which had not been written off after **BURNELL** and Businessman P signed the settlement and release.

57.     On or about July 29, 2016, **BURNELL** and **BEEBE** signed loan documents renewing the approximately $2.4 million GMRP loan and approving an increase of $400,000. The stated purpose of the $400,000 increase was "minor improvements and working capital." **BURNELL** risk rated the loan a "6" despite his knowledge of Treme's poor financial status. A portion of the $400,000 was used for Treme's purchase of a home from the Bank employee who

assisted Treme's loan officer with the loan documents. Further, approximately $198,000 of the loan proceeds were kicked back to GMRP. Treme then spent those proceeds on, among other things, gambling at a casino.

58.     On or about September 28, 2016, **RYAN**, **BURNELL**, and **BEEBE** presented a renewal of the GMRP loan at a Board committee meeting. When a Board member asked why the Bank had released Businessman P as a guarantor, **RYAN**, **BURNELL**, and **BEEBE** falsely answered that the Bank benefited by receiving a half-million dollar pay-down. In truth, as **RYAN**, **BURNELL**, and **BEEBE** knew, **RYAN** gave the $400,000 from Businessman P to Treme and St. Angelo, not the Bank.

*November 2016 Loan*

59.     In October 2016, Treme and his entities appeared on a past-due loan report. In November 2016, to prevent Treme and his entities from being on the report again, **RYAN**, **BURNELL**, and **BEEBE** caused an unsecured $70,000 loan to be given to Treme. **BURNELL** risk rated the loan a "6" despite his knowledge of Treme's poor financial status. The stated purpose of the loan was "temporary working capital" and "permanent financing of real estate." Contrary to the loan's stated purpose, **RYAN**, **BURNELL**, and **BEEBE** used approximately $64,000 in loan proceeds to pay **TREME's** loans, including approximately $25,000 on the GMRP loan.

### Jeffrey Dunlap Banking Relationship

60.     From in or around July 2009 through April 2017, Jeffrey Dunlap was a customer at the Bank. Dunlap owned Phoenix, a construction company. Beginning in or around March 2009, **RYAN** and Treme, through their business Wadsworth Estates, contracted with Dunlap and his company Phoenix to do construction work to prepare Wadsworth Estates for commercial development. Even though **RYAN** had a business relationship with Dunlap, **RYAN** served as the

loan officer for Dunlap and Phoenix. **RYAN** failed to disclose this conflict of interest to the Board, auditors, and examiners.

61.     From 2009 through November 2016, **RYAN** and **BURNELL** fraudulently concealed **RYAN's** diversion of funds from Phoenix's Bank loans to pay for work done at Wadsworth Estates. This scheme benefitted **RYAN** and Treme, who owned Wadsworth Estates and sought to develop and sell the property for a profit. Dunlap benefited by receiving loans that he otherwise would not have received, the proceeds of which he fraudulently spent on personal expenses. **RYAN** and **BURNELL** concealed the true nature of these loans from the Board, auditors, and examiners.

62.     Phoenix used its accounts receivable from Wadsworth Estates and other clients as collateral for its borrowing. **RYAN** instructed Dunlap to falsely inflate his accounts receivable in order to increase the amount that Phoenix could borrow. Dunlap used the accounts receivable for his business as collateral for Phoenix's loans. At **RYAN's** direction, Dunlap inflated the value of these accounts receivable and did not disclose the age of the fraudulent accounts. This non-disclosure created the false and fraudulent impression that the accounts were still collectable. In truth, most of the accounts receivable were non-existent or had been paid years earlier.

63.     From in or around 2009 through April 2017, **BURNELL** knew that **RYAN** owned Wadsworth Estates and that Wadsworth Estates was listed as an accounts receivable securing the Phoenix loans. **BURNELL** knew that **RYAN** was the loan officer on the Phoenix loans and thus had an improper conflict of interest in acting as the loan officer. Nevertheless, **BURNELL** signed at least 38 loan documents without disclosing **RYAN's** conflict of interest.

64.     From in or around 2009 through late 2016, **RYAN** and **BURNELL** approved numerous new loans, increases in loans, and credit extensions for Phoenix, despite knowing that

loan proceeds were the primary source of Phoenix's payment of principal and interest. During this time, Phoenix's debt to the Bank continued to grow. Despite this, **BURNELL** kept Phoenix's risk rating a "6."

65.    From in or around April 2012 through November 2016, **RYAN** extended more than $16 million to Phoenix through methods that did not require any approval from the Board. **RYAN** chose these methods because they circumvented the Board's oversight and made it less likely that the Board, auditors, or examiners would discover that he was using Phoenix's loan proceeds to benefit Wadsworth Estates, the project he co-owned with Treme.

66.    **RYAN** fraudulently diverted at least $383,000 in Phoenix loan proceeds to pay for work done at Wadsworth Estates.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-37**
(Bank Fraud)

A.    The allegations contained in Parts A and C of Count One of this Second Superseding Indictment are hereby realleged and incorporated herein by reference.

B.    **THE OFFENSE:**

On or about the dates set forth below, in the Eastern District of Louisiana, the defendants, **ASHTON J. RYAN, JR.**, **WILLIAM J. BURNELL**, **ROBERT B. CALLOWAY**, **FRED V. BEEBE**, and **FRANK J. ADOLPH**, for the purpose of executing and attempting to execute the scheme and artifice to defraud did knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, thereby placing First NBC Bank at risk of civil liability or financial loss, by means of false and fraudulent pretenses, representations, and promises relating to a material fact, in violation of Title 18, United States Code, Section 1344(1).

23

C.     **THE EXECUTION:**

On or about the following dates listed below, the defendants, **ASHTON J. RYAN, JR.,**

**WILLIAM J. BURNELL, ROBERT B. CALLOWAY, FRED V. BEEBE,** and **FRANK J.**

**ADOLPH,** did knowingly execute and attempt to execute the scheme and artifice to defraud as

described in Count One of this Second Superseding Indictment, by the following means:

| Count | Defendant | Date | Execution |
|---|---|---|---|
| 2 | **RYAN BURNELL CALLOWAY** | 11/23/2010 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $347,000 in loan proceeds to be disbursed. Approximately $18,000 of the loan proceeds went to pay another borrower's loans and approximately $31,000 made a payment on Gibbs's house in Florida. |
| 3 | **RYAN BURNELL** | 11/30/2010 | **RYAN** and **BURNELL** caused $610,000 in fraudulent tax credit funds related to Annadele/Girod to be disbursed to St. Angelo's Premier Information Systems account when it was already overdrawn at the Bank by more than $400,000. |
| 4 | **RYAN BURNELL CALLOWAY** | 5/31/2011 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused $500,000 in loan proceeds to be disbursed. Approximately $147,000 of the total loan proceeds covered Gibbs's personal expenses, including a house payment for approximately $6,000, approximately $9,000 for Gibbs's mother's medical care, and approximately $72,000 toward his private plane. |

| 5 | **RYAN BURNELL** | 7/29/2011 | **RYAN** and **BURNELL** caused approximately $450,000 in fraudulent tax credit investment funds for 622 Conti Street to be deposited into St. Angelo's Premier Information Systems account when it was already overdrawn by approximately $167,000. |
|---|---|---|---|
| 6 | **RYAN BURNELL** | 9/30/2011 | **RYAN** and **BURNELL** caused approximately $750,000 in fraudulent tax credit investment funds for 622 Conti Street to be deposited into St. Angelo's Premier Information Systems account when it was already overdrawn by approximately $442,000. |
| 7 | **RYAN BURNELL CALLOWAY** | 10/31/2011 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions on Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused $500,000 in loan proceeds to be disbursed to Gibbs. Approximately $82,000 paid another borrower's loans and approximately $47,000 paid Gibbs's private plane expenses. |
| 8 | **RYAN** | 1/31/2012 | **RYAN** directed Dunlap to inflate Phoenix's receivables to support a Loan Advance Request for approximately $175,000 "to cover overdrafts." The overdrafts included an approximately $57,000 payment to American Express. Approximately $10,000 of the proceeds were funneled to Treme. Treme used approximately $6,000 on gambling expenses and restaurants. |
| 9 | **RYAN BURNELL CALLOWAY** | 5/18/2012 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $1 million in loan proceeds to be disbursed. Approximately $102,000 paid Gibbs's plane expenses, and approximately $113,000 went to pay Gibbs's sport fishing boat expenses. |

| 10 | **RYAN BURNELL CALLOWAY** | 8/24/2012 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $1 million in loan proceeds to be disbursed. More than $117,000 went to pay another borrower's loans. |
|----|----|----|----|
| 11 | **RYAN BURNELL** | 10/09/2012 | **RYAN** and **BURNELL** made false statements and material omissions in Nominee D's loan documents related to the purpose of the loan, the source of repayment, Charity's creditworthiness, Nominee D's creditworthiness, the risk of loss to the Bank caused by Charity's and Nominee D's loans, the relationship between Charity and Nominee D, and the relationship between **RYAN** and Charity. The approximately $1.6 million dollar loan was purportedly for an "investment" property. However, **RYAN** and **BURNELL** knew that it was for a personal home for Charity. |
| 12 | **RYAN BURNELL CALLOWAY** | 12/28/2012 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $150,000 in loan proceeds to be disbursed. More than $71,000 went to pay another borrower's loans. |

| 13 | **RYAN BURNELL CALLOWAY** | 2/15/2013 | **RYAN, BURNELL**, and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $1 million in loan proceeds to be disbursed. A portion of the funds went to pay another borrower's loans. |
| --- | --- | --- | --- |
| 14 | **RYAN** | 3/26/2013 | **RYAN** created a false document describing the Bank's ownership of tax credits and caused it to be forwarded to external auditors to justify the Bank's investments in the 622 Conti property. |
| 15 | **RYAN BURNELL CALLOWAY** | 9/13/2013 | **RYAN, BURNELL**, and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $1 million in loan proceeds to be disbursed. More than $143,000 went to pay another borrower's loans. |
| 16 | **RYAN BURNELL CALLOWAY** | 10/17/2013 | **RYAN, BURNELL**, and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $1 million in loan proceeds to be disbursed. More than $86,000 went to pay another borrower's loans. |

| 17 | **RYAN** **BURNELL** **ADOLPH** | 3/27/2014 | **RYAN**, **BURNELL**, and **ADOLPH** made false statements and material omissions in loan documents related to the purpose of the loan, the source of repayment, Adolph's creditworthiness, the risk of loss to the Bank caused by Adolph's loans, and the results of the audit of Adolph's accounts receivable. Loan proceeds went to pay other **ADOLPH** loans. |
| 18 | **RYAN** **BURNELL** **BEEBE** | 6/19/2014 | **RYAN**, **BURNELL**, and **BEEBE** made false statements and material omissions in Treme's loan documents related to the purpose of the loan, the source of repayment, Treme's creditworthiness, the risk of loss to the Bank caused by Treme's loans, and the business relationship between **RYAN** and Treme. Contrary to the stated purpose of the loan, Treme used loan proceeds to make loan payments. Treme also withdrew loan proceeds as cash and purchased a cashier's check payable to himself. |
| 19 | **RYAN** **BURNELL** | 7/31/2014 | **RYAN** and **BURNELL** caused approximately $830,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account to make payments on St. Angelo's outstanding loans and pay overdrafts. At the time, the 616 Girod account was more than $468,000 overdrawn. |
| 20 | **RYAN** **BURNELL** | 8/29/2014 | **RYAN** and **BURNELL** caused approximately $570,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account to make payments on St. Angelo's outstanding loans and pay overdrafts. At the time, the 616 Girod account was more than $278,000 overdrawn. |
| 21 | **RYAN** | 9/16/2014 | **RYAN** caused approximately $66,000 in loan proceeds for Phoenix, a company owned by Dunlap, to pay Contractor C for work done on Wadsworth Estates, **RYAN's** business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |
| 22 | **RYAN** | 9/18/2014 | **RYAN** caused approximately $80,000 in Phoenix loan proceeds to pay Contractor C for work done on Wadsworth Estates, **RYAN's** business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |
| 23 | **RYAN** **BURNELL** | 11/25/2014 | **RYAN** and **BURNELL** caused approximately $450,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. At the time, the 616 Girod account was more than $139,000 overdrawn. |

| 24 | **RYAN BURNELL** | 12/23/2014 | **RYAN** and **BURNELL** caused approximately $450,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. More than $240,000 of this total was used to pay St. Angelo's loan payments and approximately $38,000 was used to make payments at Annadele's restaurant. |
| 25 | **RYAN BURNELL** | 2/13/2015 | **RYAN** and **BURNELL** caused approximately $500,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. Most of these funds were used by St. Angelo to purchase a different property with the knowledge of **RYAN** and **BURNELL**. |
| 26 | **ADOLPH** | 5/21/2015 | **ADOLPH** submitted a false and fraudulent statement from another bank for January 2015 in order to obtain loan proceeds from First NBC Bank. |
| 27 | **RYAN BURNELL** | 5/28/2015 | **RYAN** and **BURNELL** caused approximately $315,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. More than $224,000 were used to pay St. Angelo's outstanding loan payments. |
| 28 | **RYAN** | 6/25/2015 | **RYAN** caused approximately $117,000 in Phoenix loan proceeds to pay Contractor M for work done on Wadsworth Estates, **RYAN's** business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |
| 29 | **RYAN** | 10/16/2015 | **RYAN** caused approximately $55,000 in Phoenix loan proceeds to pay Contractor T for work done on Wadsworth Estates, **RYAN's** business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |
| 30 | **RYAN BURNELL** | 12/27/2015 | **RYAN** and **BURNELL** caused approximately $350,000 of Bank funds to be disbursed to a Charity entity, purportedly to enclose the patio at 620 Decatur Street, when they knew the funds were not used to enclose the patio. They were used, in part, to pay interest on a Charity loan, tuition, and credit card payments. No proceeds were used to enclose the patio. |
| 31 | **RYAN** | 2/17/2016 | **RYAN** caused approximately $65,000 in Phoenix loan proceeds to pay Contractor T for work done on Wadsworth Estates, **RYAN's** business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |

| 32 | **RYAN BURNELL BEEBE** | 2/12/2016 | **RYAN**, **BURNELL**, and **BEEBE** made false statements and material omissions in Treme's loan documents related to the purpose of the loan, the source of repayment, Treme's creditworthiness, the risk of loss to the Bank caused by Treme's loans, and the business relationship between **RYAN** and Treme. This caused approximately $250,000 in loan proceeds to be disbursed to Treme. Approximately $74,000 in proceeds went to Wadsworth Estates and approximately $49,000 went to Treme's home renovation. Treme also withdrew approximately $81,000 in cash. |
|---|---|---|---|
| 33 | **RYAN BURNELL CALLOWAY** | 3/21/2016 | **RYAN**, **BURNELL**, and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $3 million in loan proceeds to be disbursed to Gibbs. Approximately $35,000 went to pay another borrower's loans. |
| 34 | **RYAN BURNELL** | 3/29/2016 | **RYAN** and **BURNELL** caused approximately $350,000 in Bank funds to be disbursed to a Charity entity, purportedly to enclose the patio at 620 Decatur Street, when they knew the funds were not used to enclose the patio. In reality, proceeds were used to pay Charity's personal credit cards, life insurance policies, summer camp, tuition, and approximately $228,000 to make loan payments. |
| 35 | **RYAN BURNELL** | 8/31/2016 | **RYAN** and **BURNELL** caused approximately $500,000 in Bank funds to be disbursed to a Charity entity, purportedly to enclose the patio at 620 Decatur Street, when they knew the funds were not used to enclose the patio. In reality, proceeds were used to pay Charity's personal credit cards, tuition, after school programs, and loan payments. |

| 36 | **RYAN BURNELL** | 11/29/2016 | **RYAN** and **BURNELL** made false statements and material omissions in Phoenix loan documents related to the purpose of the loan, the source of repayment, Phoenix's creditworthiness, Dunlap's creditworthiness, the risk of loss to the Bank caused by Phoenix's and Dunlap's loans, and the business relationship between **RYAN** and Dunlap. The stated purpose of the loan was for "working capital." In reality, the proceeds covered $165,000 in loan payments on outstanding Phoenix loans and $28,000 for a hunting trip taken by Dunlap. |
| 37 | **RYAN BURNELL BEEBE** | 11/29/2016 | **RYAN**, **BURNELL**, and **BEEBE** made false statements and material omissions in Treme's loan documents related to the purpose of the loan, the source of repayment, Treme's creditworthiness, the risk of loss to the Bank caused by Treme's loans, and the business relationship between **RYAN** and Treme. This caused approximately $70,000 in loan proceeds to be disbursed to Treme. Approximately $64,000 in proceeds went to make loan payments for Treme. |

All in violation of Title 18, United States Code, Sections 1344(1) and 2.

## COUNTS 38-49
(False Entries in Bank Records)

On or about the dates set forth below, in the Eastern District of Louisiana, the defendants

**ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY, FRED V. BEEBE**, and others known and unknown to the Grand Jury, with the intent to injure and defraud

First NBC Bank, a financial institution that was insured by the Federal Deposit Insurance

Corporation, and to deceive any officer of the Bank, the Federal Deposit Insurance Corporation,

any agent or examiner appointed to examine the affairs of such bank, and the Board of Governors

of the Federal Reserve System, knowingly made the following false entries in the books, reports,

and statements of the Bank:

| Count | Defendant | Date | False Entry |
|-------|-----------|------|-------------|
| 38 | **RYAN** | 3/30/2012 | With intent to deceive the Board, auditors, and examiners, **RYAN** placed a false and fraudulent Change in Terms Authorization for Charity loan 5317 in the books and records of the Bank. **RYAN** misrepresented the reason why Charity's loans needed an extension. |
| 39 | **RYAN** | 3/30/2012 | With intent to deceive the Board, auditors, and examiners, **RYAN** placed a false and fraudulent Change in Terms Authorization for Charity loan 5789 in the books and records of the Bank. **RYAN** misrepresented the reason why Charity's loans needed an extension. |
| 40 | **RYAN** | 3/30/2012 | With intent to deceive the Board, auditors, and examiners, **RYAN** placed a false and fraudulent Change in Terms Authorization for Charity loan 0136 in the books and records of the Bank. **RYAN** misrepresented the reason why Charity's loans needed an extension. |
| 41 | **RYAN BURNELL CALLOWAY** | 9/15/2014 | With intent to deceive the Board, auditors, and examiners, **RYAN, BURNELL,** and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
| 42 | **BEEBE** | 1/7/2015 | With intent to deceive the Board, auditors, and examiners, **BEEBE** placed a false and fraudulent Loan Officer Risk Rating Verification Form in the books and records of the Bank, falsely stating that the loans in his portfolio were in compliance with the Bank's loan policy and omitting material information about the loans in his portfolio. |
| 43 | **RYAN BURNELL CALLOWAY** | 3/18/2015 | With intent to deceive the Board, auditors, and examiners, **RYAN, BURNELL,** and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |

| 44 | **RYAN BURNELL CALLOWAY** | 9/17/2015 | With intent to deceive the Board, auditors, and examiners, **RYAN**, **BURNELL**, and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
|---|---|---|---|
| 45 | **BEEBE** | 11/13/2015 | With intent to deceive the Board, auditors, and examiners, **BEEBE** placed a false and fraudulent Loan Officer Risk Rating Verification Form in the books and records of the Bank, falsely stating that the loans in his portfolio were in compliance with the Bank's loan policy and omitting material information about the loans in his portfolio. |
| 46 | **CALLOWAY** | 1/15/2016 | With intent to deceive the Board, auditors, and examiners, **CALLOWAY** placed a false and fraudulent Loan Review document about Gibbs into the books and records of the Bank, which was also transmitted to outside auditors. The Loan Review document made misrepresentations and material omissions about Gibbs's loans, and it did not disclose that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
| 47 | **RYAN BURNELL CALLOWAY** | 1/21/2016 | With intent to deceive the Board, auditors, and examiners, **RYAN**, **BURNELL**, and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
| 48 | **RYAN BURNELL CALLOWAY** | 3/18/2016 | With intent to deceive the Board, auditors, and examiners, **RYAN**, **BURNELL**, and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |

| 49 | BEEBE | 12/13/2016 | With intent to deceive the Board, auditors, and examiners, **BEEBE** placed a false and fraudulent Loan Officer Risk Rating Verification Form in the books and records of the Bank, falsely stating that the loans in his portfolio were in compliance with the Bank's loan policy and omitting material information about the loans in his portfolio. |

All in violation of Title 18, United States Code, Sections 1005 and 2.

## NOTICE OF FORFEITURE

1.     The allegations contained in Counts 1 through 49 of this Second Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2.     Upon conviction of the offenses in violation of Title 18, United States Code, Sections 1349, 1344, and 1005 set forth in Counts 1 through 49 of this Second Superseding Indictment, the defendants, **ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY, FRED V. BEEBE** and **FRANK J. ADOLPH**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation(s).

3.     If any of the property described above, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to 18 U.S.C. § 982(a)(2)(A).

A TRUE BILL:

FOREPERSON

DUANE A. EVANS
UNITED STATES ATTORNEY

MATTHEW R. PAYNE
Assistant United States Attorney

NICHOLAS D. MOSES
Assistant United States Attorney

J. RYAN McLAREN
Assistant United States Attorney

K. PAIGE O'HALE
Assistant United States Attorney

RACHAL CASSAGNE
Assistant United States Attorney

New Orleans, Louisiana
August 5, 2021

35

FORM OBD-34
No. 20-65 "H"

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

_____ Criminal _____ Division

## THE UNITED STATES OF AMERICA

vs.

**ASHTON J. RYAN, JR.**
**WILLIAM J. BURNELL**
**ROBERT B. CALLOWAY**
**FRANK J. ADOLPH**
**FRED V. BEEBE**

# SECOND SUPERSEDING INDICTMENT

## FOR

# CONSPIRACY TO COMMIT BANK FRAUD, BANK FRAUD, AND FALSE ENTRIES

**VIOLATIONS:**   18 U.S.C. § 1344
18 U.S.C. § 1349
18 U.S.C. § 1005
18 U.S.C. § 2

A true bill.

_____

Filed in open court this _____ _____ day of _____ A.D. 2021.

_____
Clerk

Bail, $ _____

**MATTHEW R. PAYNE**
**Assistant United States Attorney**