**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.  20-65** |
| **v.** | * | **SECTION:  "L"(4)** |
| **ASHTON J. RYAN, JR.** | * | |
| **WILLIAM J. BURNELL** | | |
| **ROBERT B. CALLOWAY** | * | |
| **FRED V. BEEBE** | | |
| | * | |

\* \* \*

**NOTICE OF INTENT TO INTRODUCE INTRINSIC EVIDENCE, OR**
**ALTERNATIVELY, EVIDENCE ADMISSIBLE**
**PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)**

The United States of America, through the undersigned Assistant United States

Attorneys, hereby notices its intent to introduce evidence related to acts committed by Bank

officer defendants Ashton J. Ryan, Jr., William J. Burnell, Robert B. Calloway, and Fred

V. Beebe.[1] The evidence described in this motion should be admitted because it is intrinsic to the

crimes charged in the second superseding indictment. *See* Rec. Doc. 318. Alternatively, the

evidence should be admitted pursuant to Federal Rule of Evidence 404(b).

**FACTS AND PROCEDURAL HISTORY**

**I.      Second superseding indictment**

In July 2020, a federal grand jury in the Eastern District of Louisiana charged Ryan,

Burnell, Calloway, and Adolph in a 46-count indictment with conspiracy to defraud First NBC

Bank. Rec. Doc. 1. In January 2021, the grand jury charged Ryan, Burnell, Calloway, Adolph,

and Beebe in a 49-count superseding indictment. Rec. Doc. 65. In August 2021, the grand jury

---

[1] On March 19, 2021, the government filed a similar Rule 404(b) notice as to Adolph. *See* Rec. Doc. 138. Adolph has not yet filed an opposition. The government incorporates that notice herein.

charged Ryan, Burnell, Calloway, Adolph, and Beebe in a second superseding indictment. Rec. Doc. 318. The second superseding indictment charges the Bank officer defendants with making false statements and material omissions in loan documents for certain borrowers. *See* Rec. Doc. 318, p. 7. As alleged in the Count 1 bank fraud conspiracy, these false statements and material omissions were related to the purposes of the loans, the borrowers' creditworthiness, the risk of loss the borrowers' loans posed to the Bank, the sources of repayment for the loans, and other significant details. *See* Rec. Doc. 318, pp. 7-23.

Intent and motive will be issues in this case. Ryan has argued that he acted in good faith. Burnell, Calloway, and Beebe have sought to distance themselves from Ryan and deflect any criticism of their conduct by pointing to Ryan's authority as the Bank's president and CEO. Calloway and Beebe have also described themselves as whistleblowers. For example, Calloway's attorney has stated to the news media, "All of the loans at issue were above Mr. Calloway's loan authority and were negotiated and approved by FNBC's president and CEO [Ryan] or the bank's board of directors. . . . Indeed, the FDIC's watchdog agency—the Office of Inspector General—has already determined that the bank failed, in large measure, due to the acts of a 'dominant officer' [Ryan], who controlled this and other lending relationships." Anthony McAuley, *In First NBC case, feds indict Mississippi developer Gary Gibbs for alleged bank fraud*, Nola.com, July 1, 2020.[2] Similarly, Beebe's attorney told the news media, "Fred Beebe is innocent. He saved taxpayers and First NBC creditors millions by having the courage to blow the whistle and stop the fraud." John Simerman, *First NBC Bank executive added to indictment*

---

[2] Available at https://www.nola.com/news/business/article_feb9f97e-bbdb-11ea-be57-0395463f1589.html.

*against founder Ashton Ryan*, Nola.com, Jan. 30, 2021.[3]

Calloway and Beebe have made similar statements in filings and during hearings and status conferences. *See* Rec. Doc. 201-1, p. 4 (Beebe: "An innocent man cannot recreate whatever mental process the prosecution wishes to impute to him."); Rec. Doc. 188-2, p. 8 (Calloway: "[Calloway] acted as the loan officer of the Gibbs relationship that was, in fact, controlled by Mr. Ryan. Mr. Ryan was the decision maker and controlling force in the relationship between FNBC and Mr. Gibbs. Each and every loan made to Mr. Gibbs was above Mr. Calloway's loan authority and could only be approved by Mr. Ryan, and in some instances by the Board of Directors."); Rec. Doc. 188-2, p. 8 (Calloway: "Mr. Calloway voiced his concerns about the loans to Mr. Ryan, Chief Credit Officer Burnell, and Chief Compliance Officer Marcia Crowle, among other senior managers in the bank."); Rec. Doc. 188-2, p. 9 (Calloway: "Far from being a co-conspirator, Mr. Calloway appropriately raised concerns about Mr. Gibbs' creditworthiness and other borrowers whose lending relationships are charged in the Indictment as fraud committed by Mr. Ryan.").

As explained below, the evidence this motion seeks to admit addresses the issue of the Bank officer defendants' intent. The evidence shows that Burnell, Calloway, and Beebe worked closely with Ryan as part of the charged fraudulent scheme, rather than being "dominated" by Ryan. The evidence also provides insight into the defendants' states of mind while they were defrauding the Bank.

---

[3] Available at https://www.nola.com/news/business/article_5b166654-62b6-11eb-afec-abba5de7c0e6.html.

II.      **Summary of evidence**

A.      **The Bank officer defendants' compensation**

The Bank officer defendants were well-compensated. Ryan, the Bank's CEO, president, and chairman of the board of directors, received over $9.5 million in salary, employee benefits, and forgivable bank loans from 2006 through April 2017. *See* Rec. Doc. 318, p. 2. Burnell, the Bank's chief credit officer, received compensation of over $3.5 million in the same period. *See* Rec. Doc. 318, p. 3. Calloway received compensation totaling $2.3 million in that time span. *See* Rec. Doc. 318, p. 3. From 2009 through February 2017, Beebe received compensation totaling more than $1.5 million. *See* Rec. Doc. 318, p. 3.

Each Bank officer defendant received stock awards and stock options in the Bank's holding company as part of their compensation.[4] Stock options are a common form of compensation, particularly for executives, because they provide a performance incentive:

> Stock options ("call options") allow an employee to buy the employer's stock at a specified future date at a price (the "strike price" [or "exercise price"]) fixed on the date that the stock is granted. Stock options are granted with the expectation that the stock will increase in price during the intervening period, thus allowing the grantee the right to buy the stock significantly below its market price.

*Scully v. US WATS, Inc.*, 238 F.3d 497, 507 (3d Cir. 2001). Because the value of the stock option is deferred to a later date, and because the value is tied to value of the company's stock, "[t]he conferring of options on an executive creates an incentive for the executive to work hard to increase the market price of the employer's stock because that increases the value of the executive's stock options." *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1243 (10th Cir. 2000) (citing Susan J. Stabile, *Motivating Executives: Does Performance-Based Compensation*

---

[4] The Bank itself was not publicly traded; rather, its holding company, First NBC Bank Holding Company, was traded on the NASDAQ. The Bank was a wholly owned banking subsidiary of First NBC Bank Holding Company. *See* https://www.sec.gov/Archives/edgar/data/ 0001496631/000119312513145727/d413833ds1.htm.

*Positively Affect Managerial Performance?*, 2 U. Pa. J. Lab. & Employment L. 227, 235 (1999)).

However, just as stock awards and stock options can be an incentive for an executive to work

hard, they can also be an incentive for an executive to commit fraud to prop up the company

whose future stock performance will affect his income. *See United States v. Valencia*, 600 F.3d

389, 399-400 (5th Cir. 2010) (defendants convicted of manipulating gas indices in order to

benefit their respective companies, which "would redound to the benefit of the trader in the form

of promotions or higher year-end bonuses."); *United States v. Kaiser*, 609 F.3d 556, 561 (2d Cir.

2010) (stating that "[U.S. Foods] executives, including Kaiser, only received bonuses when USF

met [promotional allowance] targets, providing a powerful motive for Kaiser to inflate USF's PA

income.").

Here, the evidence will show that each of the Bank officer defendants were compensated

with Bank stock. In 2015, Ryan received approximately $187,492 in stock awards and options.

USAO-0001277915-158.[5] In the same year, Burnell received $99,980 in stock awards and

options. USAO-0001277915-158. Calloway and Beebe were likewise compensated with Bank

equity. In 2011, Calloway received $24,056 in options, while Beebe received $17,567 in options.

USAO-0012690416. In each of 2012 and 2013, Calloway received $44,320 in stock options,

while Beebe received $13,357 in options. USAO-0012688681, USAO-0009710601-002. By

2015, Calloway received $32,534 in stock options, and Beebe received $24,066 in options.

USAO-0009708311-02. As the price of the Bank's stock rose, so did the value of the Bank

officer defendants' stock and stock options. Indeed, they would become a significant portion of

the defendants' wealth. For example, in August 2015, Calloway submitted a personal financial

statement in support of a loan from the Bank. In that statement, he declared a total net worth of

---

[5] Citations to documents with "USAO" prefixes reflect Bates numbers for documents the government has already produced to all defendants.

$1,686,887. USAO-0010265838. Calloway further declared that he owned $108,850 worth of First NBC stock, and $471,852 in vested First NBC options. USAO-0010265838. Thus, by 2015, over a third of Calloway's net worth—$580,702—depended on First NBC's stock value.

Stock also could be used as collateral. The evidence will show that Ryan took out numerous loans. For several of these loans, he used his First NBC stock as collateral. *See* USAO-0009953109-35; USAO-0006729233. The value of the collateral depended on the value of the stock: If the stock fell in price, the collateral would be worth less, which could prompt the lender to demand further collateral. The value of First NBC stock was important to Ryan to ensure he could retain financial liquidity through loans and avoid having these loans become due. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 250 (5th Cir. 2003) (finding that securities fraud plaintiff pleaded motive and intent where, if company's stock price dropped significantly, personal loans of named amounts from named banks that were secured by shares of company stock would become due).

### B.      Borrower J Loan Relationship

The government intends to introduce evidence that Ryan, Burnell, and Beebe engaged in misconduct regarding Borrower J. Borrower J was a businessman who sold restaurant business concepts to investors. Borrower J began banking at the Bank in approximately 2011. Beebe was Borrower J's loan officer. In May 2015, Borrower J pleaded guilty before Judge Vance to wire fraud and willful failure to pay taxes. In February 2016, Judge Vance sentenced Borrower J to a term of imprisonment of 30 months and ordered Borrower J to pay over $993,000 in restitution to his victims.

The second superseding indictment describes one aspect of Borrower J's relationship with the Bank. *See* Rec. Doc. 318, pp. 12-13. As set forth in the second superseding indictment,

Borrower J rented space at 620 Decatur Street in New Orleans from another borrower, Kenneth Charity, for $20,000 per month. Borrower J operated a beignet shop out of the rented space. As part of Charity's guilty plea to bank fraud conspiracy, he admitted that he "had no cash flow or ability to repay his loans at First NBC Bank." *United States v. Charity*, E.D. La. No. 19-90, Doc. 22, p. 8. Nevertheless, Ryan and Burnell represented to the Bank's board of directors, external auditors, and state and federal regulators that continuing to lend money to Charity posed only a minimal risk of loss to the Bank. Ryan and Burnell cited the $20,000 per month rent payments from Borrower J as a stable source of income for Charity. This gave the false impression that Charity could repay his loans.

In October 2013, Borrower J made his last loan payment to the Bank and stopped paying rent to Charity. Ryan and Burnell then arranged for the Bank to take over the beignet shop from Borrower J and make monthly payments to Charity from an operating account they opened. From April 2014 to March 2017, the Bank, as operator of the beignet shop, paid $20,000 in rent to Charity every month. At one point at the end of 2014, the Bank's beignet shop account was overdrawn. Ryan and Burnell arranged for approximately $171,000 to be drawn from Borrower J's dormant line of credit to clear the overdraft, even though Borrower J had not made loan payments to the Bank for over a year.

### 1.    Depositions of Borrower J and Beebe's assistant

In addition to this conduct described in the second superseding indictment, Ryan, Burnell, and Beebe also funneled money to Borrower J to keep him off month-end overdraft and past-due reports to the Bank's board of directors. In so doing, the defendants "masked" Borrower J's loans like they did with other borrowers, including Charity.

In a deposition in a civil case concerning a different Bank borrower, Borrower J spoke about the loan-masking scheme. Borrower J stated, "It's my understanding, you know, through conversations I've had with all of them [Ryan, Beebe, Beebe's assistant, and the Bank's general counsel, Gregory St. Angelo] that there was a monthly board meeting and one of the agenda items was to review accounts that were, you know, either on an overdraft list or were behind in loan payments." USAO-0014371380-81. Borrower J described the defendants' "ongoing mission to try to keep our accounts in the green if you will. You know, keep them current, try to stay off the overdraft list, that sort of thing." USAO-0014371276-77. Borrower J stated further, "If there was a loan that was made at the end of the month, it was to clear up bad debt, overdraft fees, what have you. Mostly speaking. Because that's when they did it. They wanted to get done so that their list would be cleansed." USAO-0014371317.

When describing his financial situation at the time he received loans from Ryan, Burnell, and Beebe, Borrower J testified, "I would say our problems were catastrophes, not problems." USAO-0014371318. According to Borrower J, no Bank employees, including the defendants, visited his businesses to see how they were doing or audited his financial statements. USAO-0014371320-21. Nevertheless, the defendants continued to funnel Borrower J hundreds of thousands of dollars in loans, and they continued to risk rate Borrower J's loans as "6 – Acceptable with Care." Borrower J did not generate sufficient income from his businesses to make his own loan payments. *See* USAO-0014371221 ("[O]ur company was never in a position where we were so positive to the effect that we could come in and say, hey, here's a loan payment."). Rather, the defendants paid Borrower J's loans with proceeds from new loans and with money deposited into Borrower J's accounts from investors, including the victims of his fraud. *See* USAO-0014371221 (Q: "The only way the records showed at FNBC that the

[Borrower J] entities are meeting their loan payments, either principal and interest on schedule, was by FNBC either giving you more money themselves, a larger loan, or by using investor money?" A: "That's correct.").

Beebe's assistant was also deposed as part of the same civil case, and her testimony corroborated Borrower J's. Beebe's assistant described Borrower J as a "joke" and a "crook." USAO-0014372042-43. She stated that she "knew [Borrower J] was shady" because his payroll checks to his employees bounced. USAO-0014372043. Additionally, Borrower J "had nothing" and was a "horrible" businessman. USAO-0014372058. Beebe's assistant testified that Beebe shared her negative opinion about Borrower J. *See* USAO-0014372044 ("Fred didn't like [Borrower J] either. Absolutely not. None of us did."); USAO-0014372046 ("Fred didn't like him either. He didn't trust him."). She stated that, despite Beebe's distrust of Borrower J, Beebe made loans to Borrower J to cover overdrafts. *See* USAO-0014372017-18 ("We would have been told to cover what was overdrawn. That's what—Ashton would tell us loan proceeds will go to cover overdrafts."). According to Beebe's assistant, Beebe prepared and approved these loans even though he knew they "were no good." USAO-0014372060.

### 2.    FBI interviews of Ryan and Beebe

Two additional events related to Borrower J provide insight into Ryan's and Beebe's mental states when they were defrauding the Bank. First, in October 2014, the FBI interviewed Ryan and Beebe as part of its investigation into Borrower J's fraud against his investors. Second, in late 2016, after Ryan had been forced to step down as the Bank's CEO and give up his loan portfolio, Beebe copied Ryan's false statements and presented them as his own when preparing a criticized asset action plan for Borrower J.

Beginning with the FBI interviews, Ryan misrepresented during his interview in November 2014 that he and Beebe loaned Borrower J money so Borrower J could open restaurants across the country. Ryan 302, USAO-0012664890. In fact, Ryan and Beebe made loans to Borrower J to "clear" Borrower J's overdrafts and keep him off the month-end overdraft and past-due reports. Ryan also told the FBI that Borrower J loaned $120,000 to enclose the patio at 620 Decatur Street but did not spend the loan proceeds on the enclosure. The next year, Ryan and Burnell gave loans to Charity for the same stated purpose, knowing the loan proceeds would not be used to enclose the patio. *See* Rec. Doc. 318, pp. 14, 29-30.

Ryan lied to the FBI about the profitability of the beignet shop the Bank operated out of 620 Decatur Street, falsely stating that the Bank averaged between $40,000 to $70,000 in profits per month. Ryan 302, USAO-0012664891. When told that the IRS had tax liens against Borrower J and that Borrower J made false admissions to the IRS in an interview, Ryan misrepresented that the Bank recently changed its policy and would check whether borrowers' tax returns were filed. Ryan 302, USAO-0012664894. Following this interview with the FBI, the defendants regularly loaned money to borrowers such as Warren Treme without requiring updated financial statements or tax returns.

Further, Ryan lied to the FBI that, had he known that Borrower J's financial statement was false or the extent to which Borrower J gambled, he would not have approved additional loans to Borrower J. Ryan 302, USAO-0012664892, 94. However, multiple borrowers referenced in the second superseding indictment, including Gary Gibbs and Arvind "Mike" Vira, had financial statements that they falsified at Ryan's direction, and Ryan knew that Treme gambled, despite his lack of income and inability to repay his loans.

Beebe also was not truthful during his interview with the FBI in October 2014. Beebe falsely told the FBI that he was unaware that Borrower J had accounts at other banks. Beebe 302, USAO-0012664857. However, Beebe knew that Borrower J wired money to an account at Regions that Borrower J owned. *See* USAO-0003354095.

Beebe falsely stated that he had never heard of one of Borrower J's victims and that he was unaware that Borrower J received money from investors. USAO-0012664860. Contrary to Beebe's statement, Beebe had been forwarded an email from the investor accusing Borrower J of taking $300,000 from her as part of a fraudulent restaurant investment scheme, and Beebe responded to the email. *See* USAO-0004046700.

Beebe misrepresented that he was unaware that Borrower J had million-dollar judgments against him. USAO-0012664860. In fact, Beebe had been forwarded news articles describing the million-dollar judgments against Borrower J, including one article attached to an email from a loan officer at Beebe's branch that said, "Here it is in black and white." *See* USAO-0003365260, 61. Another email from Calloway to Ryan, Burnell, and Beebe contained an article that was titled "[Borrower J] responds to growing court troubles." *See* USAO-0009354728, 5375878.

Finally, Beebe failed to disclose that the Bank officer defendants were funneling money to similarly problematic borrowers. Notably, Beebe did not alert the FBI that he, Ryan, and Burnell were defrauding the Bank in the same way (using loan proceeds to "clear" loan payments and overdrafts) with Treme, another borrower in his loan portfolio. Thus, rather than acting as a whistleblower, Beebe withheld information about the fraud and misled the FBI.

St. Angelo, the Bank's general counsel, accompanied Beebe to the FBI interview. A day later, St. Angelo described the interview in a recorded conversation to Ryan, Burnell, and other Bank employees. USAO-0000208272. St. Angelo said that Beebe, "sat there and told outright

11

lies." According to St. Angelo, Beebe was "misguidedly thinking that he's protecting people." St. Angelo continued, "People are like that. Again, I guess you're nervous and, you know, you don't want to say anything," to which a Bank employee responded, "Just say 'I don't recall.'" Another employee added, "See, that's the problem, though. People always feel embarrassed to say, 'I don't know, I don't remember.' And those are perfectly fine answers." St. Angelo joked, "Not Ken [Charity], he says—Charity says that all the time. He don't recall the company he owns." Ryan jokingly responded, "He don't recall his CPA, he don't recall anyone." In later interviews with law enforcement after he pleaded guilty, St. Angelo reiterated that Beebe lied multiple times during his 2014 interview about Borrower J. USAO-0013582344; USAO-0012665518. St. Angelo recounted that, when he asked Beebe why he lied to the FBI, Beebe answered, "I'm loyal to the boss man. I'm not going to throw Ashton under the bus." USAO-0012665518.

### 3.    December 2016 criticized asset action plan

In late 2016, Ryan was forced to step down as the Bank's CEO and give up his loan portfolio. Around this time, Bank employees were completing their criticized asset action plans ("CAAPs"), reports that Ryan and Burnell presented to the board of directors every quarter describing actions the Bank was taking with certain troubled borrowers. On December 8, 2016, a Bank employee emailed Beebe saying that Ryan previously prepared the CAAP memos for Borrower J, but that, because Ryan no longer had a loan portfolio, Beebe needed to complete the CAAP. *See* USAO-0003003116. Beebe then forwarded the email to Ryan's assistant and asked:

> Can you provide to me the templet that Ashton used so I can complete and sign [Borrower J and two other credits]. [The Bank employee] needs to have this quickly. I don't think a lot has changed since August. If we can re-date that would be great.

12

*See* USAO-0003003116. After receiving the CAAP Ryan previously completed for Borrower J, Beebe changed the date and submitted it without edits. *See* USAO-0003128011. Beebe claimed that he did not make any changes because he was "not familiar" with Borrower J's CAAPs. *See* USAO-0003128011, 18.

The CAAP Beebe copied from Ryan contained misrepresentations and material omissions. For example, the CAAP classified Borrower J's credit risk rating as "3 – Substandard," despite Beebe's knowledge that Borrower J was in prison and owed over $993,000 in restitution, making collection on Borrower J's loans unlikely. The CAAP falsely stated that the beignet shop at 620 Decatur Street was "cash-flowing" and that proceeds from the beignet shop were being used to pay down Borrower J's debt. A memo attached to the CAAP falsely stated that the Bank was "entertaining 5 potential buyers" for the beignet shop's leasehold and improvements. The memo also falsely stated that Borrower J's debt could be mitigated by enclosing the patio at the beignet shop, agreeing to a settlement with Borrower J for his house, and taking over Borrower J's various litigation claims. Rather than refuting any of these false statements or disclosing the truth about Borrower J's loans (*i.e.*, that Ryan, Burnell, and Beebe funneled money to Borrower J to keep him off the month-end reports), Beebe simply copied and pasted Ryan's lies.

### C. Borrower K Loan Relationship

The government intends to introduce evidence related to Borrower K against all four Bank officer defendants. Borrower K was Ryan's nephew and a borrower in Beebe's loan portfolio. Borrower K performed work for Treme, Ryan's business partner who was also in Beebe's loan portfolio, and Jeffrey Dunlap, a contractor who worked on Ryan and Treme's development project Wadsworth Estates. Borrower K was frequently overdrawn and unable to

make his loan payments. As a result, the defendants worried about whether Borrower K would appear on month-end overdraft and past-due reports.

To keep Borrower K off month-end reports, the defendants regularly caused money from Treme's bank account to be debited to Borrower K's account, such as in this November 2011 email:

| From: | Fred Beebe |
|---|---|
| To: | ▓▓▓▓▓▓▓▓▓ |
| Subject: | FW: |
| Date: | Thursday, November 3, 2011 8:54:39 AM |

Go ahead and debit Warren.  Thanks

fvb

---

**From:** ▓▓▓▓▓▓▓
**Sent:** Thursday, November 03, 2011 8:41 AM
**To:** Fred Beebe
**Subject:**

Don't forget the payment on ▓▓▓▓▓▓▓▓

USAO-0003375747. The defendants did this despite Treme's lack of income and inability to make his own loan payments. In fact, as alleged in the second superseding indictment and as Treme admitted in the factual basis supporting his guilty plea to bank fraud conspiracy, the defendants used proceeds from new loans to make Treme's loan payments for him. Thus, the defendants fraudulently funneled loan proceeds to Treme and, in turn, used Treme's account as a slush fund to clear Borrower K off the month-end reports.

Neither Borrower K's nor Treme's loan packages disclosed this arrangement, and Borrower K's loan packages did not disclose that Borrower K was frequently overdrawn and unable to make his own loan payments. For example, this September 2014 package for a Borrower K loan, signed by Beebe, assigned a credit risk rating "6 – Acceptable with care." The

loan package falsely described the sources of repayment as "Personal income from borrower" and "Liquidation of personal assets":



**First NBC Bank**
**CREDIT MEMORANDUM**

Report to SLC: No.

| DATE: | 09/30/14 | CIF NO.: | RAA1573 |
|---|---|---|---|
| NAME: | ▓▓▓ | LOAN NUMBER (renewals only): | 1000110588 |
| ADDRESS: | ▓▓▓ | TYPE OF BUSINESS: | Carpentry |
| TAX ID or SSN: | ▓▓▓ | PRINCIPALS/ OWNERSHIP: | N/A |
| PHONE: BUSINESS: | | NAICS CODE | 238130 |
| HOME: | | PURPOSE CODE: | 51 - Commercial General Purpose |
| CELL: | ▓▓▓ | RISK RATING: | 6-Acceptable with care |
| EMAIL/FAX: | | PARTICIPATION: | N/A |

| LOAN AMOUNT: | $11,300.00 | LOAN TYPE: | Term |
|---|---|---|---|
| REPAYMENT: | P&I monthly | MATURITY DATE: | 3 years |
| RATE: | 6.50% | | |
| FEES: | | NEW or RENEWAL: | Renewal with Increase |
| LOAN: | | Amt of increase or decrease, if any: | $2,200.00 |
| DOCUMENTATION: | | (If Renewal, Complete TDR information on Page 2) | |

| LOAN PURPOSE: | To increase loan to cover additional business expenses. |
|---|---|
| GUARANTORS: | N/A |
| LIFE INSURANCE INFORMATION: | None |
| | Please provide the amount of life insurance that will be required on all associated individuals, both individual borrowers and guarantors. |
| COLLATERAL DESCRIPTION: | Unsecured |
| ADVANCE RATE (LTV/LTC): | N/A |
| PRIMARY SOURCE OF REPAYMENT: | Personal income from borrower |
| SECONDARY SOURCE OF REPAYMENT: | Liquidation of personal assets |
| PROJECT INFORMATION: | Borrower works as a carpenter and needs additonal funds for business expenses he incurred. |
| | Project information should include: project's anticipated time frame, what the contingency plan, and what the Bank's exit strategy will be to repay the debt. |
| ON SITE VISIT: | 9/30/2014 |
| PROPOSED COVENANTS: | To provide invoices from vendors prior to advancing funds. All deposits regarding his employment will be deposited into his FNBC account. |
| FINANCIAL REPORTING: (selections provided) | Annual financial statements and tax returns on borrower(s) |
| OTHER FINANCIAL REPORTING: (Agings, brokerage stmts, etc. ) | |

Please accompany the Credit Memo with a Loan & Deposit Recap!

| Direct Loan Exposure: | $10,670.00 | Branch: | Kenner |
|---|---|---|---|
| Indirect Loan Exposure: | $0.00 | Credit Officer: | Fred Beebe |
| Total & Proposed Exp: | $12,870.00 | Account Officer: | Fred Beebe |
| Total YTD Deposits: | $100.00 | | |

| APPROVING OFFICER: | Fred Beebe | ADDITIONAL APPROVING OFFICER: | |
|---|---|---|---|
| SIGNATURE: | | SIGNATURE: | |
| DATE: | | DATE: | |

USAO-0010567586. The loan package did not disclose Borrower K's history of overdrafts and failure to make payments. To the contrary, the next page of the loan package stated that Borrower K's credit score of 608 "is below policy, but mitigated by cash flow." USAO-0010567587. The loan package also did not disclose that Borrower K was Ryan's nephew.

Later in the September 2014 loan package were utility bills for Borrower K showing that he was past-due on utilities payments. USAO-0010567592-94. There also was a legal document from the 29th Judicial District Court in which Borrower K requested an extension of time to pay a bond. Borrower K's reason for the extension was, "I can only afford 100$ today and do not want to be wanted[.] Please allow me 30 days to pay remaining 200$ Balance." USAO-0010567595. Despite being attached to the September 2014 loan package, these documents were not attached to or mentioned in subsequent Borrower K loan packages.

Indeed, in subsequent loan packages, the defendants continued to assign Borrower K a credit risk rating "6 – Acceptable with care," misrepresent Borrower K's creditworthiness, and misrepresent the purpose of the loans. One example is a loan package from December 2014. *See* USAO-0003307423. In an email preceding the December 2014 loan, Beebe's and Ryan's

assistants stated that the Bank was giving Borrower K "an additional 8k to buy a truck, pay rent and get Christmas gifts":



USAO-0003310603.

The subsequent loan package, this time signed by Calloway, falsely stated that the purpose of the loan was "To purchase vehicle for business purposes and payoff loans # 1000121676 and 1000122237," omitting that Borrower K intended to use loan proceeds to pay

his rent and buy Christmas gifts. The loan package also assigned a fraudulent credit risk rating "6 – acceptable with care" and falsely stated that Borrower K would repay the loan with "Personal income from borrower" and "Liquidation of personal assets":

**First NBC Bank**
**CREDIT MEMORANDUM**

Report to SLC# No.

| | | | |
|---|---|---|---|
| DATE: | 12/01/14 | CIF NO.: | RAA1573 |
| NAME: | | LOAN NUMBER (renewals only): | New |
| ADDRESS: | | TYPE OF BUSINESS: | Carpentry |
| TAX ID or SSN: | | PRINCIPALS/OWNERSHIP: | N/A |
| PHONE: BUSINESS: | | NAICS CODE | 238130 |
| HOME: | | PURPOSE CODE: | 51 - Commercial General Purpose |
| CELL: | | RISK RATING: | 6-Acceptable with care |
| EMAIL/FAX: | | PARTICIPATION: | N/A |

| | | | |
|---|---|---|---|
| LOAN AMOUNT: | $24,300.00 | LOAN TYPE: | Term |
| REPAYMENT: | Interest only for 12 months then converting to P&I monthly for remaining 48 months. | MATURITY DATE: | 5 years |
| RATE: | 6.5% Fixed | | |
| FEES: | | NEW or RENEWAL: | Renewal with Increase |
| LOAN: | | Amt of increase or decrease, if any: | $8,000.00 |
| DOCUMENTATION: | | (If Renewal, Complete TDR Information on Page 2) | |

LOAN PURPOSE: To purchase vehicle for business purposes and payoff loans # 1000121676 and 1000122237.

GUARANTORS: N/A
LIFE INSURANCE INFORMATION: None
*Please provide the amount of life insurance that will be required on all associated individuals, both individual borrowers and guarantors.*
COLLATERAL DESCRIPTION: Pledge of 2005 Chrysler Pacifica VIN# 2C4GM68485R258339.
ADVANCE RATE (LTV/LTC): 75% LTV on the vehicle taken as abundance of caution and the remaining portion of the loan is unsecured.

PRIMARY SOURCE OF REPAYMENT: Personal income from borrower
SECONDARY SOURCE OF REPAYMENT: Liquidation of personal assets
Borrower works as a carpenter and needs additional funds to purchase a vehicle for business purposes. Waiver of full insurance
PROJECT INFORMATION: coverage, only liability insurance required.
*Project Information should include: project's anticipated time frame, what the contingency plan, and what the Bank's exit strategy will be to repay the debt.*

ON SITE VISIT: 12/1/2014

PROPOSED COVENANTS: All deposits regarding his employment will be deposited into his FNBC account.

FINANCIAL REPORTING: (selections provided) Annual financial statements and tax returns on borrower(s)
OTHER FINANCIAL REPORTING: (Agings, brokerage stmts, etc. )

*Please accompany the Credit Memo with a Loan & Deposit Recap!*

| | | | |
|---|---|---|---|
| Direct Loan Exposure: | $16,244.38 | Branch: | Kenner |
| Indirect Loan Exposure: | $0.00 | Credit Officer: | Fred Beebe |
| Total & Proposed Exp: | $24,244.38 | Account Officer: | Fred Beebe |
| Total YTD Deposits: | $100.00 | | |

| | | | |
|---|---|---|---|
| APPROVING OFFICER: | Fred Beebe | ADDITIONAL APPROVING OFFICER: | Brad Calloway |
| SIGNATURE: | | SIGNATURE: | |
| DATE: | | DATE: | 12/5/14 |

USAO-0003307423.

Additional fraudulent loans, again signed by Beebe, include a loan in January 2015, *see* USAO-0003365541, and a loan in June 2015. *See* USAO-0010544972. These loans make similar misrepresentations about Borrower K's income and ability to repay his loans.

### D.    Universal Pro Vision, LLC, and Borrowers L and M

Ryan and Calloway engaged in self-dealing while at First NBC Bank by lending money to troubled borrowers who were tenants in a building that Ryan and Calloway co-owned. Ryan and Calloway did this without disclosing the conflict to the Bank's board of directors, including when Calloway and Ryan presented their tenants' multimillion dollar loans to the board loan committee. Both before and during their time together at the Bank, Ryan and Calloway co-owned a business named Universal Pro-Vision, LLC ("Universal Pro-Vision"), which they registered with the State of Louisiana in 2002. USAO-0002762142. Ryan and Calloway owned Universal Pro-Vision along with four others, including two Bank borrowers, Borrower L and Borrower M. Borrower M was both an employee at the Bank and a borrower. Borrower L was a reverend who controlled several entities that borrowed from the Bank and were in Calloway's loan portfolio.

Before he was a borrower at First NBC Bank, Borrower L was a borrower at Bank B, where Ryan was the president and handled Borrower L's loans along with Calloway, who was his loan officer. When Ryan left Bank B to start First NBC Bank, he resolved a dispute related to his departure by agreeing to take a set of troubled borrowers with him by paying off their Bank B loans with new loans from First NBC Bank. Borrower L's businesses were among the troubled borrowers, along with St. Angelo, Treme, and others. *See* USAO-0005277019, pp. 6-8, 11-12, 22, 28, 33. At the time of the purchase, accounts for several of Borrower L's businesses, like St.

Angelo's and Treme's accounts, were all on Bank B's watch list for problem loans from the previous month. USAO-0005277019, pp. 34-35.

Universal Pro-Vision owned a property on Oretha Castle Haley Boulevard in New Orleans, and it had a mortgage on the property. Ryan, who was the largest shareholder in Universal Pro-Vision, paid the mortgage for the building. USAO-0011577214, p. 3; USAO-0011577291; USAO-0012669300; USAO-0012669301. The mortgage was at a different bank from First NBC Bank, but Ryan did not make the mortgage payments to that bank directly. USAO-0002764324. Instead, Ryan sent checks in the amount of the monthly mortgage payment to Borrower M, who deposited Ryan's checks in an account at Bank B. Money from that Bank B account was then used to make the monthly mortgage payments at Universal Pro-Vision's bank. *E.g.,* USAO-0014372334; USAO-0014372345; USAO-0014372430.

Two of Universal Pro-Vision's co-owners also occupied the property at various times. Borrower L operated a funeral services business out of the building from at least 2009 through the sale of the property in December 2015. Borrower L's funeral service business had a lease requiring a monthly rent of at least $3,000 (increasing over the time of the lease) payable to Universal Pro-Vision. USAO-0013579570. Borrower M also operated a separate business out of the same building for a period of time.

Although others were involved with Universal Pro-Vision and handled the day-to-day operations, Calloway maintained paperwork and performed certain tasks for the company. *See* USAO-0010266335. In 2003, Calloway wrote a letter to the City of New Orleans Tax Assessor on Universal Pro-Vision's behalf, copying Ryan and his other partners, and he directed questions to Borrower L or himself. USAO-0007759356. As late as 2014, Calloway and St. Angelo exchanged emails, copying Ryan, about old paperwork for the company that Calloway may have

had in his records. USAO-0007944728. Calloway also listed his interest in Universal Pro-Vision, along with the company's debt, on his personal financial statement in 2015. USAO-0010265838; USAO-0010265877.

Borrower L and Borrower M received loan proceeds that were approved by Ryan, Burnell, and Calloway, despite the frequent inability of Borrowers L and M to pay their First NBC Bank loans. As early as 2011, Borrower M was placed on a criticized asset action plan, which listed Calloway, Burnell, and Ryan as the relevant officers. USAO-0004464843. By 2012, Burnell was arranging a new loan for Borrower M to pay his existing debt. USAO-0010795753.

Calloway and Ryan also assisted Borrower L by arranging a First NBC loan for him for the purpose of settling a lawsuit against one of Borrower L's businesses. In 2012, Borrower L was sued by a business partner based on allegations that Borrower L had breached a fiduciary duty in connection with a deal for housing tax credits, because Borrower L allegedly failed to take several steps necessary for the relevant tax credits. An attorney for the Bank notified Ryan and Calloway of the lawsuit in May 2012. USAO-0010782032. From June 2012 through at least August 2013, Calloway, Ryan, St. Angelo, and others met with Borrower L to discuss the lawsuit. USAO-0014372298; USAO-0014372297. In August 2013, Calloway and Ryan obtained a new First NBC loan for Borrower L and used $200,000 of the proceeds to settle the lawsuit. USAO-0010714240. In internal emails including Ryan, Calloway, St. Angelo, and Borrower L, everyone acknowledged that the loan was made to pay for the settlement. USAO-0011369119; USAO-0011369120. In the credit memorandum that Calloway signed, the stated purpose of the loan was "working capital" to purchase certain properties and acquire an ownership interest from

investors, with no mention of the lawsuit or allegations that Borrower L failed to abide by the requirements of a tax credit deal. USAO-0010714240.

Calloway then arranged a loan advance from those funds and approved the $200,000 wire to be sent to the attorneys for the plaintiffs in the lawsuit, with the wire confirmation giving the true purpose of the payment: "Settlement for [Borrower L's company that was sued]." USAO-0007628736; USAO-0008958166; USAO-0007628701-2. The plaintiffs dismissed the lawsuit against Borrower L in January 2014. USAO-0014372300. By October 2015, Calloway had arranged for a new loan for housing involving Borrower L, and he signed a letter to Borrower L pledging over $2 million in Bank funds to the same entity of Borrower L's that had paid the $200,000 settlement for failing to comply with the terms of another housing finance deal. USAO-0014372299. Thus, after a tax credit investor sued Borrower L—Calloway's and Ryan's business partner—for failing to fulfill his obligations in one housing transaction, Calloway committed First NBC Bank to using its own funds to finance another.

Ryan also funneled money to Borrower L by paying developer's fees in the tens of thousands of dollars to an entity Borrower L controlled, again without disclosing that Borrower L's mortuary was the tenant in the building that Ryan and Calloway co-owned and that Borrower L was partners with Ryan and Calloway in Universal Pro-Vision. USAO-0006065175.

Ryan and Calloway did not disclose the conflict of interest that resulted from their being business partners with and landlords of Borrower L while also preparing and approving loans for Borrower L and his entities. For example, despite this conflict, in February 2015, Calloway attended a board loan committee meeting as the loan officer for several loans for entities that Borrowers L and M were involved in, concerning renewals of loans exceeding $21 million, but Calloway did not disclose that the borrowers were tenants in a building that Ryan and Calloway

co-owned. USAO-0000224624; USAO-0000262026. In June 2015, Calloway and Ryan made a presentation to the board loan committee in support of renewal of two more loans for Borrower L's entities, exceeding $13 million in total value, and they again failed to disclose their conflict. USAO-0000224870.

The same month, Calloway communicated with Borrower M about showing Universal Pro-Vison's property to a prospective buyer. Around the same time, Borrower M checked with the bank holding the mortgage on the property and then forwarded the balance to Ryan. USAO-0002752576. Ryan then signed a contract under which Universal Pro-Vision agreed to sell the New Orleans property for $750,000. USAO-0010266336; USAO-0010266337. Ryan handled the December 2015 transaction on behalf of Calloway, Borrowers L and M, and the other partners of Universal Pro-Vision. USAO-0011576145; USAO-0014372590. Ryan deposited the proceeds of the sale into a newly created Universal Pro-Vision account at First NBC Bank, for which Ryan and Borrower M were the signatories, and then distributed the proceeds to Universal Pro-Vision's owners, including a check for $418,181 to Ryan, $29,113 to Calloway, $27,086 to Borrower L, and $18,903 to Borrower M. USAO-0007500158; USAO-0006767402. Ryan personally wrote and signed the checks, including the one to Calloway:

In sum, Ryan and Calloway were business partners before and during their tenure at First NBC Bank. The evidence shows that Ryan and Calloway collaborated as partners to use their authority as bank officers to help their personally co-owned business without disclosing the conflict to the Bank's board of directors.

## LAW AND ARGUMENT

### I.   Intrinsic Evidence

Ordinarily, Federal Rule of Evidence 404(b) dictates when evidence of "other bad acts" is admissible. However, Rule 404(b) does not apply to evidence that is intrinsic to the crime charged. *See United States v. Lockhart*, 844 F.3d 501, 512 (5th Cir. 2016) ("If the evidence is intrinsic, it is not *other* bad acts evidence at all, but rather additional facts surrounding the charge at issue.") (emphasis in original). Evidence of bad acts is admissible and characterized as "intrinsic" when the bad acts and the crime charged are "inextricably intertwined," the bad acts and the crime charged were part of a "single criminal episode," or the bad acts were "necessary preliminar[ies]" to the crime charged. *United States v. Ceballos*, 789 F.3d 607, 620 (5th Cir. 2013). Such evidence "is admissible to complete the story of the crime by proving the immediate context of events in time and place . . . and to evaluate all of the circumstances under which the defendant acted[.]" *United States v. Rice*, 607 F.3d 133, 141 (5th Cir. 2010) (citation and quotation marks omitted). In a conspiracy, evidence is "intrinsic" if it is "relevant to establish how the conspiracy came about, how it was structured, and how the [defendant] became a member." *United States v. Watkins*, 591 F.3d 780, 784 (5th Cir. 2009).

## II.     Federal Rule of Evidence 404(b)

"Under Federal Rule of Evidence 404(b), evidence of a 'crime, wrong, or other act is not admissible to prove a person's character'; however, such evidence may be admissible 'for another purpose, such as showing motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *United States v. Juarez*, 866 F.3d 622, 626-27 (5th Cir. 2017) (quoting Fed. R. Evid. 404(b)(1)-(2)). The Fifth Circuit's test for admissibility "requires a determination that (1) the extrinsic offense evidence is relevant to an issue other than the defendant's character and (2) the evidence possesses probative value that is not substantially outweighed by its undue prejudice and meets the other requirements of Federal Rule of Evidence 403." *Id.* at 627 (quotation marks, brackets, and ellipsis omitted); *see also United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

The Fifth Circuit considers four factors when analyzing whether evidence of other acts possesses probative value that is not substantially outweighed by its undue prejudice: "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." *Smith*, 804 F.3d at 736; *see also Beechum*, 582 F.2d at 915.

## III.    The evidence described above should be admitted either as intrinsic evidence or under Rule 404(b).

### *Compensation*

The compensation granted to the Bank officer defendants provides the context to their fraud, and it explains why they committed the crime. Thus, the evidence is intrinsic. Additionally, financial gain is admissible evidence of motive. *See United States v. McMahon*, 938 F.2d 1501, 1508 (1st Cir. 1991) (holding that evidence of defendant's financial condition was admissible because "[i]t defies common sense to suggest that evidence of a defendant's

motive is irrelevant to whether he committed the offense"); *United States v. Ackerman*, 704 F.2d 1344, 1351 n.10 (5th Cir. 1983) (finding no error in district court's instruction on motive relating to "[p]ersonal advancement and financial gain"). Such evidence has "significant probative value" where a defendant's income is dependent on the success of the fraud, such as the concealment of loan delinquencies by the company through which the defendant committed the fraud. *See United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (evidence of defendants' income "had a significant probative value because it demonstrated what [defendants] stood to lose if they properly reported the actual loan delinquencies" of company through which they committed the fraud), *superseded on other grounds by statute as recognized in McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013).

The purpose of this evidence is not to show mere wealth; rather, it is to explain why these defendants would keep giving loans to problem borrowers while concealing those loans from the Bank's board, auditors, and examiners. *See United States v. Kinchen*, 729 F.3d 466, 472 (5th Cir. 2013) (stating that evidence of other acts was admissible "where the actions help establish why the defendant wanted to commit the charged offense"). The Bank officer defendants' compensation depended on the success of the Bank. Had the Bank's board, auditors, or examiners learned that large bank credits were failing, the Bank officer defendants would endanger their own salaries and their accumulated stock options.

Any potential for juror misuse of this evidence can be cured with a proper limiting instruction. *See United States v. Reed*, 908 F.3d 102, 115 n.42 (5th Cir. 2018) ("We generally presume that juries follow trial court instructions."); *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (evidence of wealth to show motive "may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references

26

to that wealth"). Therefore, evidence related to the defendants' compensation should be admitted as intrinsic evidence or, alternatively, as extrinsic evidence of motive under Rule 404(b).

*Borrower J and Borrower K*

Evidence related to the defendants' funneling of loan proceeds to Borrower J and Borrower K is intrinsic to the charged bank fraud conspiracy because it is "inextricably intertwined" with the charged conduct, and it is part of a "single criminal episode." *See Ceballos*, 789 F.3d at 620. The government's presentation of evidence concerning Charity's loans will necessarily involve Borrower J. Indeed, the second superseding indictment explicitly references Borrower J and the lease arrangement he had with Charity at 620 Decatur Street. Rec. Doc. 318, pp. 12-13. The second superseding indictment describes how Ryan and Burnell used the lease arrangement to fraudulently prop up Charity's loans, including after Borrower J stopped paying rent, which required Ryan and Burnell to set up an operating account at the Bank to continue the payments to Charity. Rec. Doc. 318, pp. 12-13.

To understand this arrangement, the jury will need the proper context as to the special treatment Borrower J received from Ryan, Burnell, and Beebe. Exposing Borrower J's fraudulent loans, even after Borrower J had been investigated for his own fraud, would have led to questions about the Bank's lending practices and about how Borrower J could afford to pay Charity $20,000 every month. Ryan's and Beebe's lies to the FBI during the investigation into Borrower J and on CAAPs to the board of directors served the dual purpose of covering up Ryan, Burnell, and Beebe's fraud on Borrower J's loans and Ryan and Burnell's fraud on Charity's loans.

There is no way to discuss the Charity scheme without also discussing the defendants' roles in the Borrower J scheme. As such, evidence as to Borrower J is intrinsic because it "complete[s] the story of the crime." *See Rice*, 607 F.3d at 141. Alternatively, the evidence is admissible under Rule 404(b) because it shows the defendants' intent and motive in continuing to funnel money to troubled borrowers and conceal information from the board of directors, auditors, and examiners. *See Juarez*, 866 F.3d at 626-27; *Kinchen*, 729 F.3d at 472. Moreover, considering some defendants' statements distancing themselves from Ryan and blaming Ryan for the fraud, this evidence demonstrates that the defendants worked together as members of the bank fraud conspiracy. *See Watkins*, 591 F.3d at 784.

The same is true for evidence related to Borrower K and payments that were funneled to him through Treme. Similar to Borrower J and Charity, Treme lacked sufficient income to pay Borrower K himself. To fix this problem, Ryan, Burnell, and Beebe fraudulently issued loans to Treme and then charged Treme's account to pay Borrower K. Ryan, Burnell, Beebe, and Calloway also arranged fraudulent loans for Borrower K, knowing he lacked income other than what he received through Treme and that he would be spending loan proceeds on personal expenses.

As with the Borrower J and Charity schemes, the Borrower K and Treme schemes happened during the time period charged in the second superseding indictment. The jury will require context as to why Ryan, Burnell, and Beebe funneled money to Treme, whom they knew had insufficient income to repay his loans. In addition to being Ryan's business partner, Treme was the source of income for Borrower K, who was Ryan's nephew. Further, if the defendants had allowed Borrower K's or Treme's loans to fail or appear on month-end reports, it could have led to scrutiny from the board of directors, auditors, or examiners. Because evidence related to

28

Borrower K is necessary context for the jury to understand the Treme scheme, it is intrinsic and admissible. *See Ceballos*, 789 F.3d at 620; *Rice*, 607 F.3d at 141. It is also relevant to motive and admissible under Rule 404(b) because it shows Ryan funneling money to a member of his family and his codefendants signing fraudulent loans to cover up previous lies. *See Juarez*, 866 F.3d at 626-27; *Kinchen*, 729 F.3d at 472. Finally, evidence related to Borrower K will be necessary to rebut arguments by some defendants portraying Ryan as the only perpetrator of the fraud. *See Watkins*, 591 F.3d at 784.

*Universal Pro-Vision*

Likewise, evidence related to Universal Pro-Vision will show that the defendants collaborated during the time period charged in the second superseding indictment. Rather than being "dominated" by Ryan, Calloway chose to go into business with him. To further his and Ryan's side-business, Calloway funneled money to Borrower L, who was his and Ryan's business partner and tenant.

This evidence is intrinsic because it goes to the existence of a conspiratorial agreement and intent: Calloway worked closely with Ryan, and his conduct in the Gibbs scheme was consistent with his conduct for other borrowers whose financial status he concealed from the board. *See Ceballos*, 789 F.3d at 620; *Rice*, 607 F.3d at 141. This evidence also goes to motive and is admissible under Rule 404(b) because it demonstrates why Calloway would continue arranging and signing Gibbs loans that he knew contained false and fraudulent information. *See Juarez*, 866 F.3d at 626-27; *Kinchen*, 729 F.3d at 472. Finally, this evidence is necessary to rebut Calloway's arguments distancing himself from Ryan and claiming that Ryan "dominated" him. *See Watkins*, 591 F.3d at 784.

## CONCLUSION

For the foregoing reasons, the evidence described above should be admitted either as intrinsic evidence or under Federal Rule of Evidence 404(b).

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY

*/s/ Matthew R. Payne*
MATTHEW R. PAYNE
NICHOLAS D. MOSES
J. RYAN McLAREN
K. PAIGE O'HALE
RACHAL CASSAGNE
Assistant United States Attorneys
U.S. Attorney's Office (E.D. La.)
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3081
E-Mail: matthew.payne@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of October, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to ECF-registered counsel of record

*/s/ Matthew R. Payne*
MATTHEW R. PAYNE
Assistant United States Attorney