UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 20-65** |
| v. | * | SECTION: "L"(4) |
| **ASHTON J. RYAN, JR.** | * | |
| **WILLIAM J. BURNELL** | | |
| **ROBERT B. CALLOWAY** | * | |
| **FRANK J. ADOLPH** | | |
| **FRED V. BEEBE** | * | |

\* \* \*

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF GOVERNMENT'S MOTION TO ADMIT LAY OPINION TESTIMONY

The government submits the following supplemental memorandum in support of its motion to admit lay opinion testimony. Rec. Doc. 367. The Court requested that the government submit a memorandum discussing the notice requirements of lay opinion testimony under Federal Rule of Evidence 701 and Federal Rule of Criminal Procedure 16. Rec. Doc. 373. Courts have recognized that lay opinion testimony requires no such formal notice like that required for expert testimony. However, as set forth below, the government's proffered evidence falls well-within lay opinion testimony, and the government has provided adequate notice through the disclosure of agent reports and other evidence upon which these witnesses will base any lay opinions.

**I.    Notice Requirements in Fed. R. Crim. P. 16 and Fed. R. Evid. 701.**

The Federal Rules do not prescribe any notice for lay opinion testimony that is admitted under Rule 701. Fed. R. Crim. P. 16(a)(1)(G) states that the government must, at the defendant's request, provide a "written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Fed. R.

Crim. P. 16(a)(1)(G). Rule 16 also provides for reciprocal discovery, obliging the defendants to give a written summary of any such testimony to be offered under Evidence Rules 702, 703, or 705 if the government has provided the same discovery, or if the defense intends to present expert testimony that a defendant's mental defect is a defense. Fed. R. Crim. P. 16(b)(1)(C).

These Rule 16 provisions were part of a revision to the rule in 1993. The commentary on the 1993 amendments explains that the goal of the amendments was to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 Advisory Comm. Notes (1993). However, the Advisory Committee stated explicitly that "[t]he rule does not extend, however, to witnesses who may offer only lay opinion testimony under Federal Rule of Evidence 701[]," "[n]or does the amendment extend to summary witnesses who may testify under Federal Rule of Evidence 1006 unless the witness is called to offer expert opinions apart from, or in addition to, the summary evidence." Fed. R. Crim. P. 16 Advisory Comm. Notes (1993).

The Advisory Committee that revised Federal Rule of Evidence 701's commentary condoned the type of testimony that the government will be eliciting here. The drafters of the 2000 amendments had concerns that "Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 Advisory Comm. Notes (2000). However, the same drafters made it clear that courts nonetheless may admit lay opinion testimony under Rule 701. Notably, as an illustrative example, the drafters chose businesspeople testifying about their affairs, explaining that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701 Advisory

Comm. Notes (2000) (citing *Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business)). Courts have admitted this testimony "because of the particularized knowledge that the witness has by virtue of his or her position in the business," and "[t]he amendment does not purport to change this analysis." Fed. R. Evid. 701 Advisory Comm. Notes (2000).

Courts have similarly held that there is no requirement for a party to provide an expert-type of summary to introduce lay opinion testimony. For example, in *United States v. Valencia*, 600 F.3d 389 (5th Cir. 2010), the Fifth Circuit agreed with the district court that a former chief risk officer of a natural gas trading company could testify as a lay witness. The defense asserted on appeal that the district court erred because the risk officer "was an expert witness, implicating the strictures of prior disclosure under Federal Rule of Criminal Procedure 16(a)(1)(G), as well as foundation and reliability requirements under Federal Rule of Evidence 702[.]" *Id.* at 412. The Fifth Circuit instead affirmed the district court's ruling because the witness was "engaged in precisely the kind of analysis he regularly performed as chief risk officer; the fact that he drew particular opinions and projection for the purposes of this case does not make him an 'expert' within the meaning of Federal Rule of Evidence 702." *Id.* at 416 (citation and footnote omitted).

Similarly, the Eleventh Circuit considered a fraud prosecution where the defendants objected to the district court permitting representatives of victim lending institutions to give opinion testimony relating to whether the defendants' purported misrepresentations would have had any effect on the approval of loans. *United States v. Hill*, 643 F.3d 807, 840 (11th Cir. 2011). The defendants argued that the district court erred in permitting this "expert" testimony without "following the proper procedures for qualifying an expert witness or for disclosing the contents

of the expert's testimony as required by Rule 16(g) of the Federal Rules of Criminal Procedure." *Id.* The Eleventh Circuit affirmed the district court based on the text and commentary of the Federal Rules, finding that these witnesses were not giving expert testimony because they did not testify "based on any 'scientific, technical or other specialized knowledge,' but instead based their testimony on their personal experiences as officers of financial institutions with knowledge of their companies' policies and of the specific transactions at issue." *Id.* at 842; *see also United States v. Tinoco*, 304 F.3d 1088, 1119 (11th Cir. 2002) (holding Coast Guard officer's testimony "fell within the purview of lay opinion testimony under Federal Rule of Evidence 701, and thus was not subject to the disclosure requirements found in Federal Rule of Civil Procedure 16(a)(1)(E)."); *United States v. Whaley*, 860 F. Supp. 2d 584, 596 (E.D. Tenn. 2012) (admitting lay opinion testimony from bank employees about their observations during their investigation into misrepresentations on loan documents and about whether the bank would have made the loans in the absence of the fraud and holding that no Rule 16(a)(1)(G) disclosures were required).

## II. The Government's Disclosures Should Allay Any Concerns Regarding Unnecessary Surprise at Trial.

In the instant case, while lay witness testimony is admissible under Rule 701 without formal notice requirements, any concern of unnecessary surprise at trial should be allayed by the government's disclosure of reports and other evidence that serve as the basis for any potential lay opinions. These disclosures include First NBC's loan policy manuals, *see* USAO-0005274773 (June 2015 Loan Policy Manual), auditor and examiner reports, *see* USAO-0005272609 (March 2015 Ernst & Young audit report) and USAO-0005286237 (FDIC and Louisiana OFI 2015 examination report), and loan packages, *see* Rec. Doc. 266 (government's bill of particulars

listing loan packages that contain statements alleged to be false) (filed under seal).[1] Furthermore, the government has disclosed numerous agency reports of interviews with witnesses that provide notice of much of this lay opinion testimony.

For example, the government has disclosed the report of an interview with an FDIC examiner who is anticipated to testify at trial regarding his experience performing examinations of First NBC. He was interviewed about the information he expected bank officers to have disclosed to examiners and which of those items were not disclosed. *See* **Exhibit A** (USAO-0013579559).[2] He stated that the fact that First NBC was making working capital loans to borrowers to make loan payments was not disclosed to examiners or the board. Ex. A, p. 8. Further, inflating loan amounts to cover loan payments in addition to the stated purpose of the loan was not disclosed by bank officers to examiners or the board. Ex. A, p. 8. Moreover, bank officers received questionnaires from the FDIC during bank examinations and were supposed to be truthful, including disclosing loans with capitalized interest. Ex. A, p. 8. He also expected bank officers to disclose loans with capitalized interest to the board of directors. Ex. A, p. 8. He stated that First NBC's loan policy did not allow nominee loans, like those made to St. Angelo, and the failure of bank officers to disclose these to the board concealed the true financial condition of the borrowers and First NBC. Ex. A, p. 7.

In similar fashion, the government has disclosed the interview of an Ernst & Young ("E&Y") external auditor who audited First NBC between 2015 and 2016. *See* **Exhibit B** (USAO-0012664473). She explained that, typically, auditors rely on the bank to provide loan documents for their review, and auditors do not look at DDAs (demand deposit accounts) at the bank. Ex. B, p. 2. She said that auditors became suspicious of Kenneth Charity's loans because

---

[1] Documents with USAO bates numbers have been produced by the government in discovery.
[2] The government attaches the reports of interviews under seal.

Charity's personal financial statements and tax returns did not support the debt. Ex. B, p. 2. However, auditors added Ryan's borrowers to their audit review because of his dominance and added audit procedures during their review related to fraud risk. Ex. B, p. 2. She noted that it was unusual for a bank CEO to have his own borrower portfolio. Ex. B, p. 5. She explained that First NBC's practice of keeping borrowers off past due lists was a practice she had never seen before, and had E&Y known about it, the result of the audit would have been different. Ex. B, p. 3. She explained that she assumed that loan proceeds were being used for their intended purpose, and that loan proceeds for "working capital" meant that they were used for general operating procedures. Ex. B, p. 3. She stated that auditors would have wanted to know that certain borrowers were paying loans with loan proceeds. Ex. B, p. 4.

Likewise, the government has disclosed reports of interviews with board members, such as an interview of a First NBC board member who was also on the Board Loan Committee (BLC). *See* **Exhibit C** (USAO-0012664487). He stated that board members expected bank officers to be accurate and not misrepresent information. *See* Ex. C, p. 3. He said that Ryan made material misrepresentations when presenting Charity's loan package to the BLC. Ex. C, pp. 1-8. The board member said that the BLC would have wanted to know if a borrower was using loan proceeds for something other than the stated purpose. Ex. C, p. 8. Board members should have been told that loan proceeds were being used to clear overdrafts because that was indicative of a borrower's financial status. Ex. C, p. 6. The board member expected bank officers like Calloway to speak up at board meetings if they knew that incorrect information was being presented to the board. Ex. C, p. 7. Further, it was unacceptable for Ryan to "gross up" a loan to make loan payments, *i.e.*, to authorize that a borrower receive a larger loan to make loan payments on his prior loan. Ex. C, p. 8.

The testimony from former First NBC employees will involve the policies and practices at the bank. As an example, the government has disclosed the interview of a former senior loan officer and executive vice president of the bank. *See* **Exhibit D** (USAO-0012345492). He stated that First NBC had good loan policies in place, but that not all officers followed these policies. Ex. D, p. 1. He was aware that other officers, such as Calloway, often signed and approved loans that were not creditworthy. Ex. D, p. 1. First NBC also had a system of criticized asset action plans ("CAAPs") that were supposed to be implemented once a borrower was noticeably in financial distress or when the loan was not being paid as agreed. Typically, a bank would not continue making loans to a distressed borrower while implementing CAAPs, but First NBC continued to make loans to distressed borrowers. Ex. D, p. 1. This officer noted that a "red flag" for him was the average amount of overdrafts being significantly higher than the end of month overdraft report, which showed that payments were coming in right at the end of the month. Ex. D, p. 2. If anyone would have compared those numbers, they would have seen there was a much larger problem with overdrafts. Ex. D, p. 2. The senior loan officer said that loans to St. Angelo were not supported by cash flow or collateral, and that Gibbs' loans were not supported by cash flow and were inaccurately described as "working capital" when they actually were used to cover overdrafts. Ex. D, pp. 2-3.

The government has disclosed interview reports of lower-level employees who would likewise testify about loan policies at First NBC, such as a junior loan officer who worked under Beebe. *See* **Exhibit E** (USAO-0013582248). This junior officer stated that the signature of an approving officer on a loan package meant that that person had processed the package and to the best of their knowledge all information was accurate. Ex. E, p. 4. Beebe, however, often kept risk ratings the same when a loan went up for renewal. Ex. E, p. 3. When the junior loan officer tried

to lower a loan's risk rating to reflect higher risk, Beebe told him not to do so because the loan would be sent to the board for approval. Ex. E, pp. 3-4. Beebe told the junior officer that having such loans go to the board led to more scrutiny and Ryan did not want that. Ex. E, p. 4.

Insofar as this testimony incorporates lay opinion, it need not be the subject of any additional notice to the defense under the Federal Rules and case law applying those rules. Nonetheless, the government has disclosed the reports of interviews that contain much of this proposed testimony, and the government has disclosed the First NBC's loan policies, loan documents, auditor and examiner reports, board presentations, and other evidence upon which this testimony will be based. This testimony should be admitted, and no further disclosure is required.

## **CONCLUSION**

For the foregoing reasons, the government requests that the Court admit lay opinion testimony without further disclosures reserved for expert testimony.

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY


*/s/ Matthew R. Payne*
MATTHEW R. PAYNE
NICHOLAS D. MOSES
J. RYAN McLAREN
K. PAIGE O'HALE
RACHAL CASSAGNE
Assistant United States Attorneys
U.S. Attorney's Office (E.D. La.)
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3000
E-Mail: Matthew.Payne@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on this 18th day of October, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to ECF-registered counsel of record.

                                            */s/ Matthew R. Payne*
                                            MATTHEW R. PAYNE
                                            Assistant United States Attorney