# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 20-65** |
| **ASHTON J. RYAN JR.** | **SECTION "L"(4)** |
| **WILLIAM J. BURNELL** | |
| **ROBERT CALLOWAY** | |
| **FRANK J. ADOLPH** | |
| **FRED V. BEEBE** | |

## ORDER AND REASONS

Before the Court is the Government's "Motion to Disqualify Jones Walker LLP as Counsel for Robert B. Calloway," R. Doc. 649. Defendant Robert Calloway opposes the motion. R. Doc. 663.  The Government filed a reply. R. Doc. 673. The Court held a daylong evidentiary hearing and heard oral argument from counsel. Having carefully considered the parties' briefing, the oral argument of counsel, the record, and the applicable law, the Court now issues this Order and Reasons.

## I.   BACKGROUND

This case arises from alleged fraudulent bank activity at First NBC Bank ("the Bank" or "FNBC"), the failure of which cost the Federal Deposit Insurance Corporation's deposit insurance fund approximately $996.9 million. On August 5, 2021, a 49-count Second Superseding Indictment ("the Indictment) was entered charging Defendants with conspiracy to commit bank fraud, bank fraud, and false entries in bank records. R. Doc. 318. In relevant part, the Indictment alleges that Bank Officers and borrowers participated in a scheme to defraud the Bank and enrich

1

themselves by lying on loan documents about borrowers' creditworthiness, the purposes of the loans, and the method of repayment. *Id.* at 7.

Defendant Robert B. Calloway began his employment with the Bank in 2006 as Senior Vice President and Commercial Relationship Manager. From 2014 until the Blank's closure, Calloway served as Executive Vice President and Commercial Relationship Manager with a specialization in tax credits. *Id.* Calloway's responsibilities included presenting loan packages to the Senior Loan Committee to review and acting as a credit officer for specific Bank clients.

Among Calloway's clients was Gary Gibbs, a Bank borrower from approximately 2008 through April 2017. *Id.* at 3. As Gibbs's loan officer, Calloway exercised authority over Gibbs's loans, including by preparing and approving Gibbs's loan packages and presenting Gibbs's loans to the Bank's board loan committee. *Id.* at 7-9. Calloway allegedly funneled loan proceeds to Gibbs by approving and facilitating loans despite his knowledge that Gibbs and his business entities did not generate sufficient income for Gibbs to make his existing loan payments. *Id.* at 8. These new loan proceeds allegedly were used to pay Gibbs's overdrafts and existing debt service instead of the purpose for which the new loans were approved as stated in the Bank's documents. Calloway is only charged in the Indictment in connection with the loan relationship with Gibbs.

Following the Bank's closure, Gibbs was indicted on charges of bank fraud and ultimately pleaded guilty to one count of conspiracy to commit bank fraud. In connection with his plea agreement, Gibbs signed a factual basis detailing his involvement in the conspiracy. *See* criminal action no. 20-60, E.D. La., *United States v. Gibbs*, R. Doc. 19. Gibbs is currently cooperating with the Government and is expected to testify at trial on the Government's behalf against Calloway and other Defendants, including Ashton Ryan, Jr., the Bank's founder and former President, Chief

Executive Officer, and Chairman of the Board, and William Burnell, the Bank's former Chief Credit Officer. R. Doc. 318 at 2-3.

On March 15, 2022, the Government submitted a letter to the Court, copying all defense counsel, in which it explained that it had learned that day from Gibbs that he had previously been represented by Mike Magner and the law firm of Jones Walker LLP ("Jones Walker" or "the Firm"). R. Doc. 643. The Government expressed serious concern that the prior representations could constitute a disqualifying conflict of interest. The next day, the Government furnished the Court and all counsel with an additional letter that provided further detail on the Firm's previous engagements with Gibbs. *Id.* Despite the Indictment having been returned over 18 months ago and despite Jones Walker having represented Calloway from the outset of this case, the letters from the Government—sent less than three months before the trial date in this massively complex case—were the first indication to the Court that a potential conflict of interest may exist with respect to Mike Magner and the Firm serving as counsel in this case.

On March 17, 2022, the Court held a hearing at which it discussed the potential conflict issues with counsel for the Government and Calloway. The Court expressed its disappointment that, until that point, no party had advised it of Jones Walker's multiple past representations of Gibbs, let alone that they may pose a potential or actual conflict of interest.

At the hearing, the Government indicated it would file a motion to disqualify the Firm. The Court issued an expedited briefing schedule given the looming June 6, 2022 trial date. The Court also set an evidentiary hearing to ascertain whether there is a substantial relationship between the Firm's prior representations of Gibbs and the present matter and to determine whether Calloway and Gibbs consented to any conflict. Additionally, the Court ordered a hearing for Calloway pursuant to *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).

## II.     PRESENT MOTION

The Government now moves to disqualify Mike Magner and the law firm of Jones Walker as counsel for Defendant Robert Calloway because he and the Firm purportedly are laboring under an actual conflict of interest that cannot be waived. R. Doc. 649 at 33. The Government argues that a substantial relationship exists between the subject matter of Jones Walker's former representations of Gibbs and the Firm's present representation of Defendant Calloway. *Id.* at 33. Specifically, the Government contends that Mike Magner and the Firm represented Gibbs and his business entities in several matters that, as discussed *infra*, bear directly on important issues and witnesses in this litigation. *Id.* at 36.  And because Gibbs has not consented to Jones Walker's representing Calloway in this criminal proceeding, the Government asserts that the ethical rules prohibit the Firm from serving as Calloway's counsel in this matter.

Defendant Calloway opposes the motion. He contends, through his counsel at Jones Walker, that the Firm's prior representations of Gibbs are not substantially related to the criminal charges against him and that counsel at Jones Walker did not receive any client confidences from Gibbs that could be used against him at trial. R. Doc. 663. Rather, Calloway insists that his counsel's cross-examination of Gibbs will be based on other sources, namely, depositions he gave in other matters, the factual basis for his plea, and his debriefs with the Government in this very case. Because the Firm's prior representations of Gibbs and his entities are not the same or substantially related to its representation in the pending case, Calloway argues that the Firm was not required to obtain a written conflict waiver from Gibbs. Moreover, Calloway asserts that, even assuming there is an actual conflict, Gibbs's delay in raising the issue amounts to a waiver of his right to seek the Firm's disqualification.

## III.   EVIDENTIARY HEARING

On March 25, 2022, the Court held an evidentiary hearing to determine whether there is a substantial relationship between the Firm's successive representations of Gibbs and Calloway.[1] The Court heard from four witnesses: (1) Mr. Gary Gibbs;[2] (2) Mr. Craig Gabbert, Gibbs's bankruptcy attorney on or around 2017 to 2018; (3) Ms. Lisa Futrell, a partner at Jones Walker and bankruptcy attorney who represented Gibbs and entities affiliated with Gibbs from 2016-2017 concerning restructuring of Gibbs's loans with the Bank; and (4) Mr. Michael Magner, a partner at Jones Walker who presently is lead counsel for Calloway and previously represented Gibbs during a 2013 investigation by federal law enforcement into an affordable housing venture in which Gibbs was involved. In addition to the testimony and exhibits, the Court also reviewed *in camera* contemporaneous notes taken by attorney Magner concerning his 2013 representation of Gibbs. The evidence elicited is summarized below.

### 1.   Jones Walker's Representations of Gibbs-Controlled Entities in 2009 to 2010

In or around June 2009, Jones Walker sent a letter to Gibbs as president of Coastal Phoenix Investments, LLC ("CPI") regarding "financial, tax and economic development advice[]." Def. Ex. 1B (capitalization altered).[3] The letter states that the Firm will assist CPI "by providing advice regarding the structure and documentation of investments to be made by the company." *Id.* In his testimony, Gibbs stated that the representation likely concerned "the potential" to enter into "New Market Tax Credits" ("NMTC") transactions in Louisiana and

---

[1] At the request of the parties and in light of the highly sensitive nature of the hearing—it concerned potentially confidential and privileged attorney-client information—the courtroom was sealed.

[2] The Court ensured that Gibbs's current criminal defense counsel was present for the hearing.

[3] The date of the letter is unknown. The end of this unsigned letter states that it is "agreed and accepted this ___ date of June, 2009," but no date is filled in on the space provided. Further, the Firm retained only a MS Word version of the letter, which automatically populates the present date when opened. Accordingly, the version that was entered into evidence is erroneously dated March 20, 2022, as that was the date the Firm opened the Word document, converted it into a PDF, and included it as an exhibit in its briefing.

possibly low-income housing tax credits in Louisiana and Arkansas. The letter includes a section on conflict waivers, stating that CPI agrees to waive any conflicts arising from the Firm's representation of current or future clients in matters "not substantially related" to its representation of CPI. *Id.* The letter was drafted by now-former Jones Walker partner Louis "Sunny" Nunes. Gibbs did not sign the document.[4]

In March 2010, the Firm, again through Sonny Nunes, transmitted a letter to Gibbs and two entities closely associated with him—Coon Bayou, L.L.C. ("Coon Bayou") and Grand Prairie Corp. ("Grand Prairie")—concerning a request for a waiver of conflict of interests.[5] Def. Ex. 1A. As the letter states, the Firm represented Coon Bayou and Grand Prairie, serving as their "special tax counsel in connection with a new markets tax credit transaction" involving FNBC. The tax credits would be used to "finance the development of a hunting lodge facility" in Arkansas that was owned and operated by Coon Bayou and Grand Prairie. *Id.* Because the Firm also represented FNBC in other matters, the letter requested that the companies waive any conflict of interest that existed or may arise as a result of the Firm's representation of FNBC in matters not directly related to the NMTC transaction. Without filling in the date, Gibbs executed the conflict waiver on behalf of Coon Bayou and Grand Prairie. Attorney Nunes left Jones Walker in 2016. The Firm represents that it has searched for, but has not located, any files related

---

[4] In its March 15, 2022 letter to the Court, the Government asserted that Gibbs had reported that he was represented by a Jones Walker attorney in 2009 or 2010 concerning Levy Gardens, a real estate development project in New Orleans that FNBC also was involved in. R. Doc. 643; *see also* R. Doc. 649 at 8. "This is potentially relevant to the present case," the Government wrote, "because bank records indicate that Calloway fraudulently diverted Gibbs' loan proceeds to pay the debt on the Levy Gardens project." R. Doc. 643.

At the hearing, Gibbs testified that, in 2009, he was consulting for real estate developers Henry Klein and Fred Heisler on the Levy Gardens project. Eventually, Regina Heisler, a relative of Fred Heisler's, became involved in the project. She is named as Borrower F in Gibbs's factual basis. However, Gibbs never indicated at the hearing that the Firm represented him or entities affiliated with him in connection with Levy Gardens.

[5] In his testimony at the hearing, Gibbs stated he owned 100% of Coon Bayou. He did not indicate the extent of his ownership interest in or control of Grand Prairie; the March 2010 letter indicates that he was the "Chief Manager" of both entities. Def. Ex. 1A.

to either of the two aforementioned representations of Gibbs by Nunes. R. Doc. 663 at 14

(Calloway's brief).

### 2. Jones Walker's Representation of Gibbs in 2013

On June 26, 2013, Gibbs executed an engagement letter with Jones Walker attorneys

Michael Magner and Pauline Hardin for representation "in relation to a Grand Jury Investigation

in the Eastern District of Louisiana." Def. Exs. 2, 3A, 4A. Primary responsibility for the

representation rested with Magner. The engagement letter did not include any provision waiving

conflicts of interest. Def. Ex. 2.

Gibbs sought out Jones Walker's legal services in light of a criminal investigation federal

authorities were conducting into an affordable housing venture that he was working on in Lake

Charles, Louisiana called the Meadows project. Def. Ex. 5. Gibbs, through his company

Affordable Housing Services, LLC, consulted on the Meadows project, providing advice on tax

credits and Community Development Block Grants provided by the Louisiana Office of

Community Development ("OCD").

Throughout the representation, Attorney Magner took handwritten, contemporaneous

notes documenting conversations relating to the matter. These notes make repeated reference to

FNBC, Ashton Ryan, and Robert Calloway.[6]

During the representation, attorneys Magner and Hardin had conversations—either in

person or via phone—with Gibbs on several occasions. On June 26, 2013, for instance, the two

attorneys met with Gibbs. That same day, attorney Magner had a phone call with one of the

Assistant United States Attorneys ("AUSAs") handling the investigation into the Meadows

---

[6] Some notes include a date, while others do not. Nonetheless, all notes can be dated by reviewing the substance of the notes and cross-referencing them with the Firm's invoices to Gibbs, which describe the work the Firm performed on Gibbs's behalf for each date billed.

project. In an email to Gibbs memorializing the phone conversation, attorney Magner stated that he had provided the AUSA with a "broad overview" of Gibbs's participation in the Meadows project. Def. Ex. 4B. Magner described Gibbs as originally having served as a consultant on the project but withdrawing after he became "increasingly . . . uncomfortable" with the head of the project, Cliff Olsen.

After Gibbs ended his association with the venture, Magner's email recounts that Gibbs was asked to review and revive the project by, among others, Ashton Ryan. Gibbs accepted and helped get "the project back on its feet" by bringing in a new contactor, DeVere Construction Company ("DeVere"), to oversee the housing development's construction. Further, Gibbs's review of Olsen's work purportedly uncovered "possible financial improprieties," which he reported to OCD. *Id.* Gibbs also allegedly hired a "knowledgeable CPA/auditor" to review the project's files. *Id.* The CPA/auditor discovered "a number of problematic transactions[,] which were reported to FNBC and the OCD." *Id.*

According to Magner's email, after he summarized Gibbs's role in the Meadows project, he advised the AUSA that Gibbs "would like to assist" authorities with their investigation. *Id.* Magner wrote that Gibbs "may or may not have firsthand knowledge of" problems with the Meadows project, including a "bogus payment and performance bond and . . . questionable use of project moneys," by Cliff Olsen. Attorney Magner's email further informed Gibbs that the AUSA had confirmed that Gibbs was merely a witness—not a subject or target—in the investigation. Furthermore, the email references a proffer that attorney Magner had made to the Government in connection with representing Gibbs.

The following month, in July 2013, Magner assisted Gibbs in preparing for and meeting with officials from several federal law enforcement agencies—namely, the United States

Attorney's Office, the FBI, and the Department of Housing and Urban Development Office of

Inspector General ("HUD OIG")—regarding the Meadows project probe. Def. Exs. 3B; 5. Gibbs

testified at the evidentiary hearing that, in preparing for his interview with law enforcement, he

discussed with attorney Magner his business as a developer and a consultant, including his work

with tax credits and Community Block Development Grant funds. Attorney Magner's notes from

his meeting with Gibbs in preparation for the interview with federal authorities appear to confirm

Gibbs's testimony in this regard.

Magner's notes from that meeting also corroborate the timeline of events outlined in

Magner's June 2013 email to Gibbs. In essence: Gibbs was hired by Olsen on or around 2007 to

work on the Meadows project as a consultant but left in 2008 after the project—which involved,

at the least, very concerning business practices—fell apart. The Bank then became involved in

the project and tasked Gibbs with trying to right the ship. The construction company DeVere was

brought aboard and finished the project in 2011. Later, Olsen informed Gibbs that Gibbs may be

subject to a subpoena due to a whistleblower complaint relating to the project. The notes also

reference that Calloway refused to answer questions from the FBI, presumably in connection

with an investigation into the Meadows project. Furthermore, immediately after mentioning that

DeVere completed construction on the project in late 2011, the notes state: "Debeard [*sic*]

Construction got nothing."[7]

Gibbs also testified that his conversations with Magner touched on his income from the

Meadows project, with Gibbs citing Richard "Dick" Crittenden, who led DeVere, as one source

of such income. Crittenden is referred to as Borrower E in Gibbs's factual basis. According to a

---

[7] As mentioned, the actual name of the business is "DeVere Construction Company." Magner drew an arrow from "Debeard Construction" to the words "got nothing."

memorandum by HUD OIG documenting Gibbs's July 19, 2013 interview with federal agents, Gibbs stated that he was paid a consulting fee of $200,000 to $300,000 for his work on the Meadows project and believed that this fee was based on a percentage of the developer's fee for the project. Def. Ex. 5.

Gibbs further testified that he told Magner that there were financial irregularities attending the Meadows project and that he expressed concerns regarding Calloway's work relating to the project. In particular, Gibbs found it surprising that "the transaction would close without a vetting of the payment performance bond instrument" and that "Calloway never sought that bond until sometime after" the closing of a deal. Gibbs presumably was referring to a transaction that was made at the time Olsen was heading the Meadows project.

Additionally, Gibbs testified that he and Magner had what Gibbs characterized as "off-the-clock" phone conversations during the 2013 representation. In these conversations, Gibbs explained that the two discussed his real estate business, relationship with FNBC, and observations on the Bank's operations. Gibbs stated that, "more than likely," he reported to attorney Magner that he had inappropriately received loans from FNBC.

Following the debrief with federal law enforcement authorities, attorney Magner did not record any additional work performed on behalf of Gibbs. On January 23, 2014, Magner emailed Gibbs to notify him that it did not appear that the investigation into the Meadows project would go any further and that the representation would therefore be terminated. Def. Ex. 6. During the entirety of the representation, the Firm billed Gibbs for a total of 15.8 hours of legal work.

In an April 2018 email to Calloway regarding conflict waivers, attorney Magner characterized the prior representation of Gibbs as "essentially ministerial in nature." Def. Ex. 11. Calloway responded via email confirming his waiver of any potential conflicts pertaining to the

Firm's prior representation of Gibbs. *Id.* On October 21, 2021, Magner again emailed Calloway to update him on possible conflicts of interest. Magner stated that the representation of Gibbs was "in connection with a Grand Jury subpoena" and that he did not believe that "it poses any type of conflict." Def. Ex. 14. Calloway, via email, acknowledged receipt and agreed to waive possible conflicts. *Id.*

### 3. Jones Walker's Representations of Gibbs-Affiliated Entities in 2015 – 2016

On January 9, 2015, Gibbs, as Director of Grand Prairie, executed an engagement letter in which the Firm confirmed that it would represent Grand Prairie "as 501(c)(3) counsel in connection with is business operations." Def. Ex. 30. Former Jones Walker attorney Ronald Bell signed the engagement letter on behalf of the Firm.

In September 2015, Ronald Bell, on behalf of the Firm, sent Gibbs, as Managing Member of Windsor Pointe, LLC ("Windsor Pointe"), an invoice for nearly $70,000 for services rendered "in connection with representation of Windsor Pointe 2011 L.P. before Tennessee Housing Development Agency for utility allowance compliance matters." Govt. Ex. K. Gibbs testified that representation was related in part to an allocation of low-income housing tax credits that Windsor Pointe had received from the Tennessee Housing Finance Agency to provide affordable housing in Memphis, Tennessee. Billing records indicate that the representation spanned at least March to August 2015 and that only attorney Bell and John Peck, another Jones Walker attorney, worked on the matter. Both Bell and Peck were attorneys in the Firm's now-shuttered Cincinnati, Ohio office and, around spring 2017, left Jones Walker for the law firm Coates Rose LLP. Gibbs directed Jones Walker to transfer the files pertaining to this representation to Coates Rose, and Jones Walker indicates that it no longer possesses the case files.

**4. Jones Walker's Representations of Gibbs in 2016-17 Concerning Loan Restructuring**

In December 2016, Gibbs contacted Jones Walker to represent CPI in its efforts to restructure loans with the Bank. The invoice from this engagement reflects that CPI owed over $60 million in loans to the Bank. Def. Ex. 8A. On February 13, 2017, the Firm sent Gibbs an engagement letter confirming its representation of Gibbs individually and a number of businesses associated with him.[8] Def. Ex. 7. The engagement letter sets forth the scope of the representation: the Firm would represent the above-mentioned clients "in their attempts to restructure, out of court, various loans made by First NBC." *Id.* The letter also included a conflict waiver regarding the Firm's concurrent representation of FNBC on an unrelated loan. On February 16, 2017, Gibbs signed the engagement letter on behalf of himself and his associated businesses.

Although the engagement letter expressly refers to the Firm working on restructuring efforts only, Gibbs testified that the representation extended to the issue of bankruptcy. Specifically, Gibbs stated that he met with Jones Walker attorneys Elizabeth Futrell and Susan Tyler, both of whom were staffing this matter, to discuss "a possible . . . bankruptcy" in addition to a restructure. Gibbs explicitly recalled receiving advice on both restructuring and bankruptcy in April 2017. However, none of the billing invoices pertaining to this representation reference bankruptcy, *see* Def. Exs. 8A-C. And contrary to Gibbs's testimony, attorney Futrell testified

---

[8] The companies, and Gibbs's ownership stake in them, were: CPI, Gibbs's operating company in which he held a 100% ownership stake; GRGCBHS, LLC, an entity that owned a hotel in Hot Springs, Arkansas and in which Gibbs had a 40% percent ownership stake; DELTACB, LLC, an entity that owned part of the Arkansas hunting resort, was involved in NMTC and in which Gibbs held a 95% ownership stake; CBBB, LLC, an entity that owned part of the hunting resort, was involved in NMTC, and in which Gibbs held a 95% ownership stake; Coon Bayou, an entity that, as noted, was associated with the Arkansas hunting resort and in which Gibbs held a 100%; ownership stake; Chapel Place Homes I, LP, an entity that owned Chapel Places Homes in Memphis, was related to tax credits, and in which Gibbs held a 98% ownership stake; HP South, LLC, an entity that owned a parcel of land in Baton Rouge and in which Gibbs held a 66% ownership stake; Omega Property, Group, LLC, a property management entity in which Gibbs had a 100% ownership stake; and GRGDCC, LLC, an entity Gibbs said was involved in NMTC transactions at the hunting lodge and in which he held a 40% ownership stake. Def. Ex. 7.

that the representation concerned only restructuring of loans. She also explained that the Bankruptcy Code's rules of disinterestedness would have prohibited her from representing Gibbs and all of his associated entities concurrently in any bankruptcy proceeding. Futrell further noted that the engagement concerned an "out of court" restructuring, while bankruptcy is a judicial proceeding and therefore cannot occur out of court.

Attorney Futrell testified that Gibbs sought to restructure the loans because he could not meet his payment obligations under the then-applicable terms of the loan. She also stated that she never received any loan documents from Gibbs and never had any interaction with anyone at FNBC about a proposed restructuring of Gibbs's loans.

According to the invoices the Firm sent to Gibbs, its attorneys performed 8.9 hours of billable work during the representation. Def. Exs. 8A-C.

5. **Jones Walker's Representation of CPI in 2017**

On February 3, 2017, at the same time the Firm was representing Gibbs personally related to, at a minimum, restructuring of FNBC loans, Gibbs's operating company CPI engaged the Firm to represent it as "bond counsel, borrower counsel, tax counsel, and/or corporate counsel." Govt Ex. T. Gibbs executed the engagement letter on behalf of CPI. Gibbs testified that the representation concerned assisting CPI with developing properties with tax-exempt bonds and other financing methods, including low-income housing tax credits and Community Development Block Grants. One such development was Howell Village Apartments, a 380-unit townhouse development in Baton Rouge owned by HP South, a firm affiliated with Gibbs.

Former Jones Walker attorney Ronald Bell handled the engagement. Bell departed from the Firm in 2017, and Jones Walker claims it is unable to locate any files pertaining to this representation. Gibbs testified, however, that HP South had existing debt to FNBC at the time of

13

the representation and that he discussed obtaining new debt for the company with Jones Walker's

attorneys other than Bell.

## IV.   DISCUSSION

### A.  LEGAL STANDARDS GOVERNING ATTORNEY DISQUALIFICATION IN THE CONTEXT OF SUCCESSIVE CONFLICTS OF INTEREST

The Sixth Amendment's guarantee of the right to counsel includes the "right to

representation that is free from any conflict of interest." *United States v. Vaquero,* 997 F.2d 78,

89 (5th Cir.1993). "A conflict exists when defense counsel places himself in a position

conducive to divided loyalties." *United States v. Carpenter,* 769 F.2d 258, 263 (5th Cir. 1985).

But because the Sixth Amendment right to counsel encompasses a defendant's right to choose

his or her own counsel, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006), a defendant

may knowingly and intelligently waive the right to be represented by unconflicted counsel.

*Wheat v. United States*, 486 U.S. 153, 164 (1988). Nonetheless, the presumption in favor of

allowing an accused to choose his counsel is not absolute and may be overcome by the existence

of an actual or potential conflict that is so severe as to impair the fairness of a trial. *See United*

*States v. Vaquero*, 997 F.2d 78, 90 (5th Cir. 1993). Indeed, courts have the authority—and

duty—to disqualify conflicted counsel in order to ensure the ethical practice in law and to uphold

the integrity of judicial proceedings. *See In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir.

1992); *see also Wheat*, 486 U.S. at 164.

The burden of proving a conflict of interest that requires disqualification is borne by the

party seeking disqualification, which, in this case, is the Government. *Id.* Because motions to

disqualify affect the rights of parties, they are substantive in nature and therefore are governed by

federal law. *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995). Analysis of

14

attorney disqualification is guided "by state and national ethical standards adopted by the court." *American Airlines*, 972 F.2d at 610.

Ethical canons, however, "are not controlling." *U.S. Fire Ins. Co.*, 50 F.3d at 1314. Courts also "must take into account . . . the social interests at stake." *Id.* Among these factors are (1) whether there is "a possibility that a specific impropriety will occur" and (2) "the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case.'" *Id.* (quoting *In re Dresser Indus., Inc.*, 972 F.2d 540, 544 (5th Cir. 1992)).[9]

Turning to the relevant ethical considerations, the Fifth Circuit has explained that the local rules promulgated by a judicial district are "the most immediate source of guidance for a district court." *U.S. Fire Ins. Co.*, 50 F.3d at 1312. This District has incorporated the Louisiana State Bar's Rules of Professional Conduct. *Matter of Andry,* No. MC 15-2478, 2020 WL 5982898, at *9 (E.D. La. Oct. 8, 2020) (citing L.R. 83.2.10.). Also relevant to the inquiry are the "norms embodied in the Model Rules [of Professional Conduct] and the Model Code." *U.S. Fire Ins. Co.*, 50 F.3d at 1312. Again, as disqualification is a question of substantive law, application of these ethical canons is a matter of federal law. *Am. Airlines, Inc.*, 972 F.2d at 610.

Louisiana Rules of Professional Conduct 1.9 and 1.10 are particularly relevant to this motion. Rule 1.9, titled "Duties to Former Clients," provides:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing. . . .

---

[9] The Fifth Circuit has given conflicting guidance as to the relevance of an appearance of impropriety. *Compare U.S. Fire Ins. Co.*, 50 F.3d at 1314 (considering "'whether a conflict has (1) the appearance of impropriety in general'" (quoting *In re Dresser Indus., Inc.*, 972 F.2d at 544)); *with Am. Airlines, Inc.*, 972 F.2d at 619 ("We agree . . . that the 'appearance of impropriety' has no relevance to our probe of ethical restraints."). Accordingly, while the Court will discuss this factor, its analysis will focus primarily on application of the ethical canons and the two other factors mentioned that balance societal interests.

LA. R. PRO. CONDUCT r. 1.9. The title and wording of this Rule is identical to Model Rule

1.9. *See* MODEL RULES OF PRO. CONDUCT r. 1.9.

Louisiana Rule 1.10, titled "Imputation of Conflicts of Interest," states, in pertinent part:

    (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

    (b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:

        (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

        (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter.

LA. R. PRO. CONDUCT r. 1.10. The analog in the Model Rules is identical in substance.

*See* MODEL RULES OF PRO. CONDUCT r. 1.10.

      The substantial relationship test embodied in these Rules has two elements: (1) an

actual attorney-client relationship between the moving party and the attorney he seeks to

disqualify, and (2) a 'substantial relationship' between the subject matter of the former

and present representations. *Sempiterno*, 2020 WL 5017667, at *6 (citing *American*

*Airlines*, 972 F.2d at 614)). The test "is categorical in requiring disqualification upon the

establishment of a substantial relationship between past and current representations." *Am.*

*Airlines, Inc.*, 972 F.2d at 618.

      As the Fifth Circuit explained in *American Airlines*, the purpose of the test is to

ensure that lawyers adhere to their twin duties of loyalty and confidentiality to clients,

both past and present. *Id.*; *see also In re Yarn Processing Patent Validity Lit.,* 530 F.2d

83, 90 (5th Cir. 1976) (prohibition of representation of conflicting interests rests on lawyers' duties of loyalty and confidentiality)). Thus, the disqualification Rules at issue are "not solely concerned with the adverse use of confidential information" against a former client but also aim to "safeguard the integrity of the attorney-client relationship"—a concern at the core of the duty of loyalty. *Am. Airlines, Inc.*, 972 F.2d at 618-19. The Rule is bottomed thus not only on protecting individual litigants but also on fostering fundamental values like "'the frank exchange between attorney and client.'" *Id.* (quoting *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.,* 559 F.2d 250, 252 (5th Cir. 1977)).

Given that the substantial relationship test serves to uphold lawyers' duties both of confidentiality and loyalty, it does not reduce to a question of whether an attorney may in the course of a current representation disclose a former client's confidence and thereby taint the fairness of the trial. Put another way, the test is not properly framed as a matter of whether a current client is unfairly advantaged by his attorney's representation of a past client (or, viewed from the opposite perspective, whether the prior client is disadvantaged). *See id.* Asking only that question fails to account for the Rule's concern that lawyers maintain loyalty to former clients. The *American Airlines* court captured the significance the duty of loyalty has to analysis of the substantial relationship test:

> What the duty of loyalty adds to the duty of confidentiality is clearly presented in *Corrugated:*
>
> Container's complaint is that the district court failed to explain how [the lawyer's] advice would be relevant or substantially related to this action. The advice does not need to be "relevant" in the evidentiary sense to be "substantially related." It need only be akin to the present action in a way reasonable persons would understand as important to the issues involved.

*Id.* 618–19 (quoting *In re Corrugated Container Antitrust Litig.,* 659 F.2d 1341, 1346 (5th Cir. 1981, *abrogated in part on other grounds* by *Flanagan v. United States*, 465 U.S. 259 (1984)). Once a substantial relationship between past and present representations is established, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Id.* at 614.

Demonstrating the existence of the substantial relationship discussed in Rules 1.9 and 1.10 requires the moving party to "delineate[] with specificity the subject matters, issues and causes of action common to prior and current representations." *Id.* at 614 (internal quotation marks omitted). The substantial relationship test, the Fifth Circuit has cautioned, is not to be applied in a "mechanical" way that might forever foreclose an attorney from representing an interest adverse to a former client. *Id.* Rather, it requires the court to "engage[] in a painstaking analysis of the facts and precise application of precedent." *Id.* (internal quotation marks omitted).

The substantial relationship standard is fact-intensive and escapes being packaged into a precise mathematical formula. *Cf. Acad. of Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem. Co*., 384 F. Supp. 3d 644, 655 (E.D. La. 2018) ("What exactly is required for two representations to be 'substantially related' to one another has not been conveniently captured in a concise turn of phrase by the Fifth Circuit."). Courts have offered various glosses on the test. The Louisiana Supreme Court's definition is the narrowest, holding that two matters are "'substantially related' when they are so interrelated both in fact and substance that a reasonable person would not be able to disassociate the two.'" *Walker v. State, Dept. of Transp. and Dev.*, 817 So. 2d 57, 62 (La. 2002). One court in this District has outlined a less demanding standard: "the substantial relationship test requires common subject matters, issues and causes of action, but it does not require the same factual scenarios in both cases." *Parker v. Rowan Cos.*,

No. CIV.A. 03-0545, 2003 WL 22852218, at *10 (E.D. La. Nov. 25, 2003). But another court in

this District has observed that even this definition may "unduly limit" the test's reach. *Acad. of*

*Allergy & Asthma*, 384 F. Supp. 3d at 655. Rather, as the *Acad. of Allergy & Asthma* court noted,

the Fifth Circuit in *American Airlines* established a broader definition of "substantial

relationship": "two representations need only involve the same 'subject matter' in order to be

substantially related." *Am. Airlines, Inc.,* 972 F.2d at 625 (first citing *Corrugated Container*

*Antitrust Litig.,* 659 F.2d at 1341; then citing *Duncan*, 646 F.2d at 1020). This Court follows that

binding articulation of the test.

      To further flesh out the contours of the substantial relationship test, the Court reviews

caselaw applying it. Fifth Circuit precedent employing the test "falls[] along a continuum, from

those in which the linkage is clear to those in which the connection is nebulous and superficial."

*Parker v. Rowan Cos.*, No. CIV.A. 03-0545, 2003 WL 22852218, at *5 (E.D. La. Nov. 25,

2003).

      On one end of the spectrum are those cases where the Fifth Circuit has not found a

substantial relationship. For example, in *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

the Fifth Circuit determined that "even though plaintiff's counsel previously represented Merrill

Lynch on a variety of matters over a relatively long period of time, this was alone insufficient to

establish the requisite nexus." *Parker*, No. CIV.A. 03-0545, 2003 WL 22852218, at *5 (E.D. La.

Nov. 25, 2003) (discussing *Duncan*, 646 F.2d 1020, 1028 (5th Cir. 1981), *abrogated in part on*

*other grounds by Flanagan*, 465 U.S. at 259). In urging the disqualification of its prior counsel,

Merrill Lynch asserted that the cases its former counsel had represented it in and the case at issue

all involved causes of action arising under federal and state securities laws. However, Merrill

Lynch failed to describe the precise issues involved in each of the prior cases as required to

establish their similarity to the case before the court. *Id.* (citing *Duncan*, 646 F.2d at 1030). *Id.* at 1030. Similarly, Merrill Lynch indicated that a prior representation by plaintiff's counsel involved handling of margin accounts but failed to establish how the margin account issue in the earlier case related to the margin account question in the *Duncan* case. *Id.* Because "Merrill Lynch . . . only [described] a general, superficial connection between the subject matters of these cases and that of Duncan's suit" and because the district court improperly placed the burden of the nonmovant to negate the existence of a substantial relationship, the Fifth Circuit remanded the case for proper application of the substantial relationship test. The court of appeals noted that the district court "should require Merrill Lynch to delineate with greater specificity the scope of the prior representation and to demonstrate precisely how the subject matters of the prior representation are connected with the matters embraced within the pending suit." *Duncan*, 646 F.2d at 1033.

On the other end of the spectrum are cases where the Fifth Circuit has found a substantial relationship between the past and present representations. For instance, in *Corrugated Container,* the Fifth Circuit affirmed the district court's disqualification of defendant's counsel. 659 F.2d at 1343. There, defendant's counsel, Chadwell, Kayser, Ruggles, McGee & Hastings, Ltd., had represented plaintiff Kraft, Inc., for fifty years, serving as general counsel for the Kraft Foods Division for most of those years. *Id.* at 1345. The Chadwell firm "then represented the defendant in an antitrust case brought by Kraft as a purchaser of defendant's products." *Parker*, 2003 WL 22852218, at *6. In particular, the Chadwell firm had advised Kraft on its purchasing practices, and then in, representing its new client, the law firm propounded interrogatories on Kraft regarding its purchasing practices. *Id.* The Chadwell firm argued that the advice it gave to Kraft regarding its purchasing practices issues was not relevant or substantially

related to the present case. *Id.* (citing *Corrugated Container*, 659 F.2d at 1346). "The Court rejected a strict test of relevance and required only that the advice be 'akin to the present action in a way reasonable persons would understand as important to the issues involved.'" *Id.* (quoting *Corrugated Container*, 659 F.2d at 1346). Because the past and present representations concerned the very same subject matter, the Fifth Circuit held that they were substantially related. *Id.*

The Court finds further guidance in district court cases applying the *American Airlines* test in the context of criminal matters. In *United States v. Edwards*, which both parties cite, the government moved to disqualify counsel for defendant Stephen Edwards, son of former Governor Edwin Edwards, because counsel had previously represented two co-defendants in the case, both of whom had pleaded guilty and were expected to serve at trial as witnesses for the government. 39 F. Supp. 2d 716, 720 (M.D. La. 1999).

As to one co-defendant, Mr. Edward DeBartolo, the attorney had represented him in the application process to obtain a riverboat license. *Id.* at 733. The attorney had handled corporate documents, financial records, and accompanied DeBartolo to an interview with the state police in order to obtain a fifteenth riverboat license for DeBartolo. And the indictment specifically alleged that Stephen Edwards aided and abetted his father in extorting DeBartolo in connection with DeBartolo's application for the fifteenth riverboat license. As the court put it: "It is precisely this fifteenth riverboat license which is at issue in numerous counts of the indictment." *Id.* at 734. DeBartolo's testimony as a government witness was thus "at the heart" of these counts. *Id.* Accordingly, the court had no trouble in finding that a substantial relationship existed between the past representation of DeBartolo and the present representation of Stephen Edwards.

The other co-defendant, Mr. Robert Guidry, had been represented by the attorney in a successful challenge to a state agency's revocation of his company's video poker license after the agency had found that Guidry was unsuitable to operate such a business. *Id.* at 739. In addition to stripping Guidry's company of its video poker license, that finding of unsuitability had precluded Guidry from obtaining a riverboat gaming license. Thus, the attorney's work in overturning the unsuitability finding not only enabled Guidry's company to regain its video poker license but also was instrumental in facilitating Guidry's acquisition of a riverboat gaming license.

In applying the substantial relationship test to the attorney's successive representations, the court "consider[ed] the fact that the riverboat license granted to Mr. Guidry after he satisfied the suitability requirements to hold a video poker license is an important part of the indictment brought against Stephen Edwards." "Specifically," the indictment alleged that Stephen Edwards "extorted monthly payments of approximately $100,000.00 from Mr. Guidry in connection with securing a riverboat license to operate" a casino. *Id.* Once again, the court found that there was "clearly" a substantial relationship between the attorney's former and current representations. *Id.*

With these principles and jurisprudence in mind, the Court turns to application of the substantial relationship test to the facts of the representations at issue here. The Court is cognizant that "'[w]here conflict of interest or abuse of professional confidence is asserted, the right of an attorney freely to practice his profession must, in the public interest, give way in cases of doubt.'" *Doe v. A Corporation,* 709 F.2d 1043, 1047 (5th Cir. 1983) (quoting *Chugach Elec. Ass'n v. United States District Court,* 370 F.2d 441, 444 (9th Cir. 1966)).

### B.   ANALYSIS

At the outset, the Court notes that the parties do not dispute that Gibbs was a former client of Jones Walker and that Gibbs's interests are materially adverse to those of Calloway.

Gibbs has pleaded guilty to conspiracy to commit bank fraud and is awaiting sentencing. He is cooperating with the Government and is expected to be one if its star witnesses, offering testimony that will inculpate Calloway, among others. In return for his cooperation, it can be assumed that Gibbs hopes that the Government will assist him in obtaining a favorable sentence by filing a motion pursuant to U.S.S.G. § 5k1.1. with the sentencing judge. Meanwhile, Calloway will likely make attacks on Gibbs's character and credibility a centerpiece of his defense. Clearly, the interests of the former client—Gibbs—and the current client—Calloway— are diametrically opposed. *See* La. R. Prof. Conduct 1.9(a).

Furthermore, it is important to note that Gibbs has not provided written consent to Jones Walker's representation of Calloway. Thus, Rule 1.9's provision exempting attorneys from disqualification in the event of successive conflicts when the former client gives written consent to the present representation is inapplicable. Because there is no exemption from Rule 1.9, the Court proceeds to apply the Rule's substantial relationship standard.

The Court's analysis begins with the first step in the substantial relationship test—the existence of an actual attorney-client relationship between the putative former client and counsel. In *American Airlines*, the Fifth Circuit stated that there must be an attorney-client relationship between "the moving party" and the attorney the party seeks to disqualify. 972 F.2d at 614. But that comment was made in the factual situation in which disqualification was sought by a party to the action. In this case, however, it is the Government which seeks to disqualify opposing counsel based on defense counsels' prior representations of a non-party witness. Other courts have had no trouble applying the substantial relationship test in this precise context, even though the movant is not a purported former client. *See, e.g.*, *Edwards*, 39 F. Supp. 2d at 720; *United States v. Jefferson*, No. CR 08-140, 2009 WL 10706003, at *1 (E.D. La. July 9, 2009)). This

makes sense because the Government is much better positioned—and is, indeed, under an ethical duty—to draw the Court's attention to a potential conflict of interest by filing a motion to disqualify than is Gibbs, a non-party witness. Unlike the Government, Gibbs would have to seek, and be granted the right, to intervene in this matter in order to pursue disqualification of the Firm. Understandably then, the Firm does not argue that the Government lacks standing to pursue disqualification.

There are two representations as to which the parties agree an attorney-client relationship existed between Gibbs and Jones Walker—the 2013 representation of Gibbs in connection with a grand jury investigation and the 2016-2017 representation related to restructuring of Gibbs's loans with FNBC. These engagements are also the ones most closely connected with the pending matter. Accordingly, the Court will discuss whether a substantial relationship exists between these past representations and the present case. If necessary, the Court will then address Jones Walker's representations of entities closely associated with Gibbs and determine whether the relationship between Gibbs and these entities is sufficient to deem Gibbs to have been the Firm's client for purposes of the ethics Rules.

### 1. Relationship Between the Firm's 2013 Representation of Gibbs and Its Present Representation of Calloway

The Government argues that the Firm's 2013 representation of Gibbs is substantially related to this case because both concern: (1) Gibbs's income from the Meadows project and (2) Gibbs's relationship with Dick Crittenden.[10] R. Doc. 649 at 4-5. The 2013 engagement involved a federal criminal probe into the Meadows project, an affordable housing project in Lake Charles.

---

[10] Crittenden is identified as Borrower E in Gibbs's factual basis. *See* criminal action no. 20-60, E.D. La., *Gibbs*. R. Doc. 19.

In July 2013, Gibbs sat down for an interview with federal agents. He was accompanied at this meeting by Mr. Magner, his attorney at the time. HUD OIG drafted a contemporaneous memorandum documenting Gibbs's interview. According to that memorandum, Gibbs explained that the Meadows project was headed by a developer named Cliff Olsen and his company, EMAC Partners ("EMAC"). Starting in 2007, Gibbs served as a consultant on the project, assisting with applications for tax credits. Def. Ex. 5. Gibbs left the venture in May 2008 due to differences with Olsen. Ex. *Id.* For his consulting work, Gibbs was paid a fee of $200,000 to $300,000. Gibbs stated that he believed his compensation was "based on a percentage of the developer's fee for the project." *Id.* In January 2009, Gibbs heard from a business associate that the Meadows project was "falling apart." Eventually, Crittenden, who ran DeVere, engaged Gibbs to resurrect the project. *Id.*

At the most basic level, both the 2013 representation of Gibbs and the current representation concern the Meadows project. Were Jones Walker to continue in its present representation, attorney Magner would be placed in the position of cross-examining Gibbs about the Meadows project, which Gibbs himself originally explained to Mr. Magner in 2013. The representations also both concern, to some extent, Mr. Crittenden. In addition to Crittenden's work on the Meadows project, Gibbs's factual basis (associated with his guilty plea) states that Crittenden participated in so-called "nominee loans" from the Bank. In the present case, the Government alleges that Calloway and other Defendants used these nominee loans to funnel loan proceeds to Gibbs by falsely stating in loan documents that Crittenden (among others) was repaying a debt to Gibbs when, in fact, no such debt existed. The Bank officers then transferred loan proceeds to Gibbs in order to pay Gibbs's existing debt service. *See* criminal action no. 20-

60, E.D. La., *Gibbs*, R. Doc. 19. This alleged nominee loan scheme appears in multiple counts in the Indictment. R. Doc. 318 at 24-30.

But the overlap between the representations is even more specific and substantial than the mere fact that both representations relate to the Meadows project or involve Crittenden in some way. *Cf. Am. Airlines, Inc.*, 972 F.2d at 614 (requiring the party seeking disqualification to demonstrate "with specificity" the related subjects or issues in successive representations). Common to both representations is the subject of the income Gibbs derived from the Meadows project. Indeed, that is a key issue for several substantive counts of bank fraud charged in the Indictment against Calloway, as well as Ryan and Burnell. Counts 2, 4, and 7, respectively, charge that on November 23, 2010, May 31, 2011, and October 31, 2011, these Bank officer Defendants "made false statements . . . in Gibbs's loan documents related to," among other things, "the source of repayment" of loans to Gibbs. R. Doc. 318 at 24-25. In so doing, Defendants allegedly wrongfully caused the Bank to disburse loan proceeds to Gibbs.

The Bill of Particulars specifies that each of the three credit memoranda corresponding to the three loans to Gibbs contains the same allegedly false statement that "development fees and project proceeds from DeVere Construction Company's $25,615,761 contract with EMAC Partners 2007, LP" (as well as fees on other projects) will serve as a source of loan repayment for Gibbs. R. Doc. 266-2. DeVere's contract with EMAC was for work relating to the Meadows project. Thus, central to multiple counts against Calloway is whether he knew that Gibbs could not, in fact, pay back the loans at issue through his income from the Meadows project but instead would require new or renewed loans to do so. Stated differently, an important question in this criminal case is whether Calloway knew that Gibbs's income from the Meadows project (and other sources) would not be sufficient to repay the loans he was authorizing.

During the 2013 representation, Magner learned about the income Gibbs gained from the Meadows project for—at the very least—the period from 2007 to 2008 when Gibbs worked as a consultant on the project and earned a portion of the developer's fee. And, as reflected in Magner's notes, he also learned that, although the project was completed in 2011, DeVere—the company that Gibbs brought in after he returned to the project at some point in 2008 or later—"got nothing" for its work. It is unclear what exactly is meant by the phrase DeVere "got nothing" and why the company "got nothing." Even assuming that this phrase means only that the Meadows project was not very lucrative for DeVere, it is distinctly possible that this was so because the project itself was not a lucrative venture. And the financial success of DeVere, and, especially, DeVere's revenue from the Meadows project, is tied directly with whether Gibbs could pay make his payments on the Bank loans to him that are charged in counts 2, 4, and 7 of the Indictment. Put another way, these loans were approved on the basis that "development fees and project proceeds" from DeVere's work on the Meadow's project would provide Gibbs with income to pay back the loans. The fact that DeVere "got nothing" for its work is highly relevant to whether Gibbs would be able to pay back those loans with income he received from DeVere's work on the project.

Accordingly, both the 2013 representation and counts 2, 4, and 7 in the Indictment concern the income Gibbs derived from the Meadows project and also, potentially, the financial health of the project. Indeed, not only is there a clear connection between the subject matters involved in the two representations but the overlap concerns issues integral to multiple charges in this criminal case. *See Edwards*, 39 F. Supp. 2d at 734 (finding substantial relationship between successive representations where the first representation concerned obtaining a riverboat license and that license was at issue in multiple counts of the indictment in the subsequent, criminal

representation); *see also Corrugated Container*, 659 F. 2d at 1346 (explaining that the substantial relationship test asks whether a "reasonable person[] would understand" the issues in the past representation as being "important to the issues involved" in the present case).

Jones Walker argues that any connection between the 2013 representation and the present one is "tenuous" given that the former representation was limited in scope and duration. R. Doc. 663 at 21. But whether a representation is limited in scope does not answer whether it is sufficiently tied to a present representation. That question can only be answered by reference to the specific facts of each representation.

The Firm characterizes Gibbs work on the Meadows project as "predat[ing] his relationship with First NBC, Ryan, or Calloway." R. Doc. 663 at 21. It further claims that the "absence of any mention of First NBC, Ryan, or Calloway" in HUD OIG's July 2013 memorandum of Gibbs's interview confirms that the Meadows project is unrelated to Gibbs's involvement with the Bank. *Id.* at 21-22. However, Magner's notes from his 2013 representation of Gibbs mention the Bank half a dozen times. The same is true as Ryan. And Calloway's name appears three times on two different dates. As to him, it appears the notes reference his refusal to speak with the FBI related to an investigation into financial misconduct with the Meadows project. Calloway's knowledge of—and potential involvement in—suspect or dishonest conduct related to the finances of the Meadows project has significant bearing on the instant case.

Next, the Firm points out that the 2013 representation centered on an investigation into developer Olsen or a construction bond and did not concern FNBC. *Id.* That may be so, but it does not negate the undisputed fact that Gibbs's income from the Meadows project was discussed as part of attorney Magner's representation of Gibbs. Again, not only did Gibbs testify to this, but contemporaneous notes from HUD OIG and Magner confirm that Gibbs spoke about

his financial gains from the project. The substantial relationship does not require that successive representations be linked by issues that are at the very core of both representations; instead, the "two representations need only involve the same 'subject matter' in order to be substantially related." *Am. Airlines, Inc.,* 972 F.2d at 625. It would impair the attorney-client relationship if a disclosure made by a client in a past representation could later be used against him by his former attorney on the grounds that the disclosure concerned a topic that was not central to the past representation.

For similar reasons, Calloway's assertion that Magner did not learn any confidential information during the earlier representation is unavailing. R. Doc. 663 at 25-31. Calloway's theory appears to be that, because the Firm did not obtain confidential information regarding Gibbs, any successive representation that involves Gibbs cannot pose an ethical quandary for the Firm. According to this line of argument, since the Firm lacks confidential information that it could wield against Gibbs on cross-examination, there is no detriment to Gibbs (or the Government) from the Firm's involvement in this case. And, the argument goes, Calloway's defense also suffers no prejudice: because the Firm does not have any confidences regarding Gibbs, it is not placed in the untenable position of having to put on the "kid gloves" in cross-examining Gibbs in order to maintain client confidences—a situation that would result in less-than-zealous advocacy. But the Firm's argument rests on a cramped view of the purpose of Rule 1.9. The provision is not limited to protecting client confidences; instead, it is equally concerned with attorneys' duty of loyalty to past clients. *See Am. Airlines, Inc.*, 972 F.2d at 618-19*.* So, while it may be relevant to the substantial relationship test whether the Firm obtained confidential information from Gibbs, the absence of such disclosures does not preclude a finding that an attorney has a conflict of interest relating to successive representations. *See Am. Airlines,*

*Inc.*, 972 F.2d at 618-19 ("[B]ecause the substantial relationship test is concerned with both a lawyer's duty of confidentiality *and* his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences.").

Furthermore, it is not certain that the amounts paid to Gibbs as a consultant on the Meadows project—information that was made known to the Firm during its prior representation of Gibbs—will have no relevance were the Firm to cross-examine Gibbs in its current representation of Calloway. For example, this information could be used to justify the reasonableness of Calloway's professed belief that the Meadows project could produce sufficient revenue to support a new loan.

Last, Calloway contends that the successive representations are only minimally related because the 2013 representation does not involve the loans at issue in counts 2, 4, and 7 in the Indictment. It is true that the 2013 representation does not appear to involve those loans directly. If it did, there could be no serious debate that the relationship between these successive representations would mandate disqualification. But the income Gibbs derived from the Meadows project is a subject of both representations and, as discussed, it is salient to the false statement charges in counts 2, 4, and 7, which concern Gibbs's ability to repay three distinct loans based, in part, on his income derived from the Meadows project. Accordingly, the connection between the representations is far from "nebulous" or "superficial." *Parker*, 2003 WL 22852218, at *5.

Having found a substantial relationship between the 2013 and current representations, the Court considers "the social interests are stake." *U.S. Fire Ins. Co.*, 50 F.3d at 1314.[11] In this case,

---

[11] The Court notes that there appears to be some tension between the Fifth Circuit's statement in *American Airlines* that the substantial relationship is "categorical" in mandating disqualification when its elements are met, 972 F.2d at 618, and the court of appeals's later statement in *U.S. Fire Insurance Co.* that the ethical rules "are not controlling" and that social factors must also be weighed in adjudicating attorney disqualification. 50 F.3d at 1314.

there is a possibility that a "specific impropriety will occur," *id.*, because the conclusion that a substantial relationship exists between past and present representations requires courts to "irrebuttably presume that relevant confidential information was disclosed during the former period of representation." 972 F.2d at 614. Specifically, there is the risk here that confidential information disclosed by Gibbs to Jones Walker—such as his income from the Meadows project, the project's overall financial condition, and DeVere's gains from the project—will be revealed at trial. Such a possibility of a breach of a client's confidences—as well as a lawyer's duty of loyalty—eclipses Calloway's interest in maintaining his counsel.  *See id.*

In sum, the Court finds that the Firm's 2013 representation of Gibbs is substantially related to the instant case and that pertinent social considerations weigh in favor of disqualification.[12] This past representation is thus sufficient by itself to disqualify both attorney Mike Magner and, under Rule 1.10, the entire Jones Walker law firm from continuing to represent Defendant Calloway.

---

It is notable that the Fifth Circuit was not applying the ethical rule pertaining to conflicts in successive representations in *U.S. Fire Insurance Co.* Moreover, there do not appear to be any Fifth Circuit decisions since *American Airlines* that find a substantial relationship between successive representations but then address the social factors listed in *U.S. Fire Insurance Co.* That may be because, as discussed *infra*, once the court determines that there is a substantial relationship between successive representations, the court will "irrebuttably presume that relevant confidential information was disclosed during the former period of representation." 972 F.2d at 614 (internal quotation marks omitted). Thus, if a substantial relationship exists between successive representations, there necessarily is "a possibility that specific impropriety will occur," *i.e.*, the disclosure of client confidences. And it follows that a "likelihood of public suspicion from the impropriety" would outweigh any interest in the attorney's continued participation in the matter. *U.S. Fire Ins. Co.*, 50 F.3d at 1314. In short, it may be that violation of Rule 1.9, and the ethical considerations it embodies, will always result in societal interests weighing in favor of disqualification. But the Court need not resolve the tension, if any, between *American Airlines* and *U.S. Fire Insurance Co.* Whether or not the social factors set forth in that latter decision are considered, the Court finds that the result is the same: the Firm must be disqualified.

[12] Gibbs testified that it was more probable than not that he told Magner during the 2013 representation that he had inappropriately received loans from the Bank. If true, this would obviously further strengthen the connection between the past and present representations. However, the Court finds that, even without crediting Gibbs's assertion, a substantial relationship exists between the successive representations.

**2.  Relationship Between the Firm's Representation of Gibbs in 2016-2017
Concerning Restructuring of FNBC Loans and Its Present Representation of
Calloway**

The Court next considers the relationship between Jones Walker's representation of

Gibbs in late 2016 to early 2017 regarding the restructuring of his loans with the Bank and this

case. On December 16, 2016, Gibbs contacted the Firm seeking its services in an effort to

restructure his loans with FNBC. Def. Ex. 8A. As Jones Walker attorney Lisa Futrell testified,

Gibbs sought to restructure loans with the Bank because he could not meet his obligations under

the terms of the loans.

In many respects, this representation of Gibbs by Jones Walker was minimal. It was short

in duration, lasting only a few months and less than 10 hours in billable time. Def. Exs. 8A-C.

Attorney Futrell testified that the Firm never received any loan documents from Gibbs or

interacted with FNBC in relation to the engagement. And the representation did not result in the

restructuring of any of Gibbs's loans with the Bank.

Nonetheless, that a past representation was limited does not preclude it from having a

connection with a present representation sufficient to trigger attorney disqualification. The Court

must consider the relationship between this prior representation—however brief in duration—

and the present matter. As attorney Futrell acknowledged, the reason, of course, that Gibbs

engaged the Firm to negotiate a deal to restructure his loans with the Bank was because he was

unable to make good on those loans. And Gibbs's ability to pay his loans—and Calloway's

knowledge of Gibbs's financial wherewithal—are central to the charges against Calloway in this

case. Thus, both the Firm's representation of Gibbs with respect to restructuring his FNBC loans

and this current matter concern Gibbs's financial picture.

A brief recitation of events relating to Gibbs's FNBC loans in late 2016 illustrates the

connection between the two representations. On November 30, 2016, Calloway approved a

$500,000 loan to Gibbs for "[w]orking capital for general operations and soft costs associated with various developments in planning." On December 16, 2016, two weeks after being approved for a half-million dollar loan, Gibbs contacted the Firm regarding restructuring of FNBC loans. Five days later, on December 21, 2016, Calloway emailed Ashton Ryan, copying William Burnell, to summarize a conversation he had just had with Gibbs. Calloway wrote: Gibbs "indicated that he does not have the funds to send us to cover the payments . . . [Gibbs] stated that he would not send any funds and would likely reach out to an attorney to begin working on some sort of restructure that he feels he needs. In either event, it appears that Gary will hit on all past due loans unless he changes his mind and at least sends some funds to clear some of the past due loan payments and matured loans." Govt Ex. M.

Whether Calloway was aware on November 30, 2016 of Gibbs's true financial state at the time he approved a $500,000 loan to Gibbs or whether he only became aware of Gibbs's financial woes several weeks later during his phone call with Gibbs is relevant to Calloway's state of mind. Stated more generally, Calloway's knowledge of the reality of Gibbs's financial condition is key to the counts against him. That Calloway had some awareness of the depths of Gibbs's financial troubles by, at the latest, December 2016 helps establish a timeline of Calloway's knowledge and is thus relevant to the counts against him. And the Firm's representation of Gibbs starting in late 2016 substantiates that he had loan troubles by that time. Moreover, that Gibbs sought out the Firm's services to assist with restructuring his loans could raise doubts about whether Calloway acted honestly only a few weeks earlier in approving the November 2016 loan. And even though that loan is not charged in the Indictment, Calloway's conduct with respect to that loan goes to his credibility.

To be sure, the Firm's 2016-2017 representation was limited. But that is not the end—or even the crux—of the analysis. The issue is the interconnectedness of the successive representations. And as explained, there is a substantial relationship between the Firm's 2016-2017 representation of Gibbs and the issues in this case: both involve Gibbs's capacity to repay loans. *See American Airlines*, 972 F.2d at 625; *Corrugated Container*, 659 F.2d at 1346. Furthermore, for the reasons provided regarding the 2013 representation, the social factors are decidedly on the side of disqualification. *See U.S. Fire Ins. Co.*, 50 F.3d at 1314.

Because an actual conflict exists, the Firm must be disqualified from representing Calloway.[13]

\* \* \*

For the reasons stated, each prior representation discussed above furnishes an independent and sufficient basis to disqualify the Firm from representing Defendant Calloway in this matter. What is more, the cumulative effect of these past representations creates a substantial connection with the present representation. That is, there is a compounding—even synergistic—effect resulting from the Firm's 2013 and 2016-2017 representations of Gibbs that creates a substantial relationship with the present relationship. When the information learned in one prior representation is combined with the information disclosed in another past representation, the aggregate knowledge can yield insights and connections for a lawyer that the lawyer would not have made had she not represented the client in multiple prior engagements. In other words, the lawyer was only able to understand certain things about her client as a result of putting together

---

[13] As detailed, the 2016-2017 representation focused on the restructuring of Gibbs's FNBC loans. The representation bears directly on Gibbs's financial picture during the period of the alleged conspiracy and significantly overlaps with the present case. Accordingly, the Court need not decide whether the 2016 representation also extended to bankruptcy issues relating to Gibbs and his associated entities—a matter which the parties dispute.

the knowledge and subject matters involved in multiple past representations. In this way, a lawyer obtains a holistic picture of her client.

The Court is not prepared to say that, standing by themselves, the two representations discussed provided the Firm with an overall portrait of Gibbs's finances or loans with the Firm. But it is undeniable that each relate to Gibbs's earnings and his ability to pay his loans with the Bank. And these issues are both central to the Firm's current representation of Calloway. That the subject matter of these past representations overlaps with one another in the very same way that each overlaps with the Firm's present representation provides added reason to find the substantial relationship test satisfied here.[14]

Last, the Court notes there would be a strong appearance of impropriety in permitting the Firm to move forward with representing Calloway in this case as doing so will necessarily entail the Firm aggressively cross-examining Gibbs given that his banking relationship with Calloway is at issue in every single count against Calloway that is charged in the Indictment. After the Firm represented Gibbs multiple times in the recent past concerning his extensive financial dealings—including in a federal criminal investigation—it would be patently unfair to authorize it now to cross-examine him about those dealings. More than that, there is a strong risk that any cross-examination of Gibbs by the Firm would result in the disclosure of client confidences in addition to violating the Firm's duty of loyalty to its past client. *See U.S. Fire Ins. Co.*, 50 F.3d at 1314. Accordingly, the Firm must be disqualified.

---

[14] Because the Court finds that a substantial relationship exists between each of Jones Walker's representations of Gibbs discussed above and its current representation of Calloway representation of Calloway and two separate prior representations by the Firm of Gibbs, the Court does not consider whether the two prongs of the substantial relationship test are met with respect to the other representations of entities closely associated with Gibbs that were mentioned earlier or whether any conflict arising therefrom could be imputed to the Firm. *See Sempiterno*, 2020 WL 5017667, at *6.

**3. Waiver**

Even if the substantial relationship test is satisfied, Calloway contends that Gibbs waived any conflict of interest. R. Doc. 663 at 37. Calloway points to several instances of purported waiver. First, in April 2018, attorney Magner contacted Gibbs via phone and informed Gibbs that he was now representing Calloway. Gibbs did not object and instead referred Magner to Craig Gabbert, a bankruptcy attorney Gibbs had retained to represent him in connection with an FDIC investigation. Magner then called Gabbert on April 27, 2018, and Gabbert purportedly did not object to the Firm representing Calloway. In his testimony, however, Gabbert asserted that he never affirmatively waived any conflicts on behalf of Gibbs.

Additionally, Calloway argues that Gibbs waived any conflict because his criminal defense counsel failed to object to Jones Walker's representation of Calloway despite having notice of the representation. In August 2019, Magner emailed Gibbs's criminal defense counsel, advising that he was representing Calloway in relation to an FDIC investigation. Gibbs's attorneys did not object to the representation, even though Gibbs has been cooperating with the Government since at least August 2020. Consequently, although Gibbs, through his criminal defense counsel, now states that he will not waive any conflict, Calloway argues that Gibbs's failure to expeditiously seek Jones Walker's disqualification constitutes waiver. *Id.* at 38.

Calloway cites several cases in support of his waiver-by-delay argument. *See, e.g.*, *Lovett v. State Farm Fire & Cas. Co.*, No. 11-CV-0518, 2012 WL 13059516, at *1 (W.D. La. Feb. 7, 2012) ("A former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest, but who knowingly refrains from objecting promptly, is deemed to have waived that right."). But each of these cases concerns civil litigation where one party to the action allegedly unreasonably delayed in asserting that the opposing party's counsel

36

had conflict of interest. *See, e.g.*, *Corbello v. Iowa Prod. Co.*, 2000-1403 (La. App. 3 Cir. 6/6/01), 787 So. 2d 596, 599. ("In this case, [third party defendant] Rosewood knew of Liskow & Lewis' representation [of the third party plaintiff] for nearly eight months and did not seek disqualification until the eve of trial . . . [W]e find that Rosewood waived its right to raise the issue in this case."). The situation in this criminal case is decidedly different: Gibbs is not a party to the action and could not properly have brought a motion to disqualify before the Court without first having sought and been granted the right to intervene in this action. Moreover, in this case, Gibbs only had notice that Jones Walker was representing Calloway regarding and FDIC civil investigation or enforcement action; neither Gibbs nor his attorneys was affirmatively informed by Jones Walker that it was representing Calloway in this criminal matter in which Gibbs would likely be a witness.  Calloway's citations are therefore inapposite.

The Government cannot not be faulted for any putative delay in filing its disqualification motion. To the contrary, the Government notified the Court of a potential conflict of interest the very day that Gibbs advised that he had previously been represented by Jones Walker. Under these circumstances, the Court does not find any waiver of the right to assert a conflict of interest.

**4.  Remedy**

Having concluded that a substantial relationship exists between the present matter and each of the two prior representations by Jones Walker of Gibbs discussed above, the Court considers the appropriate remedy. Calloway suggests that, in lieu of disqualifying Jones Walker entirely, the Firm could simply be barred from cross-examining Gibbs and that he could obtain additional counsel who would take on this task. The Court does not believe this is a workable proposal. All counts against Calloway pertain to the Gibbs lending relationship. Gibbs is thus

almost certain to be discussed in Calloway's opening statement and closing argument. He is an unavoidable feature of Calloway's defense. Calloway's proposal seems addressed to preserving client confidences. But as explained, the attorney disqualification Rules at issue are equally concerned with upholding counsels' duty of loyalty to former clients. *See Am. Airlines, Inc.*, 972 F.2d at 618-19. The Court suspects that Gibbs, like any past client in his shoes, would find cold comfort in Calloway's proposition. Accordingly, the Court must reject it.

The Court is well aware that "[d]isqualification of an attorney is a harsh and disruptive" and does not lightly contemplate such a decision. *Sempiterno In Motion, LLC v. Cajun 417, LLC*, No. 20-681, 2020 WL 5017667, at *5 (E.D. La. Aug. 25, 2020). Both the Court and the parties have invested considerable time and energy into this matter. All concerned have been working on the case for over a year and a half and have been planning for many months to try this case in June 2022. To that end, the Court has held biweekly hearings to decide various discovery and pretrial motions. Disqualifying counsel at this point, unfortunately, will necessitate delaying the trial, upending the schedules of all concerned and frustrating, to some degree, the public's interest in the speedy administration of justice.

The Court also appreciates the potential effect that disqualifying competent counsel from an excellent law firm may have on Defendant Calloway, who has been proceeding with his present counsel since the inception of this action. At his *Garcia* hearing, Mr. Calloway stated that his defense has been funded through directors' and officers' liability insurance and expressed concern that the funds available from this pool are diminishing. He also expressed concern over pending litigation contesting the extent of insurers' obligations to indemnify him for the costs of his defense. *See* civil action no. 20-09, E.D. La., *Aaron, Jr., et al. v. Illinois Nat'l*

*Ins. Co., et al*. Calloway also testified that he personally has limited financial resources and conveyed concern about whether he would have the ability to pay for new counsel.

The Court is empathetic to the plight of any defendant whose wealth may impact their choice of counsel—whether it be an indigent defendant or, as here, a white-collar defendant whose litigation costs have thus far been paid for by insurance. Mr. Calloway's predicament of having to secure new counsel at this very late hour is deeply regrettable, especially as he is not responsible for his counsels' disqualification. The situation is, no doubt, doubly difficult for Mr. Calloway: not only must he seek new representation but he is simultaneously losing excellent counsel whose judgment he has relied upon over years and with whom he has presumably shared many confidences. The Court acknowledges the frustration and worry Mr. Calloway may understandably feel at this moment. Should Mr. Calloway be unable to afford new counsel, the Court will appoint counsel for him from the CJA-roster.

As much as the Court may wish to avoid disqualifying the Firm, the Court's judicial hands are tied. Paramount to the Court's empathy to any particular party is its obligation to apply the law evenhandedly and enforce ethical lawyering. *Cf. Corrugated Container Antitrust Lit*., 659 F.2d 1341, 1346 (5th Cir. 1981) ("[T]he precedents of this circuit do not indicate that even great prejudice to the party whose attorney is disqualified would warrant departure from the substantial relationship standard."). In so doing, the Court protects the fundamental fairness of judicial proceedings and, more broadly, preserves the sanctity of the attorney-client relationship. The latter is no mere abstraction; it is a principle upon which our system of justice rest and whose diminishment threatens to erode the trust that is essential to all relationships between attorneys and their clients. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

Moreover, to ignore the conflict would risk exposing the proceeding to a germ that could infect the whole case and make a retrial inevitable.

Furthermore, although Mr. Calloway elected to forego his right to unconflicted counsel, the Court notes that his defense would risk being prejudiced were he to proceed with conflicted counsel. Likewise, his co-defendants could be adversely affected by the continued representation of conflicted counsel. Finally, in order to mitigate any prejudice to Mr. Calloway due to disqualification, the Court will continue the trial to enable him adequate time to obtain new counsel who can sufficiently prepare. This case, as all counsel know well, is complex, spanning more than a decade of financial transactions and involving millions of documents. New counsel will require some months to familiarize themselves with the case and prepare for trial. The Court will ensure counsel has that time.

Once Mr. Calloway's new counsel enrolls, which the Court expects to be accomplished in no more than one month, the Court will convene a status conference with the parties to select a new trial date. As explained in the Court's order denying Defendants' motion to sever, R. Doc. 634, all Defendants will be tried together in this case considering the strong presumption of joint trial where, as here, a conspiracy is charged and the interest in conserving the resources of the Court and the criminal justice system. The Court adheres to that Order and will proceed with holding a single trial for all Defendants, hopefully before the end of this year.

## V.    CONCLUSION

For these reasons,

**IT IS ORDERED** that the Government's motion to disqualify the law firm of Jones Walker, LLP is **GRANTED**. As mentioned, in view of the Court's finding that the Firm's 2013 and 2016-2017 representations of Gibbs created an actual conflict because they are substantially related to the present matter, it is not necessary to determine—and

the Court does not decide—whether a conflict of interest sufficient to disqualify counsel results from the Firm's other representations of entities affiliated with Gibbs. But it is noted that these other representations involve many facets of Gibbs's business dealings, his financial status, and, to some extent, his inability to repay loans to the Bank. Furthermore, these other representations could result in members the Firm being subpoenaed to testify in the present proceeding, raising additional issues that may necessitate disqualification. The aggregate effect of the multiple number of times the Firm represented and counseled Gibbs and entities closely associated with—indeed, even wholly owned by—Gibbs over the same period of time covered by the Indictment on matters involving his financial status, his capacity to repay loans to the Bank, and the structure and vitality of projects which later appear prominently in the Indictment, tends to substantiate that the Firm has a conflict of interest that compels disqualification.

**IT IS FURTHER ORDERED** that the trial date and all remaining pre-trial deadlines in the Scheduling Orders are **CONTINUED** until further order of this Court. The Court specifically finds that, based on its determination that Calloway's counsel must be disqualified, the ends of justice served by continuing the trial outweigh the best interests of the public and the defendant in a speedy trial, as set forth under 18 U.S.C. § 3161(h)(7)(B)(iv). The Court further specifically finds that the failure to continue trial would deny Defendant Calloway the reasonable time necessary to obtain counsel and for newly-selected counsel to effectively prepare for trial. The Court further finds that the failure to grant a continuance be likely to result in a miscarriage of justice. 18 U.S.C. § 3161(h)(7)(B)(i).

**IT IS FURTHER ORDERED** that the Government's motion to expedite consideration of its motion to suspend deadlines, R. Doc. 683, is **GRANTED.** The Government's motion to suspend deadlines, R. Doc. 682, is **DENIED** as moot.

New Orleans, Louisiana, this 11th day of April, 2022.

**UNITED STATES DISTRICT JUDGE**