UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 20-65 |
| ASHTON RYAN | SECTION "L"(4) |

### ORDER AND REASONS

Before the Court is Ashton Ryan's Motion for Acquittal, Motion to Arrest Judgment, and Motion for a New Trial. R. Doc. 963. The Government has responded in opposition, R. Doc. 1028, and the Defendant has filed a reply, R. Doc. 1030-2. Having considered the briefing and the applicable law, the Court rules as follows.

I. BACKGROUND

This case arises from alleged fraudulent bank activity at First NBC Bank ("FNBC" or "the Bank"), which resulted in the failure of the Bank and cost the Federal Deposit Insurance Corporation's deposit insurance fund approximately $996.9 million. The Bank was founded in 2006, the year after Hurricane Katrina, by a group of businessmen in New Orleans. The leader of the group was Ashton Ryan, a former bank auditor and president of another bank. Ryan became President and CEO of FNBC and chairman of its Board of Directors.

The Bank specialized in commercial banking. From its inception in 2006 until its collapse in 2017, the Bank's Chief Credit Officer was William J. Burnell, who reported to Ryan. The Credit Department's responsibilities included reviewing borrowers' financial documents and composing a credit analysis about the financial status of each borrower and the purpose of the requested loan. For most loans, including the loans charged in this case, both Burnell and Ryan

1

approved the credit risk ratings that purported to represent the risk posed to the bank by the borrower.

On August 5, 2021, a 49-count Second Superseding Indictment ("the Indictment") was entered charging Defendant Ryan and his co-Defendants with conspiracy to commit bank fraud, bank fraud, and false entries in bank records. R. Doc. 318. In relevant part, the Second Superseding Indictment alleges that Bank Officers and borrowers participated in a scheme to defraud the Bank and enrich themselves by lying on loan documents about borrowers' creditworthiness, the purposes of the loans, and the method of repayment. *Id.* at 7. Trial began in this case on January 9, 2023 and ended on February 9, 2023, with Ryan's conviction on all counts.

Evidence presented at trial concerned FNBC's credit review process. As the President and CEO of the Bank, multiple witnesses testified, Ryan oversaw this process and had the ultimate power to approve all loans. Burnell, the Chief Credit Officer, and other witnesses testified to the process by which loans were made: loan officers, who had direct contact with clients, could themselves approve loans in amounts under each loan officer's lending authority. R. Doc. 959 at 100. For larger loans, the officers would collect financial information from borrowers and create credit packages to submit to Defendant Ryan for approval. These credit packages contained credit memoranda that included signatures by the loan officer, Defendant Ryan, and Burnell, who was responsible for approving "credit risk ratings" given to each loan on a scale, from 1 to 10, of the risk it posed to the bank. A score of 10 was the best, while a 1 represented the riskiest loans.

Loan officers developed these ratings and provided them to Burnell, who testified that in multiple instances Ryan asked inferiors at the Bank to change ratings so that loans could be

approved. R. Doc. 959 at 349. The Government presented as evidence numerous credit memoranda for a number of borrowers—notably, Gary Gibbs, Kenneth Charity, Frank Adolph, and Warren Treme—that included the signature of Ryan, Burnell, and the Bank's Executive Vice President, Brad Calloway. Witnesses, including Burnell and Calloway, testified that these memoranda listed false risk ratings. R. Doc. 988 at 124. Numerous witnesses, including the borrowers themselves, testified that Ryan knew these borrowers did not have the funds to repay the loans, approved the issuance of new loans that they used to pay the old loans, and regularly lied to the Bank's board about the purpose of these loans and the borrowers' ability to repay them. The Government introduced loan approval documents and the testimony of borrower Kenneth Charity to show that, in one instance, Ryan and Burnell approved three loans—for $2 million, $2.5 million, and $2 million—allegedly to enclose a patio at Charity's beignet shop. R. Doc. 945 at 110. The patio was never enclosed. *Id.* Instead, Charity used the loans to pay money he owed to contractors and for "personal matters," all of which were known to Ryan. *Id.* Over the years he received loans, Charity testified, he used the proceeds for personal expenses, including building a swimming pool at his home and purchasing a number of Rolex and Breitling watches. *Id.* at 184-190. Emails entered into evidence showed that Ryan was aware of Charity's spending patterns, with Ryan in one instance telling Charity that "any other bank would have foreclosed on you years ago, if you, indeed, could get a loan for them in the first place." *Id.* at 77.

Further documentary and testimonial evidence presented by the Government focused on historic building tax credits that Defendant Ryan stated the Bank bought from Gregory St. Angelo, the General Counsel of the Bank from 2006 until 2016. Kelly Longwell, an attorney who did tax credit work for FNBC, testified that she reviewed leases related to these tax credits and told Ryan that, because St. Angelo did not own the building in question or have a long

3

enough lease, he could not qualify for the tax credits—so he could not legitimately sell them to the Bank. R. Doc. 943 at 150-151. St. Angelo testified that, after receiving this information from Longwell, he and Ryan signed fraudulent documents purporting to be a sale of tax credits from St. Angelo to the Bank. R. Doc. 993 at 66-69. Krystal Calix, an auditor with Ernst & Young, testified that EY relied on the authenticity of the document when it audited FNBC in 2015. R. Doc. 993 at 192.

Throughout trial, the defense cross-examined the witnesses and introduced its own documents into evidence. Defendant Ryan testified on his own behalf. In short, the Defendant argued that he did not possess criminal intent to harm the bank, and that Ryan acted in what he thought was the best interest of the bank when he offered "workout loans" to borrowers in difficult financial circumstances so that they could eventually pay back their loans. Further, Ryan argued, members of the board, auditors, and examiners all had access to FDIC/OFI Joint Examination Reports, which he argued contained all of the information about overdraft lending and the assessment of the loans that the Government argued he concealed.

The jury rejected Ryan's theory of the case. After 22 days of evidence by the prosecution and two defendants, the jury returned its verdict on February 9, 2023, finding Ashton Ryan guilty of all 49 counts, and found his co-defendant Fred Beebe not guilty of all charges.

## II. PRESENT MOTION

In the present motion, Defendant Ryan seeks a Judgment of Acquittal under Fed. R. Crim. P. 29, Arrest of Judgment under Fed. R. Crim. P. 34, or, in the alternative, a new trial under Fed. R. Crim. P. 33. The core of Defendant's arguments here rests on the sufficiency of the evidence presented at trial. Specifically, he argues the Government failed to prove that he had the requisite intent to defraud the Bank or that he engaged in conduct that was criminal in nature

4

rather than a violation of civil regulations or best banking practices. He further argues that a number of errors made during trial—including misleading use of evidence and violations of the Federal Rules of Evidence—mean that the interests of justice require a new trial.

In opposition, the Government argues that it presented evidence sufficient to support a conviction by a rational jury. The Government maintains that the five weeks of testimony presented during trial provided a record of "countless" times in which Defendant lied to the Bank's board, auditors, and examiners about the loans made to borrowers who could not repay them, which caused the Bank to fail and cost the FDIC $996.9 million. In addition, the Government contests that all of Defendant's arguments that he is entitled to a new trial are based on various procedural and evidentiary grounds that do not justify the need for a new trial.

## III. APPLICABLE LAW

### a. *Motion for a Judgment of Acquittal Under Rule 29*

Rule 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Further, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1).

The Fifth Circuit has explained that in determining whether there is sufficient evidence to support a conviction, the court should "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United Sates v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). "It is not necessary that the

evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilty, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *Id.* (citing *United States v. Chavez*, 947 F.2d 742, 744 (5th Cir. 1991)).

In making this determination, the Court must "accept all credibility choices that tend to support the jury's verdict," recognizing that the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991); *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)). The courts have explained that the jury has the "unique role" of judging the credibility of witnesses and deciding how much weight to give each witness' testimony. *See United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)). Furthermore, the Court must keep in mind that "[g]enerally speaking, '[w]hat a jury is permitted to infer from the evidence in a particular case is governed by a rule of reason, and juries may properly 'use their common sense' in evaluating that evidence.'" *United States v. Villasenor*, 894 F.2d 1422, 1425 (5th Cir. 1990).

### b. *Motion for Arrest of Judgment Under Rule 34*

According to Federal Rule of Criminal Procedure 34, "the court on motion of a defendant, shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged." Fed. R. Crim. P. 34.

### c. *Motion for a New Trial Under Rule 33*

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so

requires." Fed. R. Crim. P. 33(b). If "grounded on any reason other than newly discovered evidence," the motion "must be filed within 14 days after the verdict." *Id.* While a district court's discretion to grant a new trial "is quite broad," a court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997). Rather, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* In contrast to a motion for acquittal, when considering a motion for a new trial, "the trial judge may weigh the evidence and may assess the credibility of the witnesses." *Id.* at 1117.

## IV.    DISCUSSION

Defendant first moves for a judgment of acquittal and arrest of the judgment because, he argues, there was not sufficient evidence to sustain his conviction. The Court will begin by addressing his Rule 29 and Rule 34 arguments, before turning to his argument that certain procedural errors occurred during trial that entitle him to a new trial under Rule 33.

### A. Rule 29: Insufficient Evidence that Defendant Possessed Intent to Deceive and Deprive the Bank of Property

As a threshold matter, Defendant argues that there is insufficient evidence to demonstrate that he had the requisite intent for a conviction for bank fraud under 18 U.S.C. § 1344(1) or false entries in bank records under 18 U.S.C. § 1005. R. Doc. 961-3 at 11. He argues that neither "[a] mistake in judgment" nor "a false statement or factual omission" can support criminal intent without proof that he possessed specific intent to deceive the Bank and deprive it of property. Further, he cites testimony by William Aaron and Leslie Hertz, whom he argues both testified that they believed that Ryan did what he thought was in the best interest of the bank. Defendant argues that Arvind Vira's misunderstanding of the term "bump" misled the jury, and that the

7

Government showed incomplete information about certain borrowers and loan packages to the jury. *Id.* at 14-15. Defendant avers that testimony presented at trial demonstrates that he did not act with intent to defraud with regards to borrowers Warren Treme, Frank Adolph, Gary Gibbs, and Gregory St. Angelo, because each of these relationships involved a "workout loan," reasonable belief that the borrower would eventually be able to re-pay the loan. Instead, Ryan argues that he made the loans for altruistic and benevolent reasons, such as to help New Orleans recover from the ravages of Hurricane Katrina and to assist minorities in New Orleans.

The evidence presented at trial proved that he made affirmative misrepresentations and that his statements to the Bank's board, auditors, and examiners omitted material facts. Ryan intentionally failed to make proper disclosures because he did not tell these parties that he, Burnell, and other loan officers regularly approved the issuance of loan proceeds to borrowers to clear their overdrafts and make loan payments that they were unable to pay themselves. Burnell and Calloway provided testimony that the bankers regularly took part in a "month-end scramble" to prevent borrowers from appearing on the month-end reports that went to the board, auditors, and examiners. R. Doc. 1028 at 45. Burnell testified that in multiple instances he knew that an asset quality report was not accurate, and that he consciously worked to "keep[] . . . loans off my past due report and my overdraft reports" so that the board and reporting agencies would not see them. *Id.* In addition, Calloway testified about his efforts to conceal certain loans from the board by keeping certain borrowers off the reports. *Id.* at 46. In both cases, these witnesses testified that Ryan knew about their actions and approved them. *Id.* at 45-46. Any "disclosures" made by Ryan were marred by "half-truth or material omissions," and therefore the jury's verdict after hearing this testimony was reasonable. *Id.* at 46.

Further, Defendant argues that he is entitled to acquittal because the Government relied on "salary-maintenance" and "accurate information" theories, which are not sufficient "property interests" under the bank fraud statute to sustain a conviction. R. Doc. 961-3 at 29-30. Ryan cites the recently decided Supreme Court case *United States v. Ciminelli*, 143 S. Ct. 1121 (2023), which he argues dispositively forecloses the Government's use of such a theory at trial. Defendant argues that "[t]he government so constantly relied on a failure to provide accurate information theory, throughout the trial" that "there is no way of knowing on what basis the jury convicted." R. Doc. 1030-2 at 3. Therefore, he argues, his conviction cannot stand.

In *Ciminelli*, the Supreme Court ruled that a "right-to-control" theory could not be the basis of a federal wire fraud conviction. 143 S. Ct. at 1124. In that case, petitioner Louis Ciminelli was convicted of wire fraud based on contracts that his construction company won as part of a large-scale development project in Buffalo, New York administered by the nonprofit Fort Schuyler Management Corporation ("Fort Schuyler"). At trial, federal prosecutors presented evidence that he had paid off a lobbyist, who in turn paid off a Fort Schuyler board member, so that the board of directors would develop metrics for the bid process that would grant his construction company "preferred" status and allow it to win bids. *Id.* at 1125. To obtain a conviction, prosecutors relied solely on a theory that, by rigging the bid process, Ciminelli and others involved in the scheme deprived Fort Schuyler of "potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Id.* at 1126.

The Court reversed Ciminelli's conviction, holding that "[t]he right-to-control theory cannot be squared with the text of the federal fraud statutes, which are 'limited in scope to the protection of property rights.'" 143 S. Ct. at 1127 (citing *McNally v. United States*, 483 U. S. 350, 360 (1987)). The interests "recognized as property" when the wire fraud statute was enacted did

9

not include "the right to control [one's] assets." *Id.* Furthermore, endorsing a right-to-control theory would "make[] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law." 143 S. Ct. at 1128. Defendant cites to this case and to *United States v. Yates*, 16 F.4th 256 (9th Cir. 2021) to argue that non-property interests cannot be the basis of his fraud conviction.

But those cases are inapplicable to the present case because non-property interests *were not* the basis of Ryan's conviction. Instead, the prosecution presented evidence that Ryan and others created false loan documents and lied to the board, auditors, and examiners so that they would issue *loan money*—not information or salaries, but loans that were disbursed to borrowers, who then failed to pay them back, causing the Bank to lose hundreds of millions of dollars. This is, undeniably, a property interest. As another district court has found regarding a defendant convicted of fraud by gaining investors' money through material misrepresentations about the use of funds,

> [*Yates*] is inapplicable here because the government only advanced one theory of fraud in this case: one or more defendants, acting with the intent to defraud, knowingly obtained *money* from investors based on material misrepresentations and misleading half-truths knowingly made, and they conspired to do so. Thus, neither *Yates* nor *Ciminelli* has any bearing in this case.

*United States v. Jesenik*, No. 3:20-cr-228-SI, 2023 U.S. Dist. LEXIS 85080, *8-9 (D. Ore. May 15, 2023). This Court finds the same to be true in this instance. Ryan's *Yates* and *Ciminelli* arguments are unavailing because they are unrelated to the theory the prosecution actually pursued in his case.

Evaluating a Rule 29 motion requires looking at the evidence in the light "most favorable to the verdict." *Pruneda-Gonzalez*, 953 F.2d at 193. It is the jury's unique role to determine the credibility of witnesses and to weigh the sufficiency of the evidence, and the Court must accept

those decisions and view the evidence in the light most favorable to the verdict. Accordingly, while Ryan claims that he put forward a feasible interpretation of certain evidence at trial, the jury ultimately did not find it credible. Viewing the evidence in the light most favorable to the verdict, the Court finds the jury's verdict reasonable. There was a plethora of evidence, including testimony, documents and recordings, showing that Ryan, Calloway, Burnell and others intentionally falsified loan documents by providing inaccurate credit risk ratings and misrepresenting the purpose of the loans in order to mislead the Bank's board, auditors, and examiners and defraud the Bank, resulting in the loss of millions of dollars.

### B. Rule 34: Civil Violations vs. Criminal Acts

With regards to Rule 34, Defendant argues that the law precludes federal criminal conviction for certain indictment counts because "the government alleged nothing more than—at most—violations of civil banking regulations, policies, or practices." R. Doc. 961-3 at 3. Ryan cites to two Fifth Circuit cases, *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997) and *United States v. Christo*, 614 F.2d 486 (5th Cir. 1980), which, he argues, provide support for his argument that "a defendant cannot be convicted based on alleged disregard for banking policies or practices"—which he admits occurred here. R. Doc. 963-1 at 7. Ryan makes the same argument about the § 1005 false entry counts involving Kenneth Charity (Counts 38, 39, and 40), which he says cannot be sustained, citing *United States v. Ramming*, 915 F. Supp 854 (S.D. Tex. 1996). *Id.* at 28.

In its opposition memorandum, the Government argues that Ryan "mentions the standard for motions to arrest judgment in passing" but that "that standard plays almost no role in his analysis." R. Doc. 1028 at 39 n.3. As to Ryan's more general argument that civil banking violations cannot be grounds for a criminal conviction, the Government argues that "[e]vidence

11

related to civil regulations, rules, policies, and practices was relevant" because it provided context for Ryan's actions and intent and showed that Ryan knowingly lied to the board, auditors, and examiners in a scheme to defraud the Bank—not that he committed "civil or administrative wrongdoing." *Id.*

Defendant's argument that he was charged or found guilty based on violations of civil regulations or best banking practices rather than of criminal law is unavailing. Regarding the Change in Terms Authorization forms that are the basis of Counts 38-40, Ryan argues that he wrote down "his understanding" of why Kenneth Charity's CPA had resigned on a Change in Terms Authorization—but this conflicts with the testimony of the CPA who indicated he told Ryan that the CPA had terminated Charity as a client because Charity did not provide proper documentation of his finances. R. Doc. 963-1 at 28. He cites *Ramming* for the proposition that "[i]t is not the province of the [bank] inspector to know the details of every transaction that makes up [a bank's] picture." *Id.* (citing *Ramming*, 915 F. Supp. at 862). Ryan argues that he cannot be liable because he "believed the truth of what he wrote, when [he] wrote it" on the authorization forms. *Id.* But the CPA, DeJean, offered testimony that, prior to his termination of Charity, he informed Ryan of concerns that he had that Charity was "not reliable in getting [me] information that I needed." R. Doc. 945 at 262. Further testimony was offered by a number of witnesses, including Calloway, Stephanie Carter, and Charity himself, that Ryan knew that Charity was unable to repay his loans and that Charity misused loan proceeds. Moreover, this Court instructed the jury on criminal law—not on civil regulations or general banking best practices. Given the testimony, the jury had ample evidence to convict on these counts.

The Court now turns to Defendant's arguments under Fed. R. Crim. P. 33 that he is entitled to a new trial on procedural and evidentiary grounds.

### C. Material Omissions vs. False Statement Language

Ryan notes that, pre-trial, the Court found Counts 41, 43, 44, 47, and 48 of the Second Superseding Indictment to be duplicative and ordered the Government to elect either false statements or material omissions to support each of these Counts. R. Doc. 961-3 at 41. The Government elected the material omissions theory. *Id.* Ryan states that he submitted a redacted indictment to the Court prior to the case going to the jury, which would not have contained reference to false statements, but that a non-redacted indictment was submitted to the jury. Ryan contends that this un-redacted indictment, which referred to both the false statement and material omissions theories, presented a "real danger of juror confusion" as anticipated by the Court's pretrial order. *Id.* (citing R. Doc. 528 at 23; *United States v. Medel-Guadalupe*, 987 F.3d 424, 428 n.3 (5th Cir. 2021)). Ryan argues that the scenario constitutes a violation of the Sixth Amendment, thus requiring reversal and new trial for these Counts.

The Government argues that there was no "danger of juror confusion" because, in giving an overview of the applicable law in its closing argument, it described the elements of the false entry counts using the material omission theory alone. Additionally, the Government alleges that the Court instructed the jury only as to the theory of material omission. R. Doc. 1028 at 57. The Government argues that the law presumes the jury followed the Court's instruction when it convicted Ryan on the Gibb's false entry counts. *Id.* (citing *United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008) ("We will presume that jurors understand and follow their instructions, abandoning that presumption only when there is an overwhelming probability that

13

the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating.")).

This Court finds that there was no Sixth Amendment violation here. As an initial matter, an example of Count 47 as listed in the Second Superseding Indictment provided to the jury is provided below. The language Defendant requested redacted, but which the Court did not remove from the document, appears underlined and in italics:

> With intent to deceive the Board, auditors, and examiners, RYAN, Burnell, and Calloway placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, *falsely stating that "all loans are performing as agreed"* and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank.

The other material omissions counts—41, 43, 44, and 48—contained identical language that Ryan sought to have removed from the Second Superseding Indictment. The Court found at trial and finds now that this is a factual allegation by the Government regarding criminal conduct in which it charged the Defendant engaged rather than an articulation of a theory of the crime that could be considered duplicative. Furthermore, the Court instructed the jury that a conviction under 18 U.S.C. § 1005 required finding "that the defendant deliberately omitted a material fact in a book, report, or statement of First NBC Bank." R. Doc. 999 at 143. The Court then defined a material omission. *Id.* The Court did not give instructions with regard to a false statement theory. Accordingly, the Government's closing argument did not rely on or make reference to a false statement theory, which was not presented by the Government. Defendant has not cited any case law to support his proposition that a duplicitous indictment, accompanied by proper jury instructions at trial, entitles him to the relief he seeks. *United States v. Holley*, 942 F.2d 916, 925 (5th Cir. 1991) and *United States v. Dvorin*, 817 F.3d 438, 477 (5th Cir. 2016) both concern *jury instructions* that were inadequate and/or misleading. By citing the bare fact that the Court

provided a copy of the indictment to jurors to aid in their deliberations alongside proper instructions, Defendant has not demonstrated that there was any risk that jurors were "confused" or that different jurors "conclud[ed] that a defendant committed different acts." *Dvorin*, 817 F.3d at 447. As such, he has not demonstrated any error.

### D. Summary Charts

Defendant asserts that three witnesses, instead of testifying about tracing loan proceeds and records from financial institutions as was allegedly proffered, offered their opinions of culpability alongside allegedly misleading and prejudicial demonstrative summary charts. R. Doc. 963 at 33. Defendant argues that the Government aggregated his alleged salary and benefits and aggregated his loan obligations without deducting any payoffs or payments, contrary to the Court's pretrial order and to prejudicial effect. *Id.* Ryan alleges that these aggregations were incorrect and misleading, in violation of Fed. R. Evid. 401. *Id.* at 34.

The Government's forensic accountants were called to testify as summary witnesses who, under Federal Rule of Evidence 1006 "may use a summary, chart, or calculation to prove the contents of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. R. Doc. 1028 at 49. The Court, in applying rules 1006 and 611, admitted summary charts into evidence only as to borrower Frank Adolph, and allowed charts to be used only as demonstrative exhibits for the other borrowers. *Id.* at 48-49. The Government's summary witnesses, in aggregating amounts of loan funds, were summarizing admitted evidence rather than drawing inferences for the jury or providing argument. *Id.*

The Court finds that the charts offered by the Government did not go beyond the scope of what is allowed by the Federal Rules of Evidence, and notes the limiting instructions that it provided to the jury that "if you find that the evidence is different from the chart, you're to go with

the evidence and not the chart. The chart is just an opportunity to try to display the evidence, but it's not evidence itself[.]" R. Doc. 993 at 209. The summary charts and witnesses offered by the Government were not unduly prejudicial to the Defendant and did not fall under any of the categories of summary witnesses that the Fifth Circuit has found to be inappropriate per *United States v. Baker*, 923 F.3d 390, 398 (5th Cir. 2019) (reviewing the types of summary evidence that has been disallowed, "such as allowing a case agent to recap a significant portion of the testimony already introduced by the Government during a rebuttal case, putting on a summary witness before there was any evidence admitted for the witness to summarize, or using a summary witness to merely repeat or paraphrase the in-court testimony of another as to ordinary, observable facts[.]").

### E. Rule 701(c) and Impermissible Lay Opinion

Ryan argues that several of the Government's witnesses gave testimony, based on technical or other specialized knowledge, of their interpretations and conclusions regarding alleged violations of banking policies, practices, or civil regulations in violation of Rule 701(c). R. Doc. 961-3 at 36. Ryan cites as an example the testimony of FDIC examiner Timothy Strain, who testified about his auditing for compliance with laws and regulations. *Id.* Ryan argues that, among other things, Strain testified as to the alleged violations of civil laws and regulations and answered questions as to whether the Bank operated "prudently," followed "safe and sound practices," and followed standard or appropriate bank practices. *Id*. Ryan argues that Strain's testimony was similar to that at issue in *Riddle,* 103 F.3d at 428-29, in which the Fifth Circuit reversed a conviction because a lay witness bank examiner spoke about the meaning and application of regulations and "even speculated that unsafe and unsound lending practices . . . caused [the bank]'s failure." *Id.* at 37. Ryan alleges that other witnesses, including Crystal Calix of EY, Kelly Longwell, Joseph Richard, and William Burnell, also "crossed the Rule 701(c) boundary." R. Doc.

963 at 38. Finally, Ryan asserts that the Government's summary witnesses and charts exceeded the bounds of Rule 701(c) as none of them testified as experts, arguing that the testimony of Josephine Beninati included her opinion about whether regulatory or policy violations occurred. *Id.* at 39.

The Government's witnesses offered testimony that was permissible under Rule 701. R. Doc. 1028 at 53. With regards to Strain's testimony, and in the case of Calix, Longwell, and Richard, Defendant raised 701 objections on numerous occasions throughout the trial, and the Court overruled them. *Id.* Further, the Government argues that any opinion included in the witnesses' testimony was based on "reasonable and straightforward inferences that anyone in their position interacting with the bank could have made," thus making the admission of their testimony proper under Rule 701. R. Doc. 1028 at 54. Furthermore, the Government's forensic accountants did not offer opinions but rather made reasonable inferences from the evidence in their summary testimony, which the Fifth Circuit has found permissible. *Id.* (citing *United States v. Armstrong*, 619 F.3d 380, 383 (5th Cir. 2010)).

The Fifth Circuit has held that "[t]he distinction between lay and expert witness testimony" is that the latter "results from a process of reasoning which can be mastered only be specialists in the field." *United States v. Ebron*, 683 F.3d 105, 136-37 (5th Cir. 2012). "[A]n officer or employee of a corporation may testify to industry practices and pricing without qualifying as an expert." *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003).

In this instance, the Court first notes that it provided in-depth and clear instruction to the parties leading up to the trial on the proper application of Federal Rules of Evidence 701 and 702 and what kind of testimony was permissible under each rule. See R. Doc. 827 at 11-15. During

trial, the Court considered a number of Defendant's 701 objections and ruled on them from the bench. The complained-of witnesses were mainly bank examiners and auditors who testified as to what they did. For example, the Court overruled an objection by Defendant to Strain's testimony on 701 grounds, stating that "[h]e is the examiner. He is the examiner and that's his purpose to go there and look at it and make a report. He's testifying as to what he has done and why he did it and what it means." R. Doc. 988 at 133. The Court did not during trial and does not now find that the Government witnesses cited by Defendant here testified outside of the boundaries of Rule 701. It therefore declines to grant Mr. Ryan relief on this ground.

## V. CONCLUSION

For the foregoing reasons, Defendant Ashton Ryan's Motion for Acquittal, Motion to Arrest Judgment, and Motion for a New Trial is **DENIED**.

New Orleans, Louisiana, this 17th day of July, 2023.

_____
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE