UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 20-65** |
| **ASHTON RYAN, JR.** | **SECTION "L"(4)** |

## ORDER AND REASONS

Before the Court is Ashton Ryan's Motion for Release Pending Appeal. R. Doc. 1065. The Government has responded in opposition. R. Doc. 1102. On October 12, 2023, the Court heard oral argument on the motion. Having considered the briefing, oral argument, and the applicable law, the Court rules as follows.

**I.      BACKGROUND**

This case arises from alleged fraudulent bank activity at First NBC Bank ("FNBC" or "the Bank"), which resulted in the failure of the Bank and cost the Federal Deposit Insurance Corporation's deposit insurance fund approximately $996.9 million. The Bank was founded in 2006, the year after Hurricane Katrina, by a group of businessmen in New Orleans. The leader of the group was Ashton Ryan, a former bank auditor and president of another bank. Ryan became President and CEO of FNBC and chairman of its Board of Directors.

The Bank specialized in commercial banking. From its inception in 2006 until its collapse in 2017, the Bank's Chief Credit Officer was William J. Burnell, who reported to Ryan. The Credit Department's responsibilities included reviewing borrowers' financial documents and composing a credit analysis about the financial status of each borrower and the purpose of the requested loan.

1

For most loans, including the loans charged in this case, both Burnell and Ryan approved the credit risk ratings that purported to represent the risk posed to the bank by the borrower.

On August 5, 2021, a 49-count Second Superseding Indictment ("the Indictment") was entered charging Defendant Ryan and his co-Defendants with conspiracy to commit bank fraud, bank fraud, and false entries in bank records. R. Doc. 318. In relevant part, the Indictment alleges that Bank Officers and borrowers participated in a scheme to defraud the Bank and enrich themselves by lying on loan documents about borrowers' creditworthiness, the purposes of the loans, and their ability to repay the loan. *Id.* at 7. Trial began in this case on January 9, 2023 and ended on February 9, 2023.

Evidence presented at trial concerned FNBC's credit review process. As the President and CEO of the Bank, multiple witnesses testified, Ryan oversaw this process and had the ultimate power to approve all loans. Burnell, the Chief Credit Officer, and other witnesses testified to the process by which loans were made: loan officers, who had direct contact with clients, could themselves approve loans in amounts under each loan officer's lending authority. R. Doc. 959 at 100. For larger loans, the officers would collect financial information from borrowers and create credit packages to submit to Defendant Ryan for approval. These credit packages contained credit memoranda that included signatures by the loan officer, Defendant Ryan, and Burnell, who was responsible for approving "credit risk ratings" given to each loan on a scale, from 1 to 10, of the risk it posed to the bank. A score of 10 was the best, while a 1 represented the riskiest loans.

Loan officers developed these ratings and provided them to Burnell, who testified that in multiple instances Ryan directed inferiors at the Bank to change ratings so that loans could be approved. R. Doc. 959 at 349. The Government presented as evidence, including numerous false credit memoranda for a number of borrowers—notably, Gary Gibbs, Kenneth Charity, Frank

2

Adolph, and Warren Treme—that included the signature of Ryan, Burnell, and the Bank's Executive Vice President, Robert Brad Calloway. Witnesses, including Burnell and Calloway, testified that these memoranda listed false risk information. R. Doc. 988 at 124. Numerous witnesses, including the borrowers themselves, testified that Ryan knew these borrowers did not have the funds to repay the loans, approved the issuance of new loans that they used to pay the old loans, and regularly lied to the Bank's board about the purpose of these loans and the borrowers' ability to repay them. The Government introduced loan approval documents and the testimony of borrower Kenneth Charity to show that, in one instance, Ryan and Burnell approved three loans—for $2 million, $2.5 million, and $2 million—allegedly to enclose a patio at Charity's beignet shop. R. Doc. 945 at 110. The patio was never enclosed. *Id.* Instead, Charity used the loans to pay money he owed to contractors and others and for "personal matters," all of which were known to Ryan. *Id.* Over the years he received loans, Charity testified, he used the proceeds for personal expenses, including building a swimming pool at his home and purchasing a number of Rolex and Breitling watches. *Id.* at 184-90. Emails entered into evidence showed that Ryan was aware of Charity's spending patterns, with Ryan in one instance telling Charity that "any other bank would have foreclosed on you years ago, if you, indeed, could get a loan for them in the first place." *Id.* at 77.

Further documentary and testimonial evidence presented by the Government focused on historic building tax credits that Defendant Ryan stated the Bank bought from Gregory St. Angelo, the General Counsel of the Bank from 2006 until 2016. Kelly Longwell, an attorney who did tax credit work for the Bank, testified that she reviewed leases related to these tax credits and told Ryan that, because St. Angelo did not own the building in question or have a long enough lease, he could not qualify for the tax credits—so he could not legitimately sell them to the Bank. R. Doc. 943 at 150-51. St. Angelo testified that, after receiving this information from Longwell, he and

3

Ryan signed fraudulent documents purporting to be a sale of tax credits from St. Angelo to the Bank. R. Doc. 993 at 66-69. Krystal Calix, an auditor with Ernst & Young, testified that Ernst & Young relied on the authenticity of the document when it audited FNBC in 2015. *Id.* at 192.

Throughout trial, the defense cross-examined the witnesses and introduced its own documents into evidence. Defendant Ryan testified on his own behalf. In short, the Defendant, Ryan testified that he did not possess criminal intent to harm the bank, and that he acted in what he thought was the best interest of the bank when he offered "workout loans" to borrowers in difficult financial circumstances so that they could eventually pay back their loans. Further, Ryan argued, members of the board, auditors, and examiners all had access to FDIC/OFI Joint Examination Reports, which he argued contained all of the information about overdraft lending and the assessment of the loans that the Government argued he concealed.

The jury rejected Ryan's theory of the case. After 22 days of evidence by the prosecution and two defendants, the jury returned its verdict on February 9, 2023, finding Ryan guilty of all 43 counts with which he was charged, and found his co-defendant Beebe not guilty of all charges.

On September 6, 2023, the Court sentenced Ryan to 170 months as to Counts 1-25, 27, 29-41, 43, 44, 47, and 48 of the Second Superseding Indictment with all such terms to run concurrently. R. Doc. 1051. On September 18, 2023, Ryan appealed this Court's final judgment to the Fifth Circuit. R. Doc. 1060. Two days later, Ryan filed the instant motion. R. Doc. 1065.

II. **PRESENT MOTION**

Ryan moves this Court for release pending appeal. He contends that he is not a flight or safety risk, and his appeal is not for delay. R.Doc. 1065-1 at 3. Ryan further argues that his appeal will raise substantial and close questions of fact and law that could be determined favorably on

4

appeal. *Id.* at 5. In opposition, the Government argues that Ryan "has not overcome the presumption against release pending appeal." R. Doc. 1102 at 5.

### III. APPLICABLE LAW

Applications for release pending appeal are governed by 18 U.S.C. § 3143(b), commonly referred to as the Bail Reform Act of 1984. In passing 18 U.S.C. § 3143(b), Congress intended to limit the availability of release pending appeal, thus creating a presumption against release pending appeal, "so that the conviction is presumed correct and the burden is on the convicted defendant to overcome that presumption." *See United States v. Valera-Elizondo*, 761 F.2d 1020, 1024 (5th Cir. 1985) (discussing and adopting Third and Eleventh Circuit precedent). In the Fifth Circuit, a defendant seeking release pending appeal must show:

(1) the Defendant is not likely to flee or pose a danger to the safety of any person or the community;

(2) the appeal is not for the purpose of delay;

(3) the appeal raises a substantial question of law or fact; and

(4) that, if the substantial question is determined favorably to defendant on appeal, the decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*Id*.

With respect to the third prong–whether the appeal raises a substantial question of law or fact–the Fifth Circuit has explained that an issue presents a substantial question of law or fact only if the issue raises a "substantial doubt (not merely a fair doubt) as to the outcome of its resolution." *Id*. The Fifth Circuit has cited with approval the Eleventh Circuit's explanation that a "substantial

question" of law or fact is a "close question or one that very well could be decided the other way." *Id*. (citing *United States v. Miller*, 753 F.2d 19, (3d Cir. 1985)).

The Fifth Circuit has further clarified that, although the absence of controlling precedent is one factor for the district court to consider in determining whether a question is "substantial," it is not the only factor. *Id*. Indeed, "there might be no precedent in this circuit, but there may also be no real reason to believe that this circuit would depart from unanimous resolution of the issue by other circuits." *Id*. (citing *Miller*, 753 F.2d at 19). It is not necessary for the district court to find that it committed error, as the district court properly deals with such inquiries in post-trial motions. Rather, the correct inquiry is whether the substantial question raised on appeal is such that, "if error is found, it will so taint the conviction that it is more probable than not that reversal will be required." *Id*.

## IV.   DISCUSSION

### B.   Prongs 1 and 2: Flight Risk/Danger to the Community and Delay

The first and second element of the Valera-Elizondo test are quickly disposed of. Ryan contends that there is "clear and convincing evidence" that he is "not likely to flee or pose a danger to the safety to any other person or the community…" R. Doc. 1065-1 at 3. As evidence, he points to letters of his good character and conduct, his substantial family and civic-minded background, his lack of criminal history, his health issues, and his consistent attendance at every court proceeding. *Id.* at 3-5. Similarly, he argues that his appeal is not for the purpose of delay. *Id.* at 5.

The Government does not contest either prong. R. Doc. 1102 at 5. Thus, Ryan has met his burden for the first two factors of the *Valera-Elizondo* test.

### C. Prongs 3 and 4: Whether the Appeal Raises a Substantial Question of Law or Fact and is Likely to Result in Reversal or an Order for a New Trial

Regarding the third and fourth elements, Ryan argues that he has raised "substantial and close questions of fact and law that could be determined favorably on appeal." R. Doc. 1065-1 at 5. These issues include, broadly, interpretations of case law and prosecutorial misconduct. *Id.* at 6-7. On appeal, Ryan seeks to extend the Supreme Court's *Ciminelli* and *Yates* decisions, which he believes apply to his case. 143 S. Ct. 1121 (2023); 16 F.4th 256 (9th Cir. 2021).

In this Court's previous order denying Ryan's Motion for Acquittal, Motion to Arrest, and Motion for a New Trial, R. Doc. 1033, this Court rejected the applicability of the Supreme Court decisions to the instant case. In *Ciminelli*, the Supreme Court reversed the defendant's conviction because "the right-to-control theory cannot be squared with the text of federal fraud statutes, which are 'limited in scope to the protection of property rights.'" 143 S. Ct. 1127 (citing *McNally v. United States*, 483 U.S. 350, 360 (1987)). Accordingly, this Court found that *Ciminelli* and *Yates* were inapplicable to the present case because non-property interests were not the basis of Ryan's conviction. Instead, this Court reasoned that Ryan's actions in providing false information to the Bank's board constituted a property interest because it involved loan proceeds. Thus, *Ciminelli* and *Yates* are distinguishable. On appeal, Ryan seeks a narrower interpretation of *Ciminelli* and its progeny. R. Doc. 1065-1 at 7.

Ryan also argues that appellate courts "should have great interest in the privilege violations" that occurred during the Government's search and seizure of Ryan's email. *Id.* at 7. Ryan contends that this act resulted in the Government wrongfully attaining privileged communications between the defendant and his counsel. *Id.*

Lastly, Ryan contends that allowing him to be released pending appeal "will avoid the travesty and risk of incarceration prior to reversal." *Id.* at 5. He cites to *United States v. Cleveland*,

7

where the Defendant spent several years in jail only to have his conviction overturned by the Supreme Court. 531 U.S. 12 (2000). The *Cleveland* Court found the prosecutors had overreached and threw out Cleveland's conviction under Louisiana state video poker regulations. Ryan argues his case involves similar prosecutorial overreach and that it is likely that his conviction will be overturned on appeal.

The Government opposes Defendants' motions, arguing that Ryan's arguments lack merit and contradict existing case law. R. Doc. 1102 at 5-9. It argues the Defendant failed to overcome the presumption that he should be detained pending appeal and contends that Ryan's arguments for bond are the same failed arguments he has made throughout this litigation. *Id*. at 5.

Regarding Ryan's claims concerning *Ciminelli* and *Yates*, the Government emphasizes the Court's reasoning in its earlier order that Ryan's arguments were unrelated to the theory of prosecution pursued in this case. *Id.* at 6; R. Doc. 1033 at 10. The Government further argues that Ryan claims fail to meet the full requirement of prong four which states that "if the substantial question is determined favorably to defendant on appeal, the decision is likely to result in a reversal or an order for a new trial on *all* counts on which imprisonment has been imposed." *Valera-Elizondo*, 761 F.2d at 1024 (emphasis added). Though *Ciminelli* and *Yates* may be applicable to some of the bases of Ryan's convictions, the Government argues that those decisions "have no bearing on his convictions for making false entries in change-in-terms agreements or criticized asset action plans." R. Doc 1102 at 7.

Regarding Ryan's claim on the search and seizure of his email, the Government stresses that this Court has already addressed this "straightforward" issue. *Id.* At the crux of this issue, Ryan contends that a member of the Government's prosecution team viewed a privileged memorandum related to borrower Jeffrey Dunlap. *Id.* This Court previously ruled that though

8

disclosure of the memo is potentially prejudicial to Ryan, it can be cured by suppression. R. Doc. 749 at 23. Further, this Court found that it is "highly unlikely that the government. . . obtained any information that it would not have discovered from other sources." *Id.* Accordingly, this Court found that suppression of the memo was appropriate. *Id.* Presently, the Government again contends that should Ryan succeed on this issue before the Fifth Circuit, it would only result in a new trial for his convictions involving Dunlap. R. Doc. 1102 at 7.

Regarding Ryan's claim that release pending appeal will avoid the risk of incarceration prior to reversal, the Government argues that this Court considered Ryan's age and health when it imposed sentencing. *Id.* at 9. Further, it argues that bond pending appeal "is reserved for 'unique cases in which the defendant faces certain prison time while appealing an uncertain conviction.'" *Id.* (citing *United States v. Reed*, No. 15-100, 2017 WL 9477274, at *4 (E.D. La. Mar. 9, 2017)). The Government contends that Ryan's 43 convictions are not "unique" because "they are supported by overwhelming evidence of his guilt." R. Doc. 1102 at 9.

Ryan's arguments fail to overcome the presumption against release pending appeal, namely these latter two prongs. As mentioned, the *Valera-Elizondo* test requires the defendant to demonstrate if a substantial question of law and/or fact is determined favorably on appeal, it will "result in a reversal or an order for a new trial on all accounts on which imprisonment has been imposed." 761 F.2d at 1024. Because the *Ciminelli* issue does not impact the false entry convictions, a meritorious *Ciminelli* issue does not impact the entire case and thus fails to overcome the presumption for release. Similarly, because Ryan's second claim does not impact the convictions related to other borrowers, a meritorious unlawful search and seizure claim on the issue does not impact the entire case and thus fails to overcome the presumption for bond pending

appeal. *Id.* at 7-8. Accordingly, the Defendant's motion is denied because Ryan fails to meet the demanding burden to overcome the presumption that his conviction is incorrect.

## V.     CONCLUSION

For the foregoing reasons, Defendant Ashton Ryan's Motion for Release Pending Appeal, R. Doc. 1065, is **DENIED**.

New Orleans, Louisiana, this 12th day of December, 2023.

_____
United States District Judge